Exhibit E

1

```
 1

 2    UNITED STATES DISTRICT COURT
      EASTERN DISTRICT OF NEW YORK
 3    ----------------------------------------X
      ANGELA BROWN,
 4
                               PLAINTIFF,
 5

 6         -against-        Case No:
                            13 Civ. 760
 7                          (KAM)(CLP)

 8

      MERMAID PLAZA ASSOCIATES LLC,
 9
                               DEFENDANT.
10    ----------------------------------------X

11

12                  DATE:  September 25, 2014

13                  TIME:  12:48 P.M.

14

15

16            DEPOSITION of a Non-Party

17    Witness, KLEO J. KING, taken by the

18    Plaintiff, pursuant to an Order and to the

19    Federal Rules of Civil Procedure, held at

20    the offices of Parker Hanski LLC, 40 Worth

21    Street, 10th Floor, New York, New York

22    10013, before Sarah Brandon-Grable, a

23    Notary Public of the State of New York.

24

25
```

2

```
 1
 2    A P P E A R A N C E S:
 3
 4    PARKER HANSKI, LLC
         Attorney for the Plaintiff
 5       ANGELA BROWN
         40 Worth Street, 10th Floor
 6       New York, New York 10013
         BY:  GLEN H. PARKER, ESQ.
 7
 8
      WILSON, ELSER, MOSKOWITZ, EDELMAN &
 9    DICKER, LLP
         Attorneys for the Defendant
10       MERMAID PLAZA
         150 East 42nd Street
11       New York, New York 10017
         BY:  STEPHEN J. BARRETT, ESQ.
12       File #:  14701.1
13
14                *        *        *
15
16
17
18
19
20
21
22
23
24
25
```

1

2      F E D E R A L   S T I P U L A T I O N S

3

4

5      IT IS HEREBY STIPULATED AND AGREED by and

6      between the counsel for the respective

7      parties herein that the sealing, filing and

8      certification of the within deposition be

9      waived; that the original of the deposition

10     may be signed and sworn to by the witness

11     before anyone authorized to administer an

12     oath, with the same effect as if signed

13     before a Judge of the Court; that an

14     unsigned copy of the deposition may be used

15     with the same force and effect as if signed

16     by the witness, 30 days after service of

17     the original & 1 copy of same upon counsel

18     for the witness.

19

20     IT IS FURTHER STIPULATED AND AGREED that

21     all objections except as to form, are

22     reserved to the time of trial.

23

24              *     *     *     *

25

4

```
 1                    K. J. KING
 2     K L E O   J.   K I N G, called as a
 3     witness, having been first duly sworn by a
 4     Notary Public of the State of New York, was
 5     examined and testified as follows:
 6     EXAMINATION BY
 7     MR. PARKER:
 8          Q.    Please state your name for the
 9     record.
10          A.    Kleo J. King.
11          Q.    What is your business address?
12          A.      United Spinal Association,
13     75-20 Astoria Boulevard, Jackson Heights,
14     New York 11370.
15          Q.    Good afternoon, Ms. King.  My
16     name is Glen Parker, I represent the
17     plaintiff, Angela Brown in a lawsuit
18     against Mermaid Plaza Associates.
19               I'm going to be asking you a
20     series of questions specifically about a
21     property at 3015 Mermaid Avenue in
22     Brooklyn, New York.
23               If at any point in time you
24     don't understand my questions, please let
25     me know, I'll either repeat it or rephrase
```

1                    K. J. KING

2    it.  If you need to take a break, let me

3    know, and we can take a break.  The only

4    condition I put on that is if there is an

5    open question and then we can take the

6    break.

7                    I'd also ask that all your

8    responses be verbal.  The Court Reporter

9    cannot take down a shrug of the shoulders

10   or a nod of the head.  And I'd also ask

11   that you wait until I finish asking a

12   question in order to answer it.

13                   Do you understand my

14   instructions so far?

15        A.    Yes.

16        Q.    Are you aware of any reason

17   today you would be unable to give truthful

18   and accurate testimony?

19        A.    No.

20        Q.    Can you tell me who or where

21   you are employed by?

22        A.    United Spinal Association.

23        Q.    For how long have you been

24   employed by United Spinal Association?

25        A.    27 years.

```
1                    K. J. KING
2        Q.    Do you supervise any employees?
3        A.    Yes, I do.
4        Q.    How many employees do you
5   supervise?
6        A.    17.
7        Q.    Of those 17 employees, are
8   those in various job classifications, do
9   they fall into certain areas?
10       A.    Yes.
11       Q.    Can you explain that for me?
12       A.    I supervise three individuals
13  in Accessibility Services, one individual
14  in the Travel Program, five individuals in
15  the Membership Program, and eight
16  individuals in the Wheelchair Medic.
17       Q.    For purposes of today, I'm just
18  going to ask you, can you tell me about the
19  three individuals that you supervise for
20  Accessibility Services?  What roles do they
21  perform?
22       A.    Yes.  Tim Perry is an
23  Accessibility Specialist, Tom Foss is our
24  architect, and Dominic Marinello is a Code
25  Expert Accessibility Specialist and the
```

```
 1                    K. J. KING
 2    Vice President of Accessibility Services.
 3         Q.    To your knowledge, for how long
 4    has Tim been employed by United Spinal
 5    Association?
 6         A.    Four or five years.
 7         Q.    Does Mr. Perry report to work
 8    at a particular day at a particular office
 9    or some other arrangement that you have
10    with him?
11         A.    He works out of his home.
12         Q.    Where does he generally have
13    his assignments, is it in New York State,
14    New Jersey, Pennsylvania or some other
15    arrangement that you have?
16         A.    Majority is out of
17    Pennsylvania, New Jersey and New York, but
18    we have work all over the United States.
19         Q.    Does Tim Perry handle any
20    particular geographic locations?
21         A.    No, they all handle the entire
22    United States.
23         Q.    To your knowledge, how often is
24    Tim Perry within the New York City area
25    conducting inspections or work on behalf of
```

```
 1                    K. J. KING
 2   United Spinal Association?
 3          A.    It varies, but at least six,
 4   seven times a month.
 5          Q.    Is Tim Perry a full-time
 6   employee?
 7          A.    Yes, he is.
 8          Q.    Was there ever a time that you
 9   personally visited 3015 Mermaid Avenue in
10   Brooklyn, New York?
11          A.    Yes.
12          Q.    When was the first time that
13   you visited that property?
14          A.    July 31, 2014.
15          Q.    What was the reason for your
16   visit on July 31, 2014?
17          A.    After discussions with Tim, we
18   needed to check a couple of items, and I
19   went out to check those items.
20          Q.    What particular items did you
21   go out to check on July 31, 2014?
22               MR. BARRETT:   Objection to
23          form.   You can answer.
24          A.    Installation of railings, and
25   the curb ramp installation.
```

```
 1                    K. J. KING
 2        Q.    Any other items that you were
 3   checking for besides that?
 4        A.    I also verify sidewalk
 5   measurements.
 6        Q.    When you say "verify sidewalk
 7   measurements," was this the public
 8   sidewalk?
 9        A.    The walkway in front of the
10   stores where the doors open.
11        Q.    Anything else that you checked
12   on that day?
13        A.    No.
14        Q.    Was anyone with you on that
15   day, July 31, 2014?
16        A.    No.
17        Q.    Did you meet anyone at the
18   property on July 31, 2014?
19        A.    No.
20        Q.    Did you have any equipment with
21   you when you went to the property on
22   July 31, 2014?
23        A.    I had a two-foot level, I had a
24   measuring tape, and my Blackberry I used to
25   take photos.
```

```
 1                    K. J. KING
 2        Q.    Did you have any papers or
 3   documents that you were using as you were
 4   performing the work that you performed at
 5   this property?
 6        A.    I had Tim's report.
 7        Q.    Any other papers?
 8        A.    No.
 9        Q.    On this day, did you actually
10   perform any measurements at any location?
11   You mentioned that you verified the
12   sidewalk.  Aside from that, did you take
13   any other measurements of any other
14   locations within this property?
15             MR. BARRETT:  Objection to
16        form.
17        A.    I measured the slope of the
18   curb ramp, I measured the height of the
19   railing, and the length of the handrail
20   extension, and the measurements on the
21   walkway where it cross-slopes with my
22   level.
23             MR. PARKER:  Could you read
24        that back?  It was a little fast.
25             (Whereupon, the referred-to
```

11

```
 1                    K. J. KING
 2          answer was read back by the
 3          Reporter.)
 4          Q.     The cross-slope of what?
 5          A.     The sidewalk.
 6          Q.     When you measured the slope of
 7     the curb ramp, do you remember if you
 8     measured the slopes of the flares to the
 9     ramp as well?
10          A.     I measured the flares as well,
11     yes.
12          Q.     How did you record your
13     measurements?
14          A.     I made a mental note of it and
15     called Stephen and gave him a verbal
16     report.
17          Q.     Stephen who?
18          A.     Barrett.
19                 MR. BARRETT:   Counsel Stephen
20          Barrett.
21          Q.     Was there anything that
22     prevented you from actually writing down
23     the measurements you were taking?
24          A.     No.
25          Q.     Did you relay these
```

```
 1                    K. J. KING
 2   measurements to Mr. Barrett after you took
 3   each measurement or was it in one
 4   conversation?
 5            MR. BARRETT:  Objection.  You
 6            can inquire as to whether or not we
 7            had a conversation, but, just so you
 8            know, I'm not going to allow her to
 9            testify to the substance of any
10            conversations that we had.
11            MR. PARKER:  I'm not asking her
12            to say what she told you.
13            MR. BARRETT:  I'm just making
14            it known now and advising the witness
15            not to discuss the substance of any
16            conversations that we had.
17       Q.    So, my question to you is how
18   many conversations did you have with
19   Stephen Barrett on July 31, 2014?
20       A.    One.
21       Q.    Do you know in relation to when
22   you took the measurements when you had that
23   conversation with Mr. Barrett?
24       A.    Immediately after.
25       Q.    Do you remember what time you
```

13

```
 1                     K. J. KING
 2    arrived at the property on July 31, 2014?
 3    And when I'm using the word "property," I'm
 4    specifically referring to 3015 Mermaid
 5    Avenue.
 6         A.    8:00, 8:30 in the morning.
 7         Q.    Do you remember what time,
 8    approximately, you called Mr. Barrett?
 9         A.    No -- 9:00 maybe.
10         Q.    After you had that conversation
11    with Mr. Barrett, did you ever put down or
12    make any recording of the measurements you
13    had taken on that day?
14         A.    No, because I just verified
15    what was also in the report.
16         Q.    Did you have the report with
17    you?
18         A.    Yes.
19         Q.    At the time, did you have a pen
20    where you would check off anything on the
21    report?
22         A.    No.
23         Q.    Is what you're describing to me
24    your normal process in terms of taking
25    measurements and recording of an
```

14

```
 1                    K. J. KING
 2    inspection?
 3                    MR. BARRETT:  Objection to
 4         form.  You can answer if you
 5         understand the question.
 6         A.    I was verifying what was
 7    already written, so.  I confirmed Tim's
 8    measurements on the sidewalk.  So, there
 9    was no need to write anything.  And then
10    the slope of the curb ramp complied, so
11    there was no need to write anything, and
12    the measurements on the handrail also
13    complied, so there was no need to write
14    anything.  If there had been deviations, I
15    would have gone out to my car, got out my
16    pad and pen and written things down.
17         Q.    Had you ever verified another
18    employee's work before?
19         A.    Yes.
20         Q.    How often is that done?
21         A.    On an as-needed basis.  We go
22    out if we need to double-check something.
23    Usually it's upon the employee's request,
24    additional work is being done, we need to
25    verify something.
```

```
 1                    K. J. KING
 2         Q.    Do you have any knowledge as to
 3    when work had been done in relation to your
 4    July 31, 2014 visit?
 5         A.    The week before.
 6         Q.    Do you have any knowledge as to
 7    why you went to the property as opposed to
 8    Tim Perry going to the property?
 9         A.    It was such a small amount of
10    work that needed to be done that it was
11    more expedient for me to do it than to have
12    Tim come up.
13         Q.    Was there any period of time
14    after you took your measurements that you
15    actually wrote anything down, either
16    stating what the actual measurements were
17    or verifying that the measurements met with
18    any particular standards?
19              MR. BARRETT:  Objection to
20         form.  You can answer.
21         A.    No.
22         Q.    You said you've gone out before
23    to verify work; is that correct?
24         A.    Yes.
25         Q.    When you've gone out to verify
```

K. J. KING

1
2    work, have you ever issued a report with
3    respect to that verification?
4         A.    If my measurements differ from
5    what's on the report, I would write down
6    the differences.
7         Q.    If your measurement didn't
8    differ, would the fact that you verified
9    the findings be contained in the actual
10   report itself?
11        A.    Yes --
12             MR. BARRETT:  Objection to
13         form.
14        A.    -- I would call Tim and tell
15   him that the numbers were the same and that
16   the curb ramp complied.
17        Q.    Did you have a conversation
18   with Tim Perry after you conducted this
19   inspection?
20        A.    Yes.
21        Q.    Do you remember when you had
22   this conversation with Tim Perry?
23        A.    Later that day.
24        Q.    Can you tell me what you
25   remember saying to Tim Perry during that

```
 1                    K. J. KING
 2    conversation?
 3         A.    I told him I measured the cross
 4    slope of the sidewalks and the points where
 5    he measured and my measurements were the
 6    same, I told him that the curb ramp
 7    installation complied, and that the
 8    handrail extension complied.
 9         Q.    As you sit here today, can you
10    remember specifically what any of your
11    measurements were?
12         A.    Handrail extension was
13    12 inches, curb ramp slope --
14         Q.    Just bear with me.
15              The handrail extended 12 inches
16    on all handrails or some handrails?
17         A.    The top of the handrail on the
18    ramp.
19         Q.    To your knowledge, how many
20    ramps are at this property?
21         A.    Two.
22         Q.    So, that would be four
23    handrails in total?
24         A.    Only one ramp has handrails.
25         Q.    To your knowledge, which ramp
```

```
 1                    K. J. KING
 2   has handrails?
 3        A.    As you're looking at the
 4   property, the ramp to your right.
 5        Q.    You said you verified handrail
 6   extensions on that ramp when you looked to
 7   the right?
 8        A.    Correct.
 9        Q.    Can you tell me, when you say
10   "handrail extensions," you're referring to
11   that the handrails extend at least
12   12 inches from the beginning of the landing
13   of the ramp; is that accurate?
14             MR. BARRETT:  Objection to
15          form.
16        A.    The handrail extensions starts
17   on the level portion at the top of the
18   ramp.  There are no handrail extensions on
19   the bottom of the ramp because of a
20   hazardous condition.
21        Q.    On the top, were there handrail
22   extensions on both sides?
23        A.    Yes.
24        Q.    Before going to this property,
25   had you ever done any research as to when
```

```
 1                     K. J. KING
 2      this property had been constructed?
 3            A.     I had a discussion with Tim on
 4      the date of construction.
 5            Q.     Do you know when the
 6      approximate date of construction was?
 7            A.     Late '90s.
 8            Q.     Would you agree that this
 9      property, 3015 Mermaid Avenue, is subject
10      to the new construction standards of the
11      1991 Standards for Accessible Design?
12            A.     The American Disabilities Act
13      1991 Accessibility Guidelines, yes.
14            Q.     Any alterations that would be
15      done to this property at 3015 Mermaid
16      Avenue would need to be compliant with the
17      2010 Standards for Accessible Design?
18                   Would you agree that statement?
19            A.     No.
20            Q.     Could you explain if there were
21      alterations that were going to be made to
22      the property at any point in time after
23      March 15, 2012, what standards under the
24      ADA would those have to comply with?
25            A.     After March 15, 2012, the 2010
```

```
1                    K. J. KING
2    Standards.
3         Q.    Are you aware of any unique
4    terrain characteristics of this particular
5    property at 3015 Mermaid Avenue?
6         A.    I don't understand the
7    question.
8         Q.    Are you aware of what the word
9    "terrain" means?
10        A.    Yes.
11        Q.    Are you aware of something
12   called structural impracticability?
13        A.    Yes.
14        Q.    What is your understanding of
15   that term?
16        A.    The modification can't be made
17   without undue, um, hard to -- structurally,
18   a modification may be not be achievable to
19   the letter of the law depending on if
20   they -- if the existing conditions of the
21   property.
22        Q.    I'm talking about now just for
23   new construction, when a property is first
24   constructed.
25              Are you aware of any specific
```

```
 1                    K. J. KING
 2   issues with regard to the terrain that they
 3   were dealing with in constructing this
 4   property that were unique?
 5              MR. BARRETT:  Objection to
 6          form.  You can answer.
 7          A.    No.
 8          Q.    Are you aware at the time when
 9   they were constructing this particular
10   property at 3015 Mermaid Avenue Mermaid
11   Avenue that there was some particular
12   characteristic of the site that made it
13   impossible to comply with the 1991
14   Standards for Accessible Design?
15              MR. BARRETT:  Objection to
16          form.
17          A.    No, not at the time.
18          Q.    In your opinion, is there any
19   reason why this property could not have
20   been designed in compliance with the 1991
21   Standards for Accessible Design when it was
22   first constructed sometime in the 1990s?
23          A.    I don't know that it wasn't
24   designed in accordance back in the '90s.  I
25   didn't look at it back then.
```

```
 1                    K. J. KING
 2         Q.    My question to you is, are you
 3    aware of any reason why the property could
 4    not have been designed in conformance with
 5    the 1991 Standards for Accessible Design at
 6    the time that it was constructed?
 7         A.    No, I'm not aware of anything.
 8         Q.    Do you have any knowledge as to
 9    whether or not this property, when it was
10    constructed in the 1990's, it was in
11    compliance with the 1991 Standards for
12    Accessible Design, specifically the
13    Standards for New Construction?
14              MR. BARRETT:   Objection to
15         form.
16         A.    Can you rephrase that?
17         Q.    When the property was
18    constructed in the mid-1990's, what was the
19    standard that should have been used with
20    regard to the ADA for this particular
21    property?
22         A.    The 1991 standard.
23         Q.    Would that be the 1991 Standard
24    for New Construction?
25         A.    Yes.
```

23

1                        K. J. KING

2          Q.     Now, are you aware of whether

3     or not this property, when it was

4     constructed, was designed in compliance

5     with the 1991 Standards for Accessible

6     Design, specifically for New Construction?

7          A.     No.

8          Q.     Are you aware of at any point

9     in time after the property was constructed,

10    whether there was any portion of the

11    property that was not in compliance with

12    the 1991 Standards for Accessible Design,

13    and specifically for New Construction?

14               MR. BARRETT:   Objection to

15          form.

16         A.     Yeah, I don't understand the

17    question.

18         Q.     Are you aware of this property

19    at 3015 Mermaid Avenue ever being in

20    violation of the new construction standards

21    under the 1991 Standards for Accessible

22    Design?

23         A.     Yes.

24         Q.     Tell me what you're aware of.

25         A.     In June, when Tim went out to

1                    K. J. KING

2     the property, he found issues that didn't

3     comply with the 1991 standards, but we have

4     no way to determine if they complied back

5     when it was constructed.   It's the

6     condition that existed in June of 2014 that

7     we were assessing.

8          Q.    Tell me about the issues that

9     you know of when Tim Perry went out in June

10    of 2014 that were not in compliance with

11    the 1991 Standards for Accessible Design?

12         A.    Signage at the accessible

13    parking spaces was at a lower height than

14    the standard states.

15         Q.    And specifically for the

16    signage, did you have any knowledge as to

17    why the signage was not at the proper

18    height?

19         A.    No.

20         Q.    Have you ever spoke with a

21    Scott Domansky?

22         A.    No.

23         Q.    Have you spoken with anyone who

24    owns or manages the property at

25    3015 Mermaid Avenue?

25

```
 1                  K. J. KING
 2        A.    No.
 3        Q.    Have you yourself ever done any
 4   independent research as to the property at
 5   3015 Mermaid Avenue with the exception of
 6   your visit there on July 31, 2014?
 7        A.    No.
 8        Q.    Are you aware of Tim Perry
 9   doing any research on the property aside
10   from going out to the property to inspect
11   it in June and possibly July of 2014?
12              MR. BARRETT:  Objection to
13         form.
14        A.    No.
15              MR. PARKER:  I'm going to mark
16         these documents.
17              (Whereupon, the aforementioned
18         blueprint was marked as Plaintiffs'
19         Exhibit 1 for identification as of
20         this date by the Reporter.)
21        Q.    I'm going to show you a
22   document marked as Plaintiff's Exhibit 1,
23   previously marked as Plaintiffs' Exhibit 2
24   at the defendant's deposition, and my
25   question to you is, first, have you ever
```

```
 1                    K. J. KING
 2    seen this document before?
 3         A.    No.
 4         Q.    My second question to you is,
 5    do you recognize what is shown in this
 6    document?
 7         A.    It's Mermaid Plaza.  Or appears
 8    to be.
 9         Q.    We're talking about the
10    property at issue here at 3015 Mermaid
11    Avenue?
12         A.    Yes.
13         Q.    Have you ever reviewed plans
14    from the Department of Buildings?
15         A.    In general?
16         Q.    In general.
17         A.    Yes.
18         Q.    At the bottom right-hand side,
19    do you recognize the markings from the New
20    York City Department of Buildings?
21         A.    Which markings, these
22    (pointing)?
23         Q.    Yes.
24         A.    Yes.
25         Q.    In general, do you know what is
```

```
 1                    K. J. KING
 2    meant on the bottom right-hand where it
 3    says Site Plan?
 4         A.    Yes.
 5         Q.    What does site plan mean to
 6    you?
 7         A.    It's a plan of the site that
 8    delineates the dimensions of the property.
 9         Q.    What is this plan generally
10    used for, the construction of a property?
11         A.    Yes.
12         Q.    In looking at that plan, do you
13    see some detail or writing relating to the
14    installation of handicapped-accessible
15    ramps on this particular property?
16         A.    The print is very small, I
17    can't read it.
18         Q.    Do you see on the bottom
19    left-hand side where it says
20    "handicapped-accessible ramp"?
21         A.    Yes.
22         Q.    As far as what we're talking
23    about here today, we're talking about the
24    property shown on the left-hand side of the
25    document that's entitled "One-story retail
```

```
 1                    K. J. KING
 2    building."
 3              Do you see that?
 4         A.    Yes.
 5         Q.    Do you see that it has labeled
 6    on it from right to left, Store 3, Store 2,
 7    Store 1.  Do you see that?
 8         A.    Yes.
 9         Q.    Right below where it says Store
10    1, do you see a marking for a ramp?
11         A.    I see a dotted line circling
12    something with the word that looks like
13    "ramp," but it's very blurry.
14         Q.    Going to the other side under
15    Store 3, do you also see a marking with the
16    word "ramp?"
17         A.    It's blurry, but I believe it
18    says "ramp," yes.
19         Q.    Do you see towards the bottom
20    of the page on the left-hand side, what
21    it's calling for or stating of what kind of
22    ramp should be constructed?
23              MR. BARRETT:   Objection to
24         form.
25         A.    Actually, the plan below has a
```

1                    K. J. KING

2    number three detail and a four detail, and

3    then I see around the dotted lines on

4    either side, its a number three detail.

5    So, I'm --

6          Q.    Does that three detail

7    correspond to what is below on this

8    particular document on the left-hand side?

9          A.    I can't read what it says under

10   "Plan Detail at Site B."

11         Q.    Do you see that it says

12   "handicapped-accessible ramp?"

13         A.    I see that, but then I can't

14   see the rest of it.

15         Q.    Does it read "the ramp shall

16   comply with local law 58/87"?

17         A.    Yes, and then it says "ANSIA

18   117."

19         Q.    To the best of your knowledge,

20   as you look at these ramp plans, were they

21   in compliance with the new construction

22   standards contained within the 1991

23   Standards for Accessible Design?

24              MR. BARRETT:   Objection to

25        form.

30

```
 1                    K. J. KING
 2        A.    I would need the detail to be
 3   bigger.  I can't see the dimensions.
 4        Q.    Fair enough.  Do you see though
 5   that for both sides under Store 3 and under
 6   the side for Store 1, both sides are
 7   calling for the installation for a
 8   handicapped-accessible ramp?
 9        A.    Yes, they both have the note
10   there.
11        Q.    The note there means that the
12   plans were calling for the
13   handicapped-accessible ramp?
14        A.    Yes.
15        Q.    Do you have any reason as you
16   sit here now to understand why
17   handicapped-accessible ramps were not
18   created on both sides, one under Store 3
19   and Store 1?
20             MR. BARRETT:  Objection to
21         form.
22        A.    At the time of construction
23   they may have complied, but with
24   settlement, the slope may have changed, and
25   we didn't do field verification until 2014.
```

```
 1                    K. J. KING
 2    So, I can't say what did or did not comply
 3    on the date of construction.
 4         Q.    I understand your point.  My
 5    question to you is, did the plans
 6    themselves at the time that the property
 7    was to be constructed call for a
 8    handicapped-accessible ramp on both sides
 9    of the property?
10         A.    Yes, it calls for a
11    handicapped-accessible ramp, and I'm
12    assuming that the dimensions that I can't
13    read would comply with the requirements at
14    the time.
15         Q.    They were calling for a ramp to
16    exist on the West 30th Street side; is that
17    correct?
18         A.    Yes.
19         Q.    And they were also calling for
20    a ramp to exist on the West 31st Street
21    side; is that correct?
22         A.    Yes.
23         Q.    To your knowledge, are those
24    two sidewalks separate site arrival points?
25         A.    Yes, you can arrive on the site
```

                        K. J. KING

1

2    one either side.

3         Q.    Under the 1991 Standards for

4    Accessible Design, was a

5    handicapped-accessible entrance required

6    from the site arrival point on East 30th

7    Street?

8         A.    Site arrival points are

9    required where there's public

10   transportation, you connect the site to the

11   public street.

12        Q.    Does site arrival points also

13   include sidewalks?

14        A.    Yes.

15        Q.    To your knowledge, there is a

16   sidewalk along West 30th Street?

17        A.    Yes.

18        Q.    Based upon your opinion, from

19   West 30th Street, the new construction

20   standards under the ADA required that the

21   entrance from the West 30th Street side be

22   accessible or meet the Standards for

23   Accessible Design?

24        A.    Yes.

25        Q.    Going to West 31st Street, are

```
 1                    K. J. KING
 2    you aware that there was a public sidewalk
 3    along the street?
 4         A.    Yes.
 5         Q.    And the West 31st Street public
 6    sidewalk also has an entrance onto the
 7    property at 3015 Mermaid Avenue; is that
 8    correct?
 9         A.    Yes.
10         Q.    From this site arrival point on
11    West 31st Street, would it be your opinion
12    that the ABA Standards for Accessible
13    Design required an accessible entrance from
14    the West 31st Street public sidewalk?
15              MR. BARRETT:   Objection to
16         form.   You can answer.
17         A.    Yes.
18         Q.    And also the same thing for
19    parking spots.   Do you see "HC" next to the
20    parking spots?
21         A.    Yes.
22         Q.    What do you understand "HC" to
23    mean?
24         A.    Handicapped.
25         Q.    From each of those
```

1                    K. J. KING

2    handicapped-accessible parking spaces, are

3    those, in your opinion, considered a site

4    arrival point?

5         A.    No.

6         Q.    From the handicapped-accessible

7    parking spot, what is your understanding

8    under the 1991 Standards for Accessible

9    Design as to what is how they were supposed

10   to achieve an accessible path of travel to

11   the retail stores?

12        A.    Parking needs -- accessible

13   parking needs to be provided and a route of

14   travel from that parking to the stores

15   needed to be provided.

16        Q.    How is that generally provided?

17        A.    Depends.

18        Q.    In this particular situation at

19   that location where you've been to, how is

20   that provided?

21        A.    There's a curb in front of the

22   parking spaces and curb ramps are provided

23   to overcome the curb.

24        Q.    Going back to the 1991

25   Standards for Accessible Design with

```
 1                      K. J. KING
 2    respect to site arrival points, would you
 3    agree that the same standard applies with
 4    regards to the 2010 Standards for
 5    Accessible Design?
 6         A.    Yes.
 7         Q.    When you were at the property,
 8    did you ever take any pictures?  I believe
 9    you said you did.
10         A.    Yes.
11         Q.    Do you remember how many
12    pictures you took?
13         A.    Two or three.
14         Q.    In your conversations with Tim
15    Perry, did you ever learn of any reason why
16    an area of this property may not have been
17    compliant with the Standards for Accessible
18    Design?  And what I mean is, you had
19    mentioned before about settling, or
20    something else having to do with the
21    property itself.  Did you ever have any
22    communication with Tim Perry regarding why
23    any particular area of the property may not
24    have been compliant with the Standards for
25    Accessible Design?
```

1                    K. J. KING

2                    MR. BARRETT:  Objection to

3             form.

4             A.    Yes, when we're dealing with

5      outside conditions, we often talk about

6      things settling unevenly.  You get pits in

7      areas, concrete sidewalk flagstones shift,

8      it may become non-compliant with the slope

9      requirements.

10            Q.    Would any of those things

11     effect handrails?

12            A.    No.

13            Q.    So, it would involve ground

14     settling and changes with respect to the

15     pavement --

16            A.    I'm sorry, let me clarify.  It

17     may affect handrails, height, measurements

18     off the ground.  If the ground settles, the

19     height of the rail may drop.

20            Q.    But not whether a handrail

21     exists or doesn't exist?

22            A.    Correct.

23            Q.    To your knowledge, at the time

24     the property was constructed, could they

25     have created a level landing at the bottom

37

```
 1                    K. J. KING
 2    of the ramp on the West 30th Street side?
 3         A.    That may have been level at the
 4    time of creation.
 5         Q.    Let's say a property was
 6    complaint at one point in time and later is
 7    no longer compliant, what is the obligation
 8    upon a public accomodation for that?
 9         A.    Property maintenance.
10         Q.    And what does that involve?
11               Let me put it to you this way,
12    if the property goes from being compliant
13    to non-compliant, does the property public
14    accommodation have to bring the property
15    back to its original compliance point?
16               MR. BARRETT:  Objection to
17          form.
18         A.    If it's technically feasible.
19    For example, if the land is settling and
20    you can't realign, say a section of
21    sidewalk or something without causing other
22    issues such as a change in level at a
23    doorway or a tripping hazard.  So, while
24    something could have been built completely
25    to code, over time, things do shift and
```

```
 1                    K. J. KING
 2     settle and that be can be maintained would
 3     be property by property.
 4          Q.    Are you aware of any specific
 5     issues relating to this particular property
 6     at 3015 Mermaid Avenue that would have
 7     prevented them from maintaining the
 8     property in compliance with the Standards
 9     for Accessible Design?
10          A.    I know there was issues with
11     the ground settling and flooding, that
12     will -- Tim had to discuss with me about it
13     flooded during Superstorm Sandy and some
14     issues had arisen because of that storm.
15          Q.    Do you know what specifically
16     had arisen as a result of that storm, if
17     anything?
18          A.    Um, the ground -- well, a lot
19     of flooding, water saturation, ground
20     settled -- settlement of the ground.
21          Q.    Do you know specifically the
22     condition that existed before Sandy and
23     after Sandy to have come to a conclusion as
24     to whether or not Sandy had any effect on
25     this particular property?
```

```
 1                    K. J. KING
 2          A.    No, we only know the condition
 3    when we went out in June and July.  I'd
 4    only be speculating as to how it settled or
 5    why it settled.
 6          Q.    Do you even know that it did
 7    settle in the first place?
 8          A.    You can see the parking lot or
 9    different areas that are -- in areas aren't
10    the accessible stalls, you can see where
11    the asphalt's cracked or dipped.  So, its
12    obviously settling.
13          Q.    And the sidewalk, I'm referring
14    to the sidewalk in front of the stores at
15    3015 Mermaid Avenue?
16          A.    Other than to know that
17    adjacent to it where the parking is has
18    started to settle.  Just by observation, I
19    would -- as with the past, I'm assuming
20    that would settle as well as would the
21    stores.  It's all on the same ground
22    (pointing).
23          Q.    But, aside from your
24    assumptions, you know for a fact that the
25    sidewalk has been affected by settling?
```

```
 1                    K. J. KING
 2        A.    No, we haven't done any soil
 3   samples or studies or anything to that
 4   extent.
 5        Q.    Did you ever have any
 6   communications with any contractors that
 7   performed work for 3015 Mermaid Avenue?
 8        A.    No.
 9        Q.    Do you know if Tim Perry ever
10   had any communications with any contractors
11   that did work for 3015 Mermaid Avenue?
12        A.    He had conversation with Scott
13   I know.  The owner.
14        Q.    What conversations did he have
15   with Scott or do you know?
16        A.    No, I know because he and I
17   spoke before he spoke to Scott.  It was
18   basically just giving Scott the
19   requirements for accessible curb ramps, the
20   dimensions, what the slopes needed to be,
21   the height of installation for a handrail.
22        Q.    So, Tim had given
23   recommendations to Scott about what should
24   be done with respect to modifications to
25   the property?
```

```
 1                    K. J. KING
 2        A.    What was in the report,
 3   elaborating on if a handrail's installed,
 4   what required height is, yes.
 5        Q.    Did Tim ever give anything in
 6   writing either by e-mail or mail as to what
 7   specifically Scott should be doing in terms
 8   of bringing the property into compliance
 9   with the Standards for Accessible Design?
10        A.    No, the only writing we had was
11   the report, and that went to the attorneys,
12   not Scott directly.
13             MR. PARKER:  Can we mark this?
14             (Whereupon, the aforementioned
15          letter was marked as Plaintiffs'
16          Exhibit 2 for identification as of
17          this date by the Reporter.)
18        Q.    I'm going to show you a
19   document marked as Plaintiffs' Exhibit 2
20   that was previously marked at an earlier
21   deposition as Plaintiffs' Exhibit 1, and my
22   first question to you is have you seen this
23   particular document before?
24        A.    No.
25        Q.    Are you familiar with the firm
```

```
 1                     K. J. KING
 2    that is listed at the top of this document?
 3          A.    DAA?
 4          Q.    Yes.
 5          A.    No.
 6          Q.    Or DiGiovanni & Associate
 7    Architects?
 8          A.    No.
 9          Q.    Are you aware of any
10    communications between United Spinal
11    Association and DAA?
12          A.    No.
13          Q.    If you go to the first
14    paragraph of this document, it says the
15    building was constructed in the late 1990s,
16    and the Certificate of Occupancy was issued
17    in 2000.
18                For purposes of the ADA
19    standards, is the Certificate of Occupancy
20    considered the defining date in terms of
21    when compliance should be made?
22          A.    Under the ADA you said?
23          Q.    Yes.
24          A.    Yes.
25          Q.    If the Certificate of Occupancy
```

43

```
 1                  K. J. KING
 2   was issued in 2000, what was the standard
 3   that the property should have been
 4   constructed in accordance with?
 5        A.     Anything that was constructed
 6   after January 1993 for first occupancy had
 7   to comply with the 1991 standards.  So, the
 8   C of O was issued in 2000, that doesn't
 9   necessarily meant that was the first
10   occupancy.  It may have had temporary COs
11   before the permanent CO.
12        Q.     For this property, do you have
13   any idea which COs were issued and when?
14        A.     No.
15        Q.     Do you know if Tim Perry has
16   any knowledge as to that?
17        A.     No, the only knowledge we had
18   was we were told it was constructed in the
19   late 1990s.  So that -- we were given that
20   information so we could do our review as it
21   pertained to the 1991 standards.
22        Q.     What did it mean to you when
23   you were told that it was constructed in
24   the late 1990s in terms of reviewing of the
25   proper standards?
```

```
 1                      K. J. KING
 2         A.    The 1991 Standards would be the
 3    standard we would apply.
 4         Q.    And specifically, the Standards
 5    for New Construction contained in the 1991
 6    standards?
 7         A.    Yes.
 8               MR. PARKER:  Lets mark this.
 9               (Whereupon, the aforementioned
10          accessibility review was marked as
11          Plaintiffs' Exhibit 3 for
12          identification as of this date by the
13          Reporter.)
14         Q.    I'm going to show you a
15    document marked as Plaintiffs' Exhibit 3,
16    and my first question to you is do you
17    recognize this document?
18         A.    Yes.
19         Q.    What do you recognize it to be?
20         A.    The report we submitted on the
21    property.
22         Q.    What was the purpose of this
23    report?
24         A.    To identify issues at the
25    property at time of inspection in June.
```

```
 1                    K. J. KING
 2        Q.    Was the purpose of the report
 3   to identify all the issues at the property
 4   or just some of the issues?
 5        A.    This report is in relation to
 6   the, um, expert report plaintiff provided.
 7        Q.    Do you know if this report went
 8   through all the issues raised by the expert
 9   report that plaintiff provided?
10        A.    Yes, Tim looked at all of the
11   issues.
12        Q.    But were all the issues
13   contained in the report you're looking at
14   right now?
15        A.    Yes, I believe so.
16             MR. PARKER:  Can we mark this?
17             (Whereupon, the aforementioned
18        accessibility survey was marked as
19        Plaintiffs' Exhibit 4 for
20        identification as of this date by the
21        Reporter.)
22        Q.    When Tim conducted his
23   inspection that resulted in this report
24   that you have before you now, were there
25   any identifications made in this report as
```

                         K. J. KING

1

2    to areas or portions of the property that

3    were not in compliance with the Standards

4    for Accessible Design?

5         A.    In his notes, he identified

6    areas.

7         Q.    My question to you is, where on

8    this report is there any identification of

9    any issues relating to problems with

10   compliance?

11        A.    This report was, um, I know he

12   had identified issues with the height of

13   the signs, um, and they were addressed, so

14   when he went out to inspect, we were able

15   to remove that and identify that the

16   signage was provided as required.

17        Q.    This report was based upon his

18   first inspection of June of 2014?

19        A.    Right, but the -- correct.

20        Q.    So, when he wrote this report

21   at the time he made the measurements, was

22   there any reason why he did not include any

23   areas of the property that did not comply

24   with the Standards for Accessible Design?

25        A.    He went out there two times and

```
1                    K. J. KING
2    I went out once, and we -- he did an
3    inspection, identified issues and issues
4    were corrected and the report was written.
5         Q.    At the time this particular
6    report was written, all the issues were
7    corrected?
8         A.    Yes.
9         Q.    So, then why was there --
10        A.    Yes, because the issues that
11   were identified that he and I went over
12   with the notes and I went out and verified
13   aren't listed there.  This is the report
14   after everything had been corrected.
15        Q.    This report was issued after
16   you went out to the property on July 31st?
17        A.    The date on the report is the
18   inspection date and that's the first date
19   of inspection, and then we went out and it
20   was, um, corrected between the first date
21   of inspection and the July dates.
22        Q.    So, this report to the best of
23   your knowledge, when do you believe it was
24   actually written?
25        A.    July, mid-July.
```

```
 1                    K. J. KING
 2        Q.    And if it hadn't been written
 3   in mid-July, then should it have identified
 4   any violations with respect to the
 5   property?
 6              MR. BARRETT:  Objection to the
 7         form.  I don't know what you mean by
 8         "should."
 9        Q.    If Tim went out and he
10   identified the property had certain
11   violations on it, shouldn't he, as a matter
12   of your regular business practices, have
13   put into the report the identification of
14   any violations of the ADA?
15        A.    Depends on what we're asked to
16   do.  If we're asked to go out and do a
17   complete -- sometimes we're asked to do a
18   complete report and submit it.  Other
19   times, we're asked to give a verbal report
20   with issues and we give a verbal report.
21   Saves time and money not giving a written
22   report, especially if items such as heights
23   of signs, minor things that can be easily
24   adjusted are gonna be done, so we'll give
25   the verbal report, folks will go out, do
```

```
 1                    K. J. KING
 2   the easy fixes such as the height of the
 3   signs, which we had an issue here, and
 4   correct it, and we go out and we verify it
 5   was corrected and there's no need to have
 6   a -- put that in the report.  It's been
 7   corrected.
 8        Q.    So, if there is a written
 9   report though, is that written report also
10   supposed to include any violations of the
11   standards that are uncovered?
12             MR. BARRETT:  Objection to
13        form.  Again, I don't know what
14        "supposed to" means.  What standards
15        are you applying?
16             MR. PARKER:  I understand.
17        You're coaching the witness.
18             MR. BARRETT:  I'm not coaching
19        the witness.  I'm just objecting to
20        the form of the question.  I don't
21        even understand the question.
22             MR. PARKER:  That's fine.  But
23        if she doesn't understand, she can
24        tell me.  She's also a lawyer too.
25        So she understands that she can tell
```

50

```
1                    K. J. KING
2         me "I don't understand the question,
3         please repeat it or rephrase it" or
4         something else.
5              MR. BARRETT:  I've noted an
6         objection to form.
7              MR. PARKER:  Fine.
8         A.    I don't remember the question.
9         Q.    Let's do it this way.  What was
10   the scope of your assignment with respect
11   to the first time that Tim Perry went out
12   to the property?
13        A.    To review the property for
14   compliance with ADA, and he also had the
15   plaintiff's expert report to look at the
16   issues identified by the plaintiff's expert
17   to see if we agreed with them or we
18   believed that there were not violations,
19   were not correct.
20        Q.    So, the scope of the assignment
21   was to do a full inspection of the property
22   with respect to any violations that were
23   found would have been noted in the report
24   if they were found?
25        A.    Yes.
```

```
 1                    K. J. KING
 2         Q.    Do you know if another report
 3    was issued after this particular report was
 4    made?
 5         A.    Yes.
 6         Q.    Why was another report issued?
 7         A.    It was more detailed with some
 8    of the issues that we saw after work had
 9    been performed.
10         Q.    But were there any violations
11    that you uncovered that were not identified
12    in this report but were later identified in
13    another report?
14         A.    I'm not sure I understand.
15         Q.    Who drafted this particular
16    report?
17         A.    Tim and I reviewed it.
18         Q.    Who wrote it up?
19         A.    Tim.
20         Q.    When he wrote it up, did you
21    review it after he wrote it up?
22         A.    Yes.
23         Q.    Do you remember any
24    modifications you made to this particular
25    report after it was written up?
```

```
 1                    K. J. KING
 2        A.    Nothing substantive.
 3        Q.    Do you know when he wrote it up
 4   if he had been told by anyone not to put in
 5   the identification of any violations of the
 6   ADA Standards?
 7              MR. BARRETT:  Objection.  To
 8         the extent that you're requesting
 9         information about drafts of reports,
10         you're not entitled to that
11         information.
12              MR. PARKER:  I'm not asking
13         about the actual draft, I'm asking
14         what was done with respect to this
15         report.
16        A.    This report was the conditions
17   as of January -- excuse me, July 31st.  So
18   anything we had identified in June or
19   earlier July that had been corrected would
20   be in this report (pointing).  We were
21   giving you -- giving the state of the
22   property at the time of this report, so
23   things had been corrected.
24        Q.    If I represent to you that your
25   attorney provided that report in June of
```

```
 1                    K. J. KING
 2   2014, would that change your testimony?
 3        A.    In June?
 4        Q.    Yes.
 5        A.    No, because I'm trying to --
 6   these points here, parking totals, that
 7   existed in June; accessible parking, the
 8   dimensions were eight-foot wide, that
 9   existed in June; signage was there, but it
10   wasn't the right height, but it was changed
11   immediately, so, in June the signage height
12   was changed, so, yes, that would be correct
13   in June; accessible routes, this says "When
14   accessible routes crosses or curb or curb
15   ramp is required, compliant program has
16   been provided at the head of one of the
17   accessible aisles," which was true in June.
18   This is a report stating what complied in
19   June.
20        Q.    What did not comply in June at
21   the property to the best of your knowledge?
22        A.    There was a second curb ramp
23   that needed work; there were railings that
24   needed to be installed at the ramp; signage
25   needed to be added at the other ramp, and
```

```
1                    K. J. KING
2    that was it.
3         Q.    So, what was the reason why
4    that report does not mention any of those
5    other issues that had not completed in
6    June?
7         A.    This is a statement of
8    everything that is correct at the property
9    (pointing).
10        Q.    So, the scope of the report was
11   just to provide everything that is correct
12   and not put in anything that was incorrect?
13        A.    Right.
14        Q.    Is that generally what the
15   practice is when United Spinal Association
16   issues reports, is to just issue a report
17   that has all the issues that are correct
18   and not identify any of the incorrect?
19             MR. BARRETT:  Objection to
20        form.
21        A.    United Spinal issues reports
22   that our client asks us.  So, if a client
23   asks us to give them a report with just
24   violations and nothing that's good, we
25   issue that type of report.  If we're asked
```

1                    K. J. KING

2    to outline anything that complies, we'll

3    issue that.  Sometimes we're asked to split

4    things up so they can see what's good and

5    what needs to be done.  We tailor our

6    reports to what the client wants.

7         Q.    Before you said the scope of

8    the assignment was for a full inspection.

9         A.    Right, which --

10        Q.    So, did that mean also that the

11   report that would come out of that

12   inspection would detail all the findings or

13   just the findings that something was

14   compliant?

15        A.    After we go out and do the

16   inspection and give a verbal report, that's

17   usually when a client will tell us what

18   they want or don't want.  Sometimes a

19   client may not even want a written report

20   at all.

21        Q.    So, in this particular

22   situation, this report was meant to only

23   convey the areas that were in compliance

24   and was not mean to be a comprehensive

25   report of whether the entire property

1                    K. J. KING

2     complied with the Standards for Accessible

3     Design?

4                    MR. BARRETT:  Objection to

5           form.

6          A.    Right.  This report is just

7     saying what complies.

8          Q.    So, this report then would not

9     be an accurate or fully accurate portrayal

10    of what violations, if any, are occurring

11    at the property?

12                   MR. BARRETT:  Objection to

13          form.

14         A.    Right, this report which was

15    issued in June doesn't describe issues that

16    could have been a violation.

17         Q.    Do you know what the purpose is

18    to have a report that just says where the

19    property complies with as opposed to a

20    report of everything, where the property

21    complies and where the property does not

22    comply?

23         A.    I don't know what purpose the

24    client would have wanted it, but if they

25    want it, that's what we give them.

1              K. J. KING

2              MR. PARKER:  Let's mark this

3         too.

4              (Whereupon, the aforementioned

5         inspection was marked as Plaintiffs'

6         Exhibit 5 for identification as of

7         this date by the Reporter.)

8         Q.    Going to the first page of

9    Plaintiffs' Exhibit 3, the second paragraph

10   says, "We have provided recommendations for

11   improvements using the 2010 ADA/ABA

12   Standards for Accessible Design as a

13   technical reference standard."

14             Did this particular report

15   provided any recommends for improvement?

16        A.    No.

17        Q.    Do you know why not?

18        A.    The introduction should have

19   been changed.  This is our standard

20   introduction to our reports.  This report

21   is just inspection comments on the areas

22   that are in compliance.

23        Q.    So, would that also be the same

24   for the second sentence, says "The report

25   provides citation to the 1991 Standards for

1                      K. J. KING

2    violations to these standards that occur

3    and remediations the same."

4                 Does the report provide any

5    citations where violations occurred?

6         A.    No, the introduction should

7    have been tailored for this report.

8         Q.    Are you aware of any reason why

9    the introduction was not tailored for this

10   report?

11        A.    No, it was probably just cut

12   and pasted in without.

13        Q.    Have you ever done an

14   introduction section to a report that

15   contained the language you're saying should

16   have be put into this report?

17        A.    The introduction should have

18   probably been removed from that report and

19   just a simple sentence saying this is a

20   report that delineates items that are in

21   compliance.

22        Q.    I'm going to show you a

23   document marked as Plaintiffs' Exhibit 5.

24   My question is, do you recognize this

25   particular document?

```
 1                    K. J. KING

 2        A.    Yes, this is the complete

 3   report.

 4        Q.    When you say "complete report,"

 5   what does that mean?

 6        A.    It identifies, um, compliant

 7   issues as well as items we had

 8   recommendations for.

 9        Q.    Do you remember reviewing this

10   particular report?

11        A.    Yes.

12        Q.    Do you know who wrote this

13   particular report?

14        A.    Tim Perry.

15        Q.    Do you remember if you made any

16   modifications to this particular report?

17        A.    I provided Tim with the

18   measurements for item 2, the Dunkin Donuts

19   ramp, the slope 7.6 to 7.9 percent, that

20   was my measurements from 7/31.  And on page

21   3 , the handrail extension at the top of

22   ramp run, I added that, discussed with Tim

23   as he was drafting the report that I had

24   gone out there on the 31st and the railings

25   were there.  So, while I didn't edit it, we
```

```
 1                    K. J. KING
 2    worked on the items jointly.
 3         Q.    Going to the first page of this
 4    report, it says "The inspection was
 5    conducted by United Spinal accessibility
 6    staff member Tim Perry."
 7                Was there any reason why your
 8    name was not put there?
 9         A.    No, it should have be added
10    once I went out on the 31st and the
11    inspection date was added at the top.
12         Q.    Are you aware of any violations
13    at the property that were not contained
14    within this particular report that you're
15    looking at?
16         A.    No, no other violations.
17         Q.    You mentioned before about the
18    measurements at Dunkin Donuts, how do you
19    recall that you took that particular
20    measurement?
21         A.    The curb ramp approximate to
22    Dunkin Donuts?
23         Q.    Yes.
24         A.    With my two-foot level.
25         Q.    Did you write that down
```

```
 1                    K. J. KING
 2   anywhere?
 3        A.    No, I knew I was gonna call Tim
 4   and tell him.
 5        Q.    Any other measurements that you
 6   took that are reflected within this report
 7   aside from the handrail extensions?
 8        A.    Other than the measurements I
 9   stated earlier about the sidewalk in front
10   of, um, I believe it was the Dunkin Donuts
11   and the Rite Aid, I believe, where I just
12   did the cross slope real quick.  And they
13   were compliant, so.
14        Q.    I'm going to show you a
15   document marked as Plaintiffs' Exhibit 4,
16   and my question to you is have you ever
17   seen that document before?
18        A.    Yes.
19        Q.    When was the first time you saw
20   that document?
21        A.    Right after we were retained I
22   believe we were provided with this report.
23        Q.    Did you, yourself, review it?
24        A.    Tim and I went over it together
25   before we went out -- before he went out to
```

```
 1                    K. J. KING
 2    the property.
 3                    MR. PARKER:  Can we mark this?
 4                    (Whereupon, the aforementioned
 5          notes were marked as Plaintiffs'
 6          Exhibit 6 for identification as of
 7          this date by the Reporter.)
 8          Q.    I'm going to show you what's
 9    marked as Plaintiff's Exhibit 6, and my
10    first question to you is do you recognize
11    the document?
12          A.    Yes, Tim's notes.
13          Q.    Can you read Tim's notes?
14          A.    Yes.
15          Q.    Do you see towards the
16    left-hand side it says 1.1?
17          A.    Yes.
18          Q.    Were those numbers
19    corresponding to what is contained within
20    Plaintiffs' Exhibit 4, the report that
21    plaintiff had submitted?
22          A.    Yes, the item numbers.
23          Q.    Let's go through them.  The
24    first says "49 total parking," is that
25    supposed to --
```

63

```
 1                      K. J. KING
 2          A.     Yes.
 3          Q.     And "four handicapped spaces"?
 4          A.     Yes.
 5          Q.     What does it say underneath
 6   that?
 7          A.     "Two van at Rite Aid."
 8          Q.     And after that?
 9          A.     "Signs at 41 inches and
10   48 inches," -- or 40, it's zero, four-zero.
11          Q.     And the next line down?
12          A.     "Left space 3.4 percent slope
13   at head."
14          Q.     And below that?
15          A.     "Right space 4.4 percent," then
16   it just has little quotation marks meaning
17   "slope at head."
18          Q.     When you're referring to the
19   left and right spaces, you're talking about
20   the handicapped-accessible spaces.
21          A.     The accessible spaces, yes.
22          Q.     To the best of your knowledge,
23   what is the maximum slope for a
24   handicapped-accessible space?
25          A.     Two percent.
```

```
 1                    K. J. KING
 2         Q.    Were those left and right
 3   spaces, in your opinion, in violation of
 4   the Standards for Accessible Design?
 5         A.    The small area at the head had
 6   a slope in excess of two percent.
 7         Q.    Where is the word "small?"
 8         A.    At "head," if it's the entire
 9   space, we would make clarification though.
10         Q.    Is it permitted under the
11   Standards for Accessible Design to have a
12   slope greater than two percent at any
13   portion of a handicapped-accessible space?
14         A.    No.
15         Q.    Going down, it says "access
16   aisle," do you see that?
17         A.    Yes.
18         Q.    Would that have been the access
19   aisle for the handicapped-accessible space
20   in front of Rite Aid?
21         A.    The left and the ride
22   accessible space shares the access aisle,
23   so that would be between the two.
24         Q.    Was there a measurement taken
25   there?
```

1                    K. J. KING

2          A.    Yes.

3          Q.    And what was that measurement?

4          A.    6.0.

5          Q.    What is the maximum slope that

6     an access aisle for a

7     handicapped-accessible space is supposed to

8     have under the Standards for Accessible

9     Design?

10         A.    Two percent.

11         Q.    Going to this particular area,

12    are you aware of any modifications being

13    made to the slope of the

14    handicapped-accessible spaces in front of

15    Rite Aid?

16         A.    I'm not aware of any.

17         Q.    Are you aware of any

18    modifications being made to the access

19    aisle in front of Rite Aid?

20         A.    No.

21         Q.    Going down, it stays "two van,"

22    do you see that?

23         A.    Yes.

24         Q.    Can you tell me what it reads?

25         A.    "Two van at Dunkin, signs

                         K. J. KING

1

2    same."

3         Q.    When it says "signs same," what

4    does that mean?

5         A.    The same dimensions as the ones

6    at Rite Aid or the ones above.

7         Q.    And those dimensions were 41

8    inches high and 40 inches high?

9         A.    Correct.

10        Q.    To the best of your knowledge,

11   the height of the handicapped-accessible

12   signs were raised to be at least 60 inches?

13        A.    60 inches to the bottom edge of

14   the sign.

15        Q.    Is that correct?

16        A.    Yes.

17        Q.    And that you verified?

18        A.    Yes.

19        Q.    Going down below that, what

20   does it say?

21        A.    Below the two van at Dunkin?

22        Q.    Yes.

23        A.    "Left space 4.8 percent, slope

24   at head."

25        Q.    And below that?

```
 1                      K. J. KING
 2          A.    "Right space 3.5," and again,
 3     indicates slope at head.
 4          Q.    And the same question as
 5     before, for this particular
 6     handicapped-accessible space, what is the
 7     maximum slope permissible under the ADA?
 8          A.    Two percent.
 9          Q.    Do you know if any measurements
10     were taken at any other point at this
11     handicapped-accessible space of the slope?
12          A.    No.
13          Q.    What is the standard practice
14     when you take a measurement of a slope of a
15     handicapped-accessible space, what point or
16     points do you measure it?
17               MR. BARRETT:  Objection to
18          form.
19          A.    United Spinal measures it in
20     six places.
21          Q.    Are you aware if Tim Perry ever
22     measured the handicapped-accessible spaces
23     in six places?
24          A.    Yes, that's our standard
25     procedure.  He'd measure it top, middle,
```

68

```
 1                   K. J. KING
 2    bottom, two running, and its cross slope.
 3          Q.    Do you know if --
 4          A.    Minimum.  Sometimes we do more.
 5          Q.    Do you know for a fact whether
 6    or not Tim Perry actually measured the
 7    slope at six points for each space?
 8          A.    That's what he was trained to
 9    do, and that's what he always does.  Yes.
10          Q.    But did you personally observe
11    him --
12          A.    No.
13          Q.    Did you personally, at any
14    point in time, ever measure the slope of
15    the handicapped-accessible spaces at the
16    property here 3015 Mermaid Avenue?
17          A.    No.
18          Q.    Going below that, it says
19    "dips"?
20          A.    "Dips puddling within spaces."
21          Q.    And after that, does it say
22    "dips repair"?
23          A.    Yes.
24          Q.    Is he referring to the
25    handicapped-accessible parking spaces?
```

1                    K. J. KING

2          A.    Yes.

3          Q.    And can you tell me why is a

4     dip or puddling or repair of a

5     handicapped-accessible space an issue for

6     the ADA?

7                    MR. BARRETT:   Objection to

8             form.

9          A.    We just know any kind of

10    condition in the space.   There could be

11    some puddling if it just rained.

12    Oftentimes, puddling doesn't really mean

13    anything, the slope is still at two

14    percent.   We just make a note.

15         Q.    Are the spaces supposed to be

16    designed so that puddling is not supposed

17    to occur?

18         A.    No, the spaces are required to

19    be two percent slope in all directions in

20    front, stable and slip resistant.   Puddling

21    isn't addressed in the code -- in the ADA

22    Accessibility Provisions.

23         Q.    And dips, what does that denote

24    to you?

25         A.    There might have been slight

```
1                    K. J. KING
2      indentation in the parking space, but
3      again, it may not have increased the slope
4      more than two percent, but we make note of
5      it.
6           Q.    Going below that, what does it
7      say?
8           A.    "Access aisle."
9           Q.    What's the measurements there?
10          A.    "3.7 to 4.4, slope at center."
11          Q.    What does it say underneath
12     there, is that "patch?"
13          A.    "Patch, 3.7 percent slope/3.2
14     cross slope."
15          Q.    For the access aisle, what is
16     the maximum of slope and cross slope?
17          A.    Two percent.
18          Q.    Do you know what he's referring
19     to when he says "patch?"
20          A.    There was an area in the space
21     that was probably different color asphalt
22     or concrete, so it denotes a patched area.
23          Q.    To your knowledge, do you know
24     if any work was ever performed to these
25     particular handicapped-accessible spaces
```

```
 1                    K. J. KING
 2    and its access aisles?
 3          A.    No.
 4          Q.    And you did not take any
 5    measurements of the access aisle or the
 6    handicapped-accessible spaces in front of
 7    the Dunkin Donuts; is that correct?
 8          A.    Correct.
 9          Q.    Below that, it says "1.2," and
10    it has a checkmark.  What is that checkmark
11    supposed to mean?
12          A.    It's a checkmark, and it's --
13    he's agreeing with the 1.2 in the
14    plaintiff's expert report.
15          Q.    And 1.4, it agrees and that
16    deals with the signs are at 54 inches on
17    the expert report?
18          A.    The signs are -- he's agreeing
19    that they were not at 60 inches.
20          Q.    And then going to 2.1?
21          A.    He's agreeing with the
22    plaintiff's expert report.
23          Q.    Tell me what is supposed to be
24    instead of these one-inch-plus gaps that
25    are referred to?
```

72

```
 1                    K. J. KING
 2        A.    There shouldn't be any gaps or
 3   level changes, it should be smooth from the
 4   parking up to the curb ramp.
 5        Q.    Are you aware of any
 6   modifications ever being done to cure this
 7   gap?
 8        A.    Yes, that was corrected.
 9        Q.    Did you, yourself, verify that
10   it was corrected?
11        A.    Yes, on the 31st.
12        Q.    What measurements did you take
13   when you were there of that area?
14        A.    I observed there were no gaps
15   or level changes, so there was nothing to
16   measure because it was flat, consistent
17   (indicating).
18             MR. PARKER:  Can you mark this?
19             (Whereupon, the aforementioned
20        photograph was marked as Plaintiffs'
21        Exhibit 7 for identification as of
22        this date by the Reporter.)
23        Q.    I'm going to show you what's
24   been marked as Plaintiffs' Exhibit 7.  My
25   question to you is, do you recognize this
```

```
 1                    K. J. KING
 2   photograph?
 3        A.    Yes.
 4        Q.    Is this a photograph that you,
 5   yourself, took?
 6        A.    Yes.
 7        Q.    And you took this photograph on
 8   or about July 31st?
 9        A.
10        Q.    -- of 2014?
11        A.    Yes.
12        Q.    Tell me what the photograph
13   shows as work that had been done.
14        A.    The asphalt has been laid to
15   make it flush with the curb ramp.  You can
16   see there's no level change or no gap any
17   longer.
18        Q.    This was the area in front of
19   the Dunkin Donuts?
20        A.    Yes.
21        Q.    The asphalt was changed.  Do
22   you know if anything was changed with
23   respect to the curb ramp shown in this
24   picture?
25        A.    Um, the curb ramp was also
```

```
 1                    K. J. KING
 2   changed because it was less than 8.33
 3   percent, running slope and cross slope was
 4   less than two percent.
 5        Q.    Going back to Plaintiffs'
 6   Exhibit 5, if you look at page 2
 7   "Accessible Path of Travel," it identifies
 8   that the curb ramp to Dunkin Donuts
 9   measures slope between 7.6 and 7.9 percent?
10        A.    Right.
11        Q.    Is there any reason why the
12   measurements of the flares are not
13   mentioned?
14        A.    No, they complied.  They were
15   less than ten percent.
16        Q.    Is there any reason why there
17   no mention in this report of the flares
18   itself?
19        A.    No, it should have been
20   included.
21        Q.    Do you remember specifically
22   what the slope of the curb ramp was, do you
23   remember specifically what the measurement
24   of the flares to this curb ramp were?
25        A.    Not specifically.  I do know it
```

```
 1                    K. J. KING
 2    was less than ten percent 'cause when I
 3    measure flares, I measure it two different
 4    ways.  I measure it this way (indicating),
 5    which a lot of people do, you put your
 6    level parallel to the curb, and I also
 7    measure it across the whole -- from the
 8    corner of the curb ramp up (indicating),
 9    straight, and as long as both measurements
10    are under ten percent, I don't identify the
11    exact measurements.  The reason I do it
12    both ways is because different consultants,
13    different experts measure it different
14    ways, so, I always want to make sure it
15    measures less than ten percent no matter
16    where I put my level.  So, if I have to
17    write down all those measurements, I only
18    do it if it's above ten percent.
19         Q.   Going down under 2.2 with the
20    curb --
21              MR. BARRETT:  Can you clarify
22         this is Exhibit 6 again?
23              MR. PARKER:  I apologize, yes.
24         Q.   Going back to Plaintiffs'
25    Exhibit 6, the first page, do you see where
```

```
 1                    K. J. KING
 2      it's 2.2?
 3           A.    Yes.
 4           Q.    Is that detailing the curb ramp
 5      in front of Dunkin Donuts?
 6           A.    Yes, because it's -- matches
 7      the 2.2 on plaintiff's report which is the
 8      Dunkin Donuts curb ramp, and it says
 9      "six-inch curb, 12 percent to 13.5 percent
10      slope, cross slope complied, landing
11      complied," that's what the checks mean, and
12      the flare size at the time complied.
13      That's what the checkmarks mean.
14           Q.    When Tim Perry first went out
15      to the property in June 2014, the curb ramp
16      was not compliant with the Standards for
17      Accessible Design; is that accurate?
18           A.    Right.  The slope was 12 to
19      13.5 percent.  Requirement is 8.33.
20           Q.    Going to the next page --
21           A.    On six?
22           Q.    Yes.  Let's go to the markings
23      for 3.1.
24           A.    Okay.
25           Q.    Can you tell me what his
```

1                    K. J. KING

2    handwriting means?

3         A.    Sure.  "SW," southwest ramp,

4    "Rent-A-Center, top and bottom landing

5    complies," via the checkmark.

6         Q.    And the second sentence?

7         A.    "Change in section at bottom,

8    first flag 7.6 to 9.7 slope, second flag

9    complies, third flag 9.8 to 6.9 percent

10   slope."

11        Q.    When you were at the property,

12   did you look at these particular flags of

13   concrete he's referring to?

14        A.    No.

15        Q.    Do you have any independent

16   knowledge as to the slope of the flags of

17   those portions of the sidewalk that he's

18   referring to under 3.1 on Plaintiffs'

19   Exhibit 6?

20        A.    No, other than I'd go with

21   Tim's measurements.

22        Q.    So, he's referring to three

23   flags; is that correct?

24        A.    Yes.

25        Q.    Each flag is a part of the

```
 1                    K. J. KING
 2     southwest ramp?
 3          A.    Yes.
 4                A flag is a section of concrete
 5     between crack and crack.  Its the way they
 6     pour it.
 7          Q.    So, the third flag was between
 8     9.8 percent and 6.9 percent?
 9          A.    Right.
10          Q.    And what is the maximum slope
11     for a ramp run?
12          A.    A ramp run that's overcoming
13     greater than six percent -- a 6-inch
14     elevation is 8.33 percent.
15          Q.    Do you know if this southwest
16     ramp is subject to that 8.33 percent rise?
17          A.    Yes, it is.
18          Q.    In your opinion, does the third
19     flag comply with the Standards for
20     Accessible Design?
21          A.    The bottom portion does not at
22     9.8, the top portion of 6.9 does.
23          Q.    And with respect to the first
24     flag?
25          A.    6.7 would comply.  So, it goes
```

1                         K. J. KING

2    from 7.6 to 9.7, so, part of the flag

3    complies, the top part at 9.7 would not.

4         Q.    Are you aware of any work that

5    has be performed to any of these flags

6    since June of 2014?

7         A.    To the flags, no, signage was

8    added determining accessible routes on the

9    other side of the center.

10        Q.    Are you aware of any reason why

11   these flags could not be modified to create

12   a ramp run of no greater than 8.33 percent?

13        A.    The extent of the work required

14   would be the length of the ramp would have

15   to be extended into the sidewalk, it could

16   defringe on the clearances of the doorway

17   depending on how much more of the sidewalk

18   would need to be cut away to create a ramp.

19        Q.    Could you have also created the

20   ramp such as the ramp that went into the

21   sidewalk that's part of the retail stores

22   as opposed to going into the public

23   sidewalk?

24             MR. BARRETT:  Objection to

25        form.

```
 1                    K. J. KING

 2          A.    I mean the retail stores

 3     sidewalk.  So, the ramp, if you made it

 4     8.33 percent, it would have to be longer,

 5     so the slope would comply.  So, if you

 6     start at the bottom of the ramp at the

 7     property line of the City sidewalk, which

 8     we can't go into the City sidewalk, we

 9     create an issue, it's not the owner's

10     property.  So, you start at the bottom of

11     the ramp, and you'd have to increase your

12     length of ramp to make it comply with

13     8.33 percent.  You'd have to then cut into

14     the sidewalk in front of the stores and the

15     length required to comply with 8.33 percent

16     would now infringe on that sidewalk,

17     infringe on the storefront with the glass,

18     the maneuvering clearance on the doors, and

19     depending on the length required, if it's

20     more than 30 inches, we would then need to

21     have an interim level area.

22          Q.    To the best of your knowledge,

23     is it possible for this ramp to be modified

24     to be made compliant with the ADA in that

25     the ramp run would be no greater than
```

```
1                    K. J. KING
2    8.33 percent?
3         A.    Based on its location, we may
4    not be able to get 8.33 percent because
5    of -- where the stores are located, the
6    doorway.
7         Q.    Let's say --
8         A.    You would need to go more than
9    30 inches long, so then the code requires a
10   level landing, so, if it's feasible or not
11   depending on the cost would be something to
12   be looked at.  I mean, in a perfect world,
13   yes, you can build an 8.33 percent.  You
14   can ramp the Empire State Building at 8.33,
15   but you have to take into account what's
16   already there, the doorway to
17   Rent-A-Center, um, the length of the ramp,
18   how much concrete needs to be cut into, if
19   there was going to be enough room to do the
20   level landing.
21        Q.    Have you done any measurements
22   or analysis as to what would be required
23   here to make this particular ramp run
24   compliant?
25        A.    No.
```

```
 1                    K. J. KING
 2         Q.    Based upon your review of the
 3    slopes, do you have any idea as to how much
 4    extra space would be required in order to
 5    make this ramp run compliant?
 6              MR. BARRETT:   Objection to
 7         form.
 8         A.    Anywhere from -- based on the
 9    slope measurements, anywhere from five to
10    ten more feet, and that would trigger the
11    level landing area required at 30 feet.
12         Q.    The level landing for the 30
13    that you're talking about is after every
14    30-inch rise; is that correct?
15         A.    Yes.
16         Q.    Is this ramp rising more than
17    30 inches?
18         A.    It's actually -- 30-inch rise
19    -- it would be the run if the run is longer
20    than 30 feet.  So, I would have to go out
21    and do a survey and measure to see exactly
22    if we had enough room to do the ramp with
23    the location of the Rent-A-Center, glass,
24    doorway, that type of thing.
25         Q.    Assuming you could redesign the
```

K. J. KING

1        K. J. KING

2   doorway to the Rent-A-Center and move it to

3   another location if it needed to be done,

4   could the ramp be made compliant with the

5   ADA?

6        A.    Other factors -- I don't know,

7   other factors may come into account.

8        Q.    What other factors?

9        A.    The cost of the ramp.

10       Q.    Do you know if cost is actually

11  a factor in the new construction standards

12  for the ADA Standards for Accessible

13  Design?

14       A.    Cost in new construction is not

15  modifying existing facilities if -- cost

16  does come into barrier removal, cost does

17  come into compliance.  So, there is two

18  different standards to look at.

19       Q.    If someone doesn't concrete

20  their property in compliance with the new

21  construction standards, they can then claim

22  that it's too expensive to now make it

23  compliant?

24       MR. BARRETT:  Objection to

25       form.

```
 1                    K. J. KING
 2        A.    No, my point is it could have
 3   been created in compliance, we don't know
 4   that.  It was built over 14 years ago,
 5   minimum 14 years.  It started in the late
 6   1990s.  It could have be could have been
 7   constructed in compliance.  Conditions
 8   change.  Now we're looking at alterations
 9   or barrier removal to try to make it
10   accessible again.
11        Q.    Do you have any reason to
12   believe this was actually created in
13   compliance when it was first constructed?
14   And I'm talking about this southwest ramp.
15        A.    The percentage of the slopes of
16   three flags, one being compliant and the
17   other two half compliant, half not,
18   indicate to me settling and it could have
19   very well been constructed compliant.  But
20   again, it's an exterior ramp that outdoor
21   conditions, slopes change year to year with
22   frost and heaving.  These slope
23   requirements aren't so far off were I would
24   say that it wasn't constructed back in the
25   '90s correctly.  It probably was, and this
```

1                    K. J. KING
2    has occurred over time, the settling.
3         Q.    If it was constructed properly,
4    the location of the doors to the
5    Rent-A-Center and any other tenant
6    locations, they haven't moved, have they?
7         A.    I don't know.
8         Q.    Well, would they be affected by
9    settling?
10        A.    The location, no, the height at
11   the concrete could be by settling.
12        Q.    But if it had been created in
13   compliance with the standards when it was
14   first created, there wouldn't have been a
15   problem with where the doors are currently
16   located.
17        A.    Correct, right.  But now that
18   it's settled, conditions have changed and I
19   don't know how, you know, I don't know how
20   much longer we'd have to make this ramp now
21   to comply with the existing conditions,
22   what's underneath it, how much support
23   would have to be created so we wouldn't
24   pour a compliant ramp today, and next year
25   it's settled again.  There is all kinds of

```
 1                    K. J. KING
 2    kinds of factors to look at, not just
 3    saying, yeah, you can pour a ramp that's 20
 4    feet long at 8.33 percent slope, and the
 5    cost is going to be X dollars.  So, I guess
 6    the short answer is without knowing what's
 7    underneath in this ground, why did it
 8    settle and what needs to be done in order
 9    to make a compliant ramp today.
10         Q.    But you don't have any first-
11    hand knowledge to know if the reason why
12    it's not compliant today is because of
13    settling or because it was built as non-
14    compliant?
15         A.    Other than the slopes are so
16    close to 8.33 and for the majority of the
17    ramp, most likely it was constructed
18    correctly.
19         Q.    But do you know if it was
20    actually constructed correctly?
21         A.    No, I didn't go out and measure
22    it in 1990.
23         Q.    Do you have any knowledge
24    whatsoever, based upon personal knowledge
25    or any documents that you reviewed, to know
```

```
1                    K. J. KING
2    if any portion of this particular property
3    was designed in compliance with the 1991
4    Standards for Accessible Design?
5        A.    Well, the one exhibit that
6    showed the plans show that it was designed
7    compliant.  Whether or not the concrete was
8    poured in compliance, no one's gonna know
9    back from 1990.
10              MR. PARKER:  Can we mark this.
11              (Whereupon, the aforementioned
12         photograph was marked as Plaintiffs'
13         Exhibit 8 for identification as of
14         this date by the Reporter.)
15        Q.    One last thing.  Back under
16    Plaintiffs' Exhibit 6, the second page
17    under 3.1, towards the bottom, does it say
18    underneath the third flag "no handrails"?
19        A.    Yes.
20        Q.    And that was the condition
21    observed in June of 2014?
22        A.    Yes.
23        Q.    And currently, there are now
24    handrails or are there no handrails?
25        A.    There are no handrails.  If I
```

1                    K. J. KING

2      recall, there may have been one small

3      little section of handrail, but there is

4      not full handrails.

5           Q.    I'm going to show you what's

6      marked as Plaintiff's Exhibit 8, and my

7      question is, do you recognize what's shown

8      on that document?

9           A.    Yes, its the ramp we've been

10     talking about.

11          Q.    Do you know if that ramp shows

12     a handrail?

13          A.    An exterior handrail, yes.

14          Q.    Do you know if that handrail

15     was installed after June of 2014?

16          A.    I don't know.

17          Q.    Do you know if that handrail

18     existed before June of 2014?

19          A.    I don't know.

20          Q.    According to Tim's note when he

21     writes down "no handrails" in Plaintiffs's

22     Exhibit 6, is he saying that there are no

23     handrails on this particular ramp?

24          A.    No compliant handrails would be

25     what he means.  So, I don't know if this

```
 1                    K. J. KING
 2    was added after or not.  I don't know.
 3         Q.    When we're talking about the
 4    flags of concrete, when he says "the first
 5    flag," is he referring to the flag of
 6    concrete that's immediately in the bottom
 7    of the picture or the flag of concrete
 8    towards the top of the picture?
 9         A.    The first flag -- he measured
10    from the bottom to the top.
11         Q.    So, the first flag would be at
12    the bottom of this picture, Plaintiffs'
13    Exhibit 8 that you see going up, correct?
14         A.    Yes.
15         Q.    And the second flag would be
16    the flag of concrete where you see a crack
17    running through it?
18         A.    Yes.
19         Q.    Do you know if that crack still
20    exists as of the last time you went to this
21    property?
22         A.    Yes.
23         Q.    Can you write one, two and
24    three to represent the flags?
25         A.    (Witness complied.)
```

1                    K. J. KING

2         Q.     Does this handrail show an

3    extension on it?

4         A.     It's hard to see from this

5    picture.  Looks like it has a bend in it

6    from the extension, but I can't -- by the

7    angle I'm not sure (indicating).

8         Q.     Did you perform any

9    measurements when you were at the property

10   as to this particular handrail?

11        A.     No.

12        Q.     Does the third flag end where

13   it appears that the handrail ends?

14        A.     I can't tell from this picture.

15        Q.     Do you see a handrail to the

16   left-hand side of the picture?

17        A.     No.

18        Q.     Do you have any reason to know

19   why there is no handrail on the left-hand

20   side?

21        A.     I think it's glass behind

22   there.  There is glass behind the security

23   door, I believe (indicating).

24        Q.     Could the handrail be attached

25   to the sidewalk itself?

91

```
 1                    K. J. KING
 2        A.    It could as long as the door is
 3   not there.  I don't know placement of the
 4   door behind that secured thing
 5   (indicating).
 6        Q.    If you're designing a property
 7   to be in compliance with the Standards for
 8   Accessible Design, does the fact that there
 9   would be glass on the side excuse the
10   installation of a handrail on both sides of
11   a ramp?
12               MR. BARRETT:  Objection to
13          form.
14        A.    You could put a handrail as
15   long as there's 36 inches clear between the
16   handrail on a ramp.  You could put a
17   handrail affixed to the bottom -- to the
18   floor of the ramp.
19        Q.    But under the ADA Standards for
20   Accessible Design, are handrails supposed
21   to be on both sides of a ramp?
22        A.    Yes, on an accessible ramp.
23   Yes.
24        Q.    And when you say "an accessible
25   ramp," is it your opinion that if a portion
```

```
 1                    K. J. KING
 2    of a ramp does not comply, then none of the
 3    other obligations imposed by the ADA also
 4    don't apply to the ramp?
 5              MR. BARRETT:  Objection to
 6         form.
 7         A.    The ADA applies to the
 8    accessible route.  If the ramp is part of
 9    that and it overcomes 6-inch elevation, it
10    must have handrails.
11         Q.    On both sides?
12         A.    On both sides.
13         Q.    When you were at the property,
14    did you see handrails on both sides at the
15    ramp we're looking at on Plaintiffs'
16    Exhibit 8?
17         A.    No.
18         Q.    Do you have any reason to know
19    why a handrail was not installed to be on
20    both sides of this ramp?
21         A.    There was signage placed here
22    designating the opposite end of the
23    sidewalk as the accessible route.
24         Q.    So, somebody arriving in a
25    wheelchair getting from this particular
```

```
 1                    K. J. KING
 2    location, how are they supposed to travel
 3    to get onto the sidewalk to get to any of
 4    the retail stores?
 5         A.    Go around the sidewalk to the
 6    other side or take this -- they could use
 7    this ramp (indicating), there is no level
 8    changes.  Certain individuals in
 9    wheelchairs -- this would be usable to
10    them.  If it's not useable to them, they
11    have to go around.
12         Q.    Is this ramp compliant as it
13    currently exists?
14         A.    No.
15         Q.    There is signage directing
16    persons in wheelchairs to use another ramp;
17    is that correct?
18         A.    Correct.
19         Q.    So, if a person in a wheelchair
20    arrives at this site arrival point of this
21    public sidewalk, how are they supposed to
22    get onto the property to any of the retail
23    stores?
24         A.    They will go around to the
25    other side.
```

1                  K. J. KING

2          Q.    Do you have any idea the amount

3    of feet that they are required to travel to

4    get to the other side?

5          A.    No.

6          Q.    Did you take any measurements

7    as to how far that would be?

8          A.    I did not, no.  It's probably

9    on your plan you showed me earlier.

10         Q.    Going back to Plaintiffs'

11   Exhibit 1 for today and Exhibit 2 at

12   another deposition, we're talking about

13   currently the ramp that exists on West 31st

14   Street.  If someone arrives there, how far

15   are they supposed to travel from there to

16   the West 30th Street?

17         A.    I can't read the dimensions,

18   they're too small.  I mean, I'd be

19   guessing, they're very small.  That looks

20   like 39 feet, that looks like 231 feet, and

21   that looks like 25 (indicating).

22         Q.    So, at least 250 feet a person

23   in a wheelchair has to travel in order to

24   get to an accessible entrance?

25         A.    Yep.

```
 1                    K. J. KING
 2         Q.    If this property was built in
 3    compliance with the 1991 Standards For
 4    Accessible Design, is that permitted under
 5    the 1991 Standards for Accessible Design
 6    for somebody to arrive at one public
 7    sidewalk and have to travel to another area
 8    in order to enter a public accomodation?
 9         A.    The law says accessible routes
10    from site arrival points.
11         Q.    So, West 31st Street is one
12    site arrival point; is that correct?
13         A.    Yes.
14         Q.    And West 30th Street is
15    another; is that correct?
16         A.    Yes.
17         Q.    Do you know if Tim Perry had
18    any communications with the owner, Scott,
19    or someone else regarding the ramp that's
20    shown on Plaintiffs' Exhibit 8, this
21    picture?
22         A.    We discussed the whole property
23    with defendant's attorneys.
24         Q.    I'm not asking for that
25    discussion, I'm asking with Scott or anyone
```

1                     K. J. KING

2    on behalf of the owner?

3         A.    Our point of contact was with

4    the attorney.

5         Q.    I believe you said before that

6    that Tim Perry actually spoke with Scott;

7    is that correct?

8         A.    Concerning the things that were

9    being changed.

10        Q.    So, was there any mention

11   between them regarding the ramp that's

12   shown on Plaintiff's Exhibit 8, to the best

13   of your knowledge?

14        A.    Not to my knowledge.

15        Q.    Did Tim Perry ever raise that

16   ramp as a concern with you?

17        A.    We discussed that the slopes

18   and the signage was going to be posted at

19   that ramp and we were going to add

20   handrails on the other ramp on 30th Street,

21   I believe it is.

22        Q.    Going to the next one back on

23   Plaintiffs' Exhibit 6, if you go to 4.1,

24   can you read for me what that says?

25        A.    "SS ramp."

```
 1                      K. J. KING
 2         Q.    What is that?
 3         A.    It's supposed to be an "E,"
 4   "southeast ramp, landing top and bottom,"
 5   check, that means it complies, "landing
 6   bottom right to asphalt patch, first flag
 7   12.5 percent, 3.12 percent."
 8         Q.    Is that 3.12 percent?
 9         A.    13.2 excuse me.
10               "Second flag, check," that
11   means it complied, "third flag 8.7 to 7.6,
12   check, within tolerances.
13               MR. PARKER:  Can we mark this?
14               (Whereupon, the aforementioned
15          photograph was marked as Plaintiffs'
16          Exhibit 9 for identification as of
17          this date by the Reporter.)
18         Q.    I'm going to show you what's
19   marked as Plaintiffs' Exhibit 9, and my
20   question to you is do you recognize the
21   ramp being shown in Plaintiff's Exhibit 9?
22         A.    Yes.
23         Q.    Is that the southeast ramp
24   we've been talking about?
25         A.    Yes.
```

98

```
 1                    K. J. KING
 2         Q.    Can you also write down which
 3    is the first flag, second flag, and third
 4    flag to the best of your ability?
 5         A.    (Witness complied.)
 6               There's too many shadows.
 7    That's one, two, three.  Top to bottom,
 8    one, two, three.
 9         Q.    The first flag is the
10    dimensions he's talking about.  Then the
11    third flag, do you know if the third flag
12    ends approximately where the line is after
13    your number 3 going towards the bottom of
14    the page?
15         A.    That's where the flag ends,
16    yes.
17         Q.    Do you see the rail to the
18    right?
19         A.    Yes.
20         Q.    Does that rail go to the end of
21    the third flag?
22         A.    Yes.
23         Q.    Does that handrail extend
24    12 inches past the third flag, to the best
25    of your knowledge?
```

```
 1                    K. J. KING
 2        A.    It extends on the level area on
 3   the top of the ramp 12 inches, yes.
 4        Q.    Do you have any knowledge as to
 5   any work performed to any flags on this
 6   ramp depicted on Plaintiffs' Exhibit 9?
 7        A.    The first flag was changed to
 8   make it close to 8.33 -- within tolerances
 9   of the 8.33 percent.
10        Q.    Do you have any pictures of
11   that?
12        A.    I do not.
13        Q.    Do you have any measurements to
14   show that?
15        A.    I don't.  Tim would have
16   measured that.
17        Q.    Did you measure that yourself?
18        A.    No.
19        Q.    When you arrived at that
20   property, do you know if it had been
21   changed or not changed?
22        A.    Tim had been at the property on
23   July 23rd, and confirmed and made those
24   measurements.  I was going back on the 31st
25   to look at additional work, the handrails
```

```
 1                    K. J. KING
 2   and the Dunkin Donuts curb ramp.
 3        Q.    Going to the next page of
 4   Plaintiffs' Exhibit 6, can you tell me
 5   where on that page it shows the slope taken
 6   of the first flag on that ramp?
 7        A.    No, I didn't make a notation.
 8        Q.    Do you see where it says "no
 9   construction work done along sidewalk?"
10        A.    Right, that is the work along
11   the stores, not on the ramp.  We talked
12   about that.
13        Q.    Do you have any knowledge as to
14   whether a measurement was taken of the
15   first flag on the southeast ramp?
16        A.    No, it's -- he had measured
17   again because he had indicated it was
18   8.6 percent in the report, but I don't see
19   a notation here in his notes.
20        Q.    Should there have been a
21   notation in his notes?
22        A.    That or I may not have
23   necessarily made a notation if I noted that
24   they had done the work recommended.
25        Q.    Did you take any measurements
```

```
1                    K. J. KING
2     of any of these concrete flags?
3          A.    No.
4          Q.    He mentions the 30th Street
5     ramp on this page.
6          A.    Right.
7          Q.    What does it say?
8          A.    "30th Street ramp," and then
9     there's no note after it.
10         Q.    Below it says "same?"
11         A.    Same as 31st.
12         Q.    What did that mean?
13         A.    Sign at -- I don't know.  Same
14    as 31st, I think that's means that 31st
15    Street wasn't changed.  The only work done
16    on 31st was the addition of the signs.
17         Q.    The 31st Street ramp, he talks
18    about it at the top of the page?
19         A.    Right.
20         Q.    And then the 30th Street ramp,
21    it says "same as"?
22         A.    I don't know what that means.
23         Q.    For the 31st Street ramp,
24    underneath that heading, it has "No
25    construction work done along sidewalk."  Do
```

```
 1                    K. J. KING
 2    we know for sure one way or the other --
 3         A.    "No construction work done
 4    along sidewalk" is the sidewalk in front of
 5    the stores.  We wouldn't refer to the ramp
 6    as a sidewalk.  A ramp is a ramp, a
 7    sidewalk is a sidewalk.
 8         Q.    Going to the top of that, it
 9    says "31st Street ramp."  And then what
10    does it say?
11         A.    There is no notes.  What the
12    next line is referring to, I don't know,
13    but obviously when he went back, he started
14    on the 31st Street ramp, made notations,
15    walked the sidewalk, came to the 30th
16    Street ramp, and then he made the notes on
17    the railing.
18         Q.    On the top of the page where it
19    says "31st Street ramp"?
20         A.    Yes.
21         Q.    Do you see to the left of that
22    there's a little circle?
23         A.    It's a dot.
24         Q.    The text below it is concerning
25    the 31st Street ramp?
```

103

1                    K. J. KING

2          A.     "Left rail not full length,

3     right rail not above."

4          Q.     Run?

5          A.     "Run.  No changes to," not sure

6     what that is.  Looks like "CR slopes," but

7     I'm not sure.

8          Q.     Could it be the same as the "no

9     KRST" that he did below there?

10         A.     Could be construction work, not

11    sure.  "No changes to concrete."  Then he

12    has "No extension left, no extension right,

13    bottom not 12 inches beyond top, not 12

14    inches beyond."

15         Q.     Let's start with the top left

16    rail.  Can you tell me what does that mean

17    in terms of the ADA requirements?

18         A.     If it's a ramp run, the rail

19    has to run the full length of the ramp.  If

20    there's a piece of rail in the middle of

21    the ramp, it's not compliant.

22         Q.     So, that left rail is not

23    compliant; is that correct?

24         A.     It's not full length.

25         Q.     And being not full length means

104

```
 1                    K. J. KING
 2    it doesn't comply with the ADA Standards?
 3         A.    If its on an accessible route,
 4    yes.
 5         Q.    Is this on an accessible route?
 6         A.    No, they designated the 30th
 7    Street ramp as the accessible route.
 8         Q.    What's below there where it
 9    says "no-something extension?"
10         A.    "No extension L," that's left.
11         Q.    So, there's no handrail
12    extension on the left-hand side, the 31st
13    Street ramp?
14              MR. BARRETT:  Objection to
15         form.
16         A.    It says "no extension L," under
17    the 31st Street ramp.
18         Q.    And the bottom, what does it
19    say after that?
20         A.    "Extension R," for right,
21    "bottom not 12 inches beyond," so there
22    must be some kind of extension that just
23    didn't run 12 inches, "top," and it has the
24    quote notes for not 12 inches beyond, so
25    that means there must be some extensions,
```

105

```
1                    K. J. KING
2    just not 12 inches long.
3         Q.    Going underneath there, it says
4    "no construction," and underneath that what
5    does that say?
6                    MR. BARRETT:  Objection to
7             form.
8         A.    Where are you, West 30th Street
9    ramp?
10        Q.    Yes?
11        A.    "Same at 31st," height --
12        Q.    Do you know what he means by
13   same as 31st?
14        A.    -- "48 high."
15        Q.    What is 48 high?
16        A.    The rails.
17        Q.    Are the handrails supposed to
18   be 48 inches high?
19        A.    No, that's not 48 inches.
20                Oh, sorry, it's "height rails,
21   checkmark."  So, the height of the rails
22   complied, "same as 31st" I believe is
23   referring to the extension.  At that point,
24   the extensions weren't there, that's why I
25   went back on the 31st to determine the
```

1                   K. J. KING
2      extensions.
3           Q.      Extensions where?
4           A.      30th Street ramp.  Railings on
5      the 30th Street ramp.
6           Q.      So, the railings on the 30th
7      Street ramp are the same as they are on the
8      31st Street ramp?
9           A.      Correct.
10          Q.      Correct?
11          A.      As to extensions, correct.
12          Q.      And he talks about the no
13     extension on the 31st Street ramp?
14          A.      Correct.
15          Q.      So, there's no extension on the
16     left rail on the 30th Street ramp?
17          A.      Right.  When he want back on
18     the 23rd, the railings were there, but
19     there were no extensions.  He and I had a
20     discussion.  I -- they were going to fix
21     the railings and provide extensions at the
22     top.  I went back on the 31st and confirmed
23     that the extensions had been provided.
24     Exhibit 9 was taken by me on the 31st
25     showing the extensions.  No, that might not

```
1                    K. J. KING
2    be my picture.  I did take a picture of the
3    ramp showing the extensions on the 31st.  I
4    don't believe it's this one though
5    (pointing).
6         Q.   Going to Plaintiffs' Exhibit 9,
7    if originally the ramp had been not
8    compliant in terms of the slope, what would
9    they have had to have done in order to make
10   it compliant?  Would it be accurate to say
11   they would have had to extend the length of
12   the ramp itself in order to make the first
13   flag compliant?
14             MR. BARRETT:  Objection to
15        form.
16        A.   You can do many things.  You
17   could grind it down depending on how long
18   the non-compliant section is, you don't
19   necessarily need to rip it out and replace
20   an entire flag.
21        Q.   Do you know what, if anything,
22   was done here?
23        A.   No, I don't know how they made
24   it -- how they reduced it to 8.6 percent.
25   I don't know how they did it.  If they
```

108

```
 1                    K. J. KING
 2     grinded it down, if they took it out and
 3     poured a new one.  They probably --  for a
 4     small section, you can grind down.
 5          Q.    Do you know if they did
 6     anything?
 7          A.    They had to have because the
 8     slope went to 8.6 percent after --  between
 9     June and July when they did the work.
10          Q.    Did you, yourself, take a
11     measurement of that slope?
12          A.    No.
13          Q.    And that 8.6 percent is not
14     contained anywhere on Plaintiffs' Exhibit
15     6; is that accurate?
16          A.    Not that I can see, no.
17          Q.    Would that have and something
18     that should have been put down on paper?
19               MR. BARRETT:  Objection to
20          form.
21          A.    He may have put it down on
22     paper, he may have just made a mental note
23     that within tolerance of 8.6 and put it in
24     a report from memory as opposed to writing
25     it down.
```

1                    K. J. KING

2          Q.     The maximum permitted is 8.33?

3          A.     Right, but there was

4    construction tolerances.

5          Q.     Understood.  So, if it was 8.6,

6    would he write just 8.6 tolerance or would

7    8.6 be reflected in an actual measurement

8    taken?

9          A.     8.6 would be an actual

10   measurement.  Tolerance would be his

11   judgment within the standards.

12         Q.     Going back to Plaintiffs'

13   Exhibit 9, does this show where it ends if

14   the --

15         A.     You would need to have a side

16   view, I can't tell where the slope ends,

17   starts and begins looking down.  You would

18   have to take the photo from the side in

19   order for me to say where it starts and

20   ends.

21         Q.     When he's talking about

22   measurements on the third flag, it still

23   had a slope; is that correct?

24         A.     Right.  It can slope and then

25   it can level off at the top to two percent.

110

1                    K. J. KING

2        Q.    Do you know if this third ramp

3    had any such --

4        A.    I know there was the level area

5    at the top of the ramp was, um, two

6    percent.  Where it starts, I can't tell

7    from this photo.  That's on page three of

8    his report.

9        Q.    On page 3 of Plaintiffs'

10   Exhibit 6, on the third flag, it says it's

11   8.7 dash 7.6.

12             Are those measurements one

13   taken at the top of the flag, the other

14   taken at the bottom of the flag or vice

15   versa?

16       A.    Yes, we move our two-foot level

17   along the flag and take the measurement.

18       Q.    So, the very top of what's

19   under 3 would have been about 8.7 percent?

20       A.    Right.  Going from the bottom

21   of the ramp to the top -- actually the top

22   of the ramp would be 7.6.  You start at the

23   bottom measuring, so 8.7 would be here

24   (indicating) adjacent to flag two, 7.6

25   would be at the top.

```
 1                    K. J. KING
 2              MR. PARKER:  Can you mark this?
 3              (Whereupon, the aforementioned
 4         photograph was marked as Plaintiffs'
 5         Exhibit 10 for identification as of
 6         this date by the Reporter.)
 7         Q.    I'm going to show you what's
 8    been marked as Plaintiffs' Exhibit 10, and
 9    my question to you is do you recognize
10    what's shown in this photograph?
11         A.    The ramp we've been discussing.
12         Q.    So, for Plaintiffs' Exhibit 9,
13    that would be a picture showing the
14    handrail on the other side of the ramp?
15         A.    On the wall side, correct.
16         Q.    For the same thing, can you
17    mark the flags of the concrete?
18         A.    (Witness complied.)
19         Q.    At the top of this ramp, does
20    the side handrail extend past the end of
21    the ramp?
22              MR. BARRETT:  Objection to
23         form.  We're talking about in the
24         photograph, right?
25              MR. PARKER:  Well, looking at
```

112

```
 1                    K. J. KING
 2        the photograph and based upon her
 3        review of it, the question is --
 4        A.    It's hard to see in this photo
 5   (pointing).  The flag three in the photo
 6   looks like it's leveled off at the top of
 7   the flag.
 8        Q.    My question to you is, does
 9   this handrail that's being shown on
10   Plaintiff's Exhibit 10 extend at least 12
11   inches beyond the end of the third concrete
12   flag?
13                MR. BARRETT:   Objection to
14        form.
15        A.    It doesn't extend beyond the
16   third concrete flag.  But my point is, that
17   the end of the third concrete flag could be
18   level.  Its hard to see where this levels
19   off.  I don't know if these are shadows, if
20   this is where the concrete changes slope
21   and direction.
22        Q.    Do you see the stones put down
23   along the side?
24        A.    Yes.
25        Q.    Does that give you an idea of
```

113

```
 1                    K. J. KING
 2    the angle, that the concrete flag is still
 3    moving up at an angle?
 4                    MR. BARRETT:  Objection to
 5         form.
 6         Q.    Towards the end of the concrete
 7    flag?
 8                    MR. BARRETT:  Objection to
 9         form.
10         A.    I would have to see where it
11    actually starts leveling off.  Again,
12    you're assuming that the wall is totally
13    level too.  That's really no indication.
14         Q.    Did you take any measurement of
15    this particular handrail?
16         A.    Yes, and the handrail had a
17    12-inch level area.
18         Q.    Where did that 12-inch level
19    area start, to the best of your knowledge?
20         A.    At the level where the ramp
21    leveled off to two percent.
22         Q.    And to the best of your
23    knowledge, where on this photograph did the
24    ramp level out to two percent?
25         A.    I don't remember exactly based
```

114

1                    K. J. KING

2     on this photo.

3          Q.    Do you see the end of the third

4     concrete flag?

5          A.    Yes.

6          Q.    Would the end of this concrete

7     flag denote the beginning of the leveling

8     section?

9          A.    Not necessarily.

10          Q.    According to Tim's

11     measurements, the top of that flag was

12     7.6 percent; is that accurate?

13          A.    He would measure the flag up

14     to -- he's measuring the ramp here, so the

15     ramp, he's measuring flag by flag by flag.

16     If -- I'm not sure where exactly he put his

17     7.6 percent.  It was here, and then it

18     started to level off, and once it levels

19     off, that becomes the landing, and it's no

20     longer the ramp, it's the landing.

21          Q.    So, the third flag has two

22     numbers, 8.7 and then dash 7.6.  Where are

23     those numbers supposed to be, are they

24     supposed to be at the bottom of the flag

25     and then the top of the flag --

```
 1                    K. J. KING
 2         A.    They start at the bottom and
 3    then work their way up.  They could be here
 4    (indicating), and then it starts to level
 5    off and becomes the landing and he would
 6    stop measuring that.  He was measuring the
 7    ramp.
 8         Q.    He's also measuring the flag
 9    too?
10         A.    Right, that's for his notation
11    so he so he knows where he's going with the
12    ramp -- with the level.  So, I would put
13    the same thing as him, "third flag 8.77.6,"
14    and once I hit the landing, I would go
15    landing, 2.0 if it was 2.0 or 4.5 if it was
16    4.5.
17         Q.    On Plaintiffs' Exhibit 10, do
18    you see a slope on the actual handrail
19    itself in relation to the concrete blocks
20    that are there?
21         A.    Yes, it slopes.  You can see
22    where the blocks change and you can see
23    where it levels off at the white line of
24    the concrete blocks (indicating).
25         Q.    Do you know what the width of
```

116

1                    K. J. KING

2    these concrete blocks are?

3         A.    No, I don't.

4         Q.    If you look at the two

5    pictures, the handrails end in different

6    ways.  This handrail shown on Plaintiffs'

7    Exhibit 9, it returns back to the rail.

8              Is there any reason why the

9    handrail on Plaintiffs' Exhibit 10 does not

10   have a return or go down?

11             MR. BARRETT:  Objection to

12        form.

13        A.    Just the placement of the rail.

14   The one on Exhibit 9 is not along the wall,

15   it's open space.  So, it's just the design

16   of the handrail, its --

17        Q.    To your knowledge, are

18   handrails supposed to have rounded returns?

19        A.    When it's on an open side such

20   as this.  When it's on the wall, you can

21   have it be a 12-inch level.  The reason the

22   handrails need to be leveled at the top of

23   the bottom if it's not a hazard such as

24   here, is for people who are blind or low

25   vision so as they're going along the

```
 1                    K. J. KING
 2    railing, they realize the ramp is stopped
 3    or the stairs have stopped, and now they're
 4    gonna be on a level area.  There's no more
 5    slope, there's no more steps.  So, you
 6    would get the same here when they would run
 7    their hand and then it levels off
 8    (indicating), they would know, okay, I'm at
 9    the top of the ramp.  Here, they just round
10    it and do it -- an exchange, because it's
11    an open area, it's on the side of the
12    building.  The handrail extensions are for
13    folks who have vision disabilities, not
14    wheelchair users, unless they're blind.
15         Q.    Is the bluntness of the end of
16    the handrail, is that a factor for
17    wheelchair users?
18              MR. BARRETT:  Objection to
19         form.
20         A.    No. I mean, it can't be sharp
21    or have burrs or cause injury to the skin.
22    But as long as it's not an jagged edge,
23    like they just come in and saw-cut a metal
24    piece and now it's a jagged edge, as long
25    as it ends in a smooth so it's not gonna
```

118

```
 1                    K. J. KING
 2    cut anybody, it would comply.  And then
 3    there's the height requirement of the rail,
 4    there's the requirements of the space
 5    between the railing and the wall.  The
 6    actual dimension of the wall has to be
 7    grippable.  All of that complies.
 8         Q.    Going back to the report, the
 9    measurements that were taken at the bottom
10    of going to 4.37 where it says the ramp at
11    the southeast corner, the third one down?
12         A.    Landing at the bottom, of the
13    top and bottom of this ramp?
14         Q.    Exactly.  To the best of your
15    knowledge, are the landings at the top and
16    bottom of this ramp, do they have cross
17    slopes of less than two percent?
18         A.    Yes.
19         Q.    Going back to Tim's notes,
20    Exhibit 6, going to number five.
21         A.    "Not in scope."
22         Q.    Do you know what he meant by
23    that?
24         A.    We were only retained to do the
25    parking, the curb ramps, and the path of
```

119

1                      K. J. KING

2      travel, not to go into any of the tenant

3      spaces.

4          Q.    What about the drain gate, did

5      you see one?

6          A.    'Cause I drove over it, yes.

7          Q.    To the best of your knowledge,

8      is that terrain grate compliant with the

9      Standards for Accessible Design?

10         A.    Doesn't have to be, it's not an

11     accessible route.  Any grating or carpeting

12     or any kind of surface texture only

13     complies when it's an accessible route.

14     So, the middle of the, you know, 6th Avenue

15     drain doesn't have to comply unless it's in

16     a cross walk.

17              MR. PARKER:  Let's take a

18         break, I'm fairly close to being

19         done.

20              (Whereupon, a short recess was

21         taken.)

22         Q.    One last question.  To the best

23     of your knowledge, what work has been done

24     between Tim's first inspection and today to

25     this property?  I believe you described a

```
1                K. J. KING
2    curb ramp.  If you could just briefly tell
3    me what you believe has been done.
4                MR. BARRETT:  Objection to
5          form.
6          A.    Um, the handrailing and the
7    extensions were added on the 30th Street
8    ramp; the ramp slopes were -- on the 30th
9    Street ramps, on the -- were within
10   tolerances of 8.33 percent so the ramps
11   were in compliance; the curb ramp at Dunkin
12   Donuts was corrected; the gaps that were
13   noted and the changes in level were
14   corrected; and the slope was corrected so
15   that curb ramp complies; the curb ramp at
16   Rite Aid complied at the beginning.
17         Q.    I'm just asking --
18         A.    The signage was raised, sign
19   was added at the 31st Street ramp.  And I
20   believe that's it.
21               MR. PARKER:  Thank you very
22         much for your time.
23               MR. BARRETT:  If I can for the
24         record, just pursuant to the Federal
25         rules, we request the opportunity to
```

121

```
1                      K. J. KING
2          review and execute the transcript.
3               MR. PARKER:  Yes.
4                  (Whereupon, at 3:46 P.M., the
5          examination of this witness was
6          concluded.)
7
8               _____
9                    KLEO J. KING
10
11     Subscribed and sworn to before me
12     this _____ day of _____ 20____.
13
14     _____
                 NOTARY PUBLIC
15
16
17
18
19
20
21
22
23
24
25
```

122

```
 1                        K. J. KING

 2                    E X H I B I T S

 3

 4     PLAINTIFFS' EXHIBITS:

 5

 6     EXHIBIT     EXHIBIT                    PAGE

 7     NUMBER      DESCRIPTION

 8     1           Blueprint                  25

 9     2           Letter to S. Domansky      41

10     3           Accessibility review       44

11     4           Accessibility survey       45

12     5           Accessibility inspection   57

13     6           Notes                      62

14     7           Photograph                 72

15     8           Photograph                 87

16     9           Photograph                 97

17     10          Photograph                 111

18

19

20

21

22

23

24

25
```

123

1                     K. J. KING

2                   I N D E X

3

4    EXAMINATION BY                    PAGE

5    MR. PARKER                        4

6

7

8      INFORMATION AND/OR DOCUMENTS REQUESTED

9    INFORMATION AND/OR DOCUMENTS      PAGE

10   Review and execute transcript     120-121

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    K. J. KING
2              C E R T I F I C A T E
3
4    STATE OF NEW YORK        )
                              :  SS.:
5    COUNTY OF RICHMOND       )
6
7         I, SARAH BRANDON-GRABLE, a Notary
8    Public for and within the State of New
9    York, do hereby certify:
10        That the witness whose examination is
11   hereinbefore set forth was duly sworn and
12   that such examination is a true record of
13   the testimony given by that witness.
14        I further certify that I am not
15   related to any of the parties to this
16   action by blood or by marriage and that I
17   am in no way interested in the outcome of
18   this matter.
19        IN WITNESS WHEREOF, I have hereunto
20   set my hand this 9th day of October 2014.
21
22
23   _____
                SARAH BRANDON-GRABLE
24
25
```

**'90s** [3] - 19:7, 21:24, 84:25

---

**1** [10] - 3:17, 25:19, 25:22, 28:7, 28:10, 30:6, 30:19, 41:21, 94:11, 122:8
**1.1** [1] - 62:16
**1.2** [2] - 71:9, 71:13
**1.4** [1] - 71:15
**10** [6] - 111:5, 111:8, 112:10, 115:17, 116:9, 122:17
**10013** [2] - 1:22, 2:6
**10017** [1] - 2:11
**10th** [2] - 1:21, 2:5
**111** [1] - 122:17
**11370** [1] - 4:14
**117** [1] - 29:18
**12** [14] - 17:13, 17:15, 18:12, 76:9, 76:18, 98:24, 99:3, 103:13, 104:21, 104:23, 104:24, 105:2, 112:10
**12-inch** [3] - 113:17, 113:18, 116:21
**12.5** [1] - 97:7
**120-121** [1] - 123:10
**12:48** [1] - 1:13
**13** [1] - 1:6
**13.2** [1] - 97:9
**13.5** [2] - 76:9, 76:19
**14** [2] - 84:4, 84:5
**14701.1** [1] - 2:12
**15** [2] - 19:23, 19:25
**150** [1] - 2:10
**17** [2] - 6:6, 6:7
**1990** [2] - 86:22, 87:9
**1990's** [1] - 22:10
**1990s** [5] - 21:22, 42:15, 43:19, 43:24, 84:6
**1991** [25] - 19:11, 19:13, 21:13, 21:20, 22:5, 22:11, 22:22, 22:23, 23:5, 23:12, 23:21, 24:3, 24:11, 29:22, 32:3, 34:8, 34:24, 43:7, 43:21, 44:2, 44:5, 57:25, 87:3, 95:3, 95:5
**1993** [1] - 43:6

---

**2**

**2** [8] - 25:23, 28:6, 41:16, 41:19, 59:18, 74:6, 94:11, 122:9
**2.0** [2] - 115:15
**2.1** [1] - 71:20
**2.2** [3] - 75:19, 76:2, 76:7
**20** [1] - 86:3
**2000** [3] - 42:17, 43:2, 43:8

---

**2010** [4] - 19:17, 19:25, 35:4, 57:11
**2012** [2] - 19:23, 19:25
**2014** [24] - 1:12, 8:14, 8:16, 8:21, 9:15, 9:18, 9:22, 12:19, 13:2, 15:4, 24:6, 24:10, 25:6, 25:11, 30:25, 46:18, 53:2, 73:10, 76:15, 79:6, 87:21, 88:15, 88:18, 124:20
**20___** [1] - 121:12
**231** [1] - 94:20
**23rd** [2] - 99:23, 106:18
**25** [3] - 1:12, 94:21, 122:8
**250** [1] - 94:22
**27** [1] - 5:25

---

**3**

**3** [12] - 28:6, 28:15, 30:5, 30:18, 44:11, 44:15, 57:9, 59:21, 98:13, 110:9, 110:19, 122:10
**3.1** [3] - 76:23, 77:18, 87:17
**3.12** [2] - 97:7, 97:8
**3.4** [1] - 63:12
**3.5** [1] - 67:2
**3.7** [2] - 70:10, 70:13
**30** [7] - 3:16, 80:20, 81:9, 82:11, 82:12, 82:17, 82:20
**30-inch** [2] - 82:14, 82:18
**3015** [17] - 4:21, 8:9, 13:4, 19:9, 19:15, 20:5, 21:10, 23:19, 24:25, 25:5, 26:10, 33:7, 38:6, 39:15, 40:7, 40:11, 68:16
**30th** [21] - 31:16, 32:6, 32:16, 32:19, 32:21, 37:2, 94:16, 95:14, 96:20, 101:4, 101:8, 101:20, 102:15, 104:6, 105:8, 106:4, 106:5, 106:6, 106:16, 120:7, 120:8
**31** [10] - 8:14, 8:16, 8:21, 9:15, 9:18, 9:22, 12:19, 13:2, 15:4, 25:6
**31st** [36] - 31:20, 32:25, 33:5, 33:11, 33:14, 47:16, 52:17, 59:24, 60:10, 72:11, 73:8, 94:13, 95:11, 99:24, 101:11, 101:14, 101:16, 101:17, 101:23, 102:9, 102:14, 102:19, 102:25, 104:12, 104:17, 105:11, 105:13, 105:22, 105:25, 106:8, 106:13, 106:22, 106:24, 107:3, 120:19
**36** [1] - 91:15
**39** [1] - 94:20
**3:46** [1] - 121:4

---

**4**

**4** [5] - 45:19, 61:15, 62:20, 122:11, 123:5
**4.1** [1] - 96:23
**4.37** [1] - 118:10
**4.4** [2] - 63:15, 70:10
**4.5** [2] - 115:15, 115:16
**4.8** [1] - 66:23
**40** [4] - 1:20, 2:5, 63:10, 66:8
**41** [3] - 63:9, 66:7, 122:9
**42nd** [1] - 2:10
**44** [1] - 122:10
**45** [1] - 122:11
**48** [5] - 63:10, 105:14, 105:15, 105:18, 105:19
**49** [1] - 62:24

---

**5**

**5** [4] - 57:6, 58:23, 74:6, 122:12
**54** [1] - 71:16
**57** [1] - 122:12
**58/87** [1] - 29:16

---

**6**

**6** [13] - 62:6, 62:9, 75:22, 75:25, 77:19, 87:16, 88:22, 96:23, 100:4, 108:15, 110:10, 118:20, 122:13
**6-inch** [2] - 78:13, 92:9
**6.0** [1] - 65:4
**6.7** [1] - 78:25
**6.9** [3] - 77:9, 78:8, 78:22
**60** [3] - 66:12, 66:13, 71:19
**62** [1] - 122:13
**6th** [1] - 119:14

---

**7**

**7** [3] - 72:21, 72:24, 122:14
**7.6** [11] - 59:19, 74:9, 77:8, 79:2, 97:11, 110:11, 110:22, 110:24, 114:12, 114:17, 114:22
**7.9** [2] - 59:19, 74:9
**7/31** [1] - 59:20
**72** [1] - 122:14
**75-20** [1] - 4:13
**760** [1] - 1:6

---

**8**

**8** [7] - 87:13, 88:6, 89:13, 92:16, 95:20, 96:12, 122:15
**8.33** [18] - 74:2, 76:19, 78:14, 78:16, 79:12, 80:4, 80:13, 80:15, 81:2, 81:4, 81:13,

---

81:14, 86:4, 86:16, 99:8, 99:9, 109:2, 120:10
**8.6** [9] - 100:18, 107:24, 108:8, 108:13, 108:23, 109:5, 109:6, 109:7, 109:9
**8.7** [5] - 97:11, 110:11, 110:19, 110:23, 114:22
**8.77.6** [1] - 115:13
**87** [1] - 122:15
**8:00** [1] - 13:6
**8:30** [1] - 13:6

---

**9**

**9** [11] - 97:16, 97:19, 97:21, 99:6, 106:24, 107:6, 109:13, 111:12, 116:7, 116:14, 122:16
**9.7** [3] - 77:8, 79:2, 79:3
**9.8** [3] - 77:9, 78:8, 78:22
**97** [1] - 122:16
**9:00** [1] - 13:9
**9th** [1] - 124:20

---

**A**

**ABA** [1] - 33:12
**ability** [1] - 98:4
**able** [2] - 46:14, 81:4
**access** [8] - 64:15, 64:18, 64:22, 65:6, 65:18, 70:15, 71:2, 71:5
**Access** [1] - 70:8
**accessibility** [3] - 44:10, 45:18, 60:5
**Accessibility** [10] - 6:13, 6:20, 6:23, 6:25, 7:2, 19:13, 69:22, 122:10, 122:11, 122:12
**Accessible** [38] - 19:11, 19:17, 21:14, 21:21, 22:5, 22:12, 23:5, 23:12, 23:21, 24:11, 29:23, 32:4, 32:23, 33:12, 34:8, 34:25, 35:5, 35:17, 35:25, 38:9, 41:9, 46:4, 46:24, 56:2, 57:12, 64:4, 64:11, 65:8, 74:7, 76:17, 78:20, 83:12, 87:4, 91:8, 91:20, 95:4, 95:5, 119:9
**accessible** [53] - 24:12, 27:14, 27:20, 29:12, 30:8, 30:13, 30:17, 31:8, 31:11, 32:5, 32:22, 33:13, 34:2, 34:6, 34:10, 34:12, 39:10, 40:19, 53:7, 53:13, 53:14, 53:17, 63:20, 63:21, 63:24, 64:13, 64:19, 64:22, 65:7, 65:14, 66:11, 67:6, 67:11, 67:15, 67:22, 68:15, 68:25, 69:5, 70:25, 71:6, 79:8,

K. J. KING

84:10, 91:22, 91:24, 92:8, 92:23, 94:24, 95:9, 104:3, 104:5, 104:7, 119:11, 119:13
**accommodation** [1] - 37:14
**accomodation** [2] - 37:8, 95:8
**accordance** [2] - 21:24, 43:4
**according** [2] - 88:20, 114:10
**account** [2] - 81:15, 83:7
**accurate** [8] - 5:18, 18:13, 56:9, 76:17, 107:10, 108:15, 114:12
**achievable** [1] - 20:18
**achieve** [1] - 34:10
**Act** [1] - 19:12
**action** [1] - 124:16
**actual** [7] - 15:16, 16:9, 52:13, 109:7, 109:9, 115:18, 118:6
**ADA** [19] - 19:24, 22:20, 32:20, 42:18, 42:22, 48:14, 50:14, 52:6, 67:7, 69:6, 69:21, 80:24, 83:5, 83:12, 91:19, 92:3, 92:7, 103:17, 104:2
**ADA/ABA** [1] - 57:11
**add** [1] - 96:19
**added** [8] - 53:25, 59:22, 60:9, 60:11, 79:8, 89:2, 120:7, 120:19
**addition** [1] - 101:16
**additional** [2] - 14:24, 99:25
**address** [1] - 4:11
**addressed** [2] - 46:13, 69:21
**adjacent** [2] - 39:17, 110:24
**adjusted** [1] - 48:24
**administer** [1] - 3:11
**advising** [1] - 12:14
**affect** [1] - 36:17
**affected** [2] - 39:25, 85:8
**affixed** [1] - 91:17
**aforementioned** [10] - 25:17, 41:14, 44:9, 45:17, 57:4, 62:4, 72:19, 87:11, 97:14, 111:3
**afternoon** [1] - 4:15
**ago** [1] - 84:4
**agree** [3] - 19:8, 19:18, 35:3
**AGREED** [2] - 3:5, 3:20
**agreed** [1] - 50:17
**agreeing** [3] - 71:13, 71:18, 71:21
**agrees** [1] - 71:15
**Aid** [7] - 61:11, 63:7, 64:20, 65:15, 65:19, 66:6, 120:16
**aisle** [8] - 64:16, 64:19, 64:22, 65:6, 65:19, 70:8, 70:15, 71:5

**aisles** [2] - 53:17, 71:2
**allow** [1] - 12:8
**alterations** [3] - 19:14, 19:21, 84:8
**American** [1] - 19:12
**amount** [2] - 15:9, 94:2
**analysis** [1] - 81:22
**AND** [2] - 3:5, 3:20
**AND/OR** [2] - 123:8, 123:9
**Angela** [1] - 4:17
**ANGELA** [2] - 1:3, 2:5
**angle** [3] - 90:7, 113:2, 113:3
**ANSIA** [1] - 29:17
**answer** [8] - 5:12, 8:23, 11:2, 14:4, 15:20, 21:6, 33:16, 86:6
**apologize** [1] - 75:23
**applies** [2] - 35:3, 92:7
**apply** [2] - 44:3, 92:4
**applying** [1] - 49:15
**approximate** [2] - 19:6, 60:21
**architect** [1] - 6:24
**Architects** [1] - 42:7
**area** [18] - 7:24, 35:16, 35:23, 64:5, 65:11, 70:20, 70:22, 72:13, 73:18, 80:21, 82:11, 95:7, 99:2, 110:4, 113:17, 113:19, 117:4, 117:11
**areas** [9] - 6:9, 36:7, 39:9, 46:2, 46:6, 46:23, 55:23, 57:21
**arisen** [2] - 38:14, 38:16
**arrangement** [2] - 7:9, 7:15
**arrival** [10] - 31:24, 32:6, 32:8, 32:12, 33:10, 34:4, 35:2, 93:20, 95:10, 95:12
**arrive** [2] - 31:25, 95:6
**arrived** [2] - 13:2, 99:19
**arrives** [2] - 93:20, 94:14
**arriving** [1] - 92:24
**as-needed** [1] - 14:21
**aside** [4] - 10:12, 25:9, 39:23, 61:7
**asphalt** [4] - 70:21, 73:14, 73:21, 97:6
**asphalt's** [1] - 39:11
**assessing** [1] - 24:7
**assignment** [3] - 50:10, 50:20, 55:8
**assignments** [1] - 7:13
**Associate** [1] - 42:6
**ASSOCIATES** [1] - 1:8
**Associates** [1] - 4:18
**Association** [7] - 4:12, 5:22, 5:24, 7:5, 8:2, 42:11, 54:15
**assuming** [4] - 31:12, 39:19, 82:25, 113:12
**assumptions** [1] - 39:24

**Astoria** [1] - 4:13
**attached** [1] - 90:24
**attorney** [2] - 52:25, 96:4
**Attorney** [1] - 2:4
**Attorneys** [1] - 2:9
**attorneys** [2] - 41:11, 95:23
**authorized** [1] - 3:11
**Avenue** [19] - 4:21, 8:9, 13:5, 19:9, 19:16, 20:5, 21:10, 21:11, 23:19, 24:25, 25:5, 26:11, 33:7, 38:6, 39:15, 40:7, 40:11, 68:16, 119:14
**aware** [25] - 5:16, 20:3, 20:8, 20:11, 20:25, 21:8, 22:3, 22:7, 23:2, 23:8, 23:18, 23:24, 25:8, 33:2, 38:4, 42:9, 58:8, 60:12, 65:12, 65:16, 65:17, 67:21, 72:5, 79:4, 79:10

---
**B**
---

**Barrett** [7] - 11:18, 11:20, 12:2, 12:19, 12:23, 13:8, 13:11
**BARRETT** [49] - 2:11, 8:22, 10:15, 11:19, 12:5, 12:13, 14:3, 15:19, 16:12, 18:14, 21:5, 21:15, 22:14, 23:14, 25:12, 28:23, 29:24, 30:20, 33:15, 36:2, 37:16, 48:6, 49:12, 49:18, 50:5, 52:7, 54:19, 56:4, 56:12, 67:17, 69:7, 75:21, 79:24, 82:6, 83:24, 91:12, 92:5, 104:14, 105:6, 107:14, 108:19, 111:22, 112:13, 113:4, 113:8, 116:11, 117:18, 120:4, 120:23
**Boulevard** [1] - 4:13
**BRANDON** [2] - 124:7, 124:23
**Brandon** [1] - 1:22
**BRANDON-GRABLE** [2] - 124:7, 124:23
**Brandon-Grable** [1] - 1:22
**break** [4] - 5:2, 5:3, 5:6, 119:18
**briefly** [1] - 120:2
**bring** [1] - 37:14
**bringing** [1] - 41:8
**Brooklyn** [2] - 4:22, 8:10
**BROWN** [2] - 1:3, 2:5
**Brown** [1] - 4:17
**build** [1] - 81:13
**building** [3] - 28:2, 42:15, 117:12
**Building** [1] - 81:14
**Buildings** [2] - 26:14, 26:20
**built** [4] - 37:24, 84:4, 86:13, 95:2
**burrs** [1] - 117:21
**business** [2] - 4:11, 48:12
**BY** [2] - 2:6, 2:11, 4:6, 123:4

53:21, 63:22, 66:10, 80:22, 96:12, 98:4, 98:24, 113:19, 113:22, 118:14, 119:7, 119:22
**between** [12] - 3:6, 42:10, 47:20, 64:23, 74:9, 78:5, 78:7, 91:15, 96:11, 108:8, 118:5, 119:24
**beyond** [6] - 103:13, 103:14, 104:21, 104:24, 112:11, 112:15
**bigger** [1] - 30:3
**Blackberry** [1] - 9:24
**blind** [2] - 116:24, 117:14
**blocks** [4] - 115:19, 115:22, 115:24, 116:2
**blood** [1] - 124:16
**blueprint** [1] - 25:18
**Blueprint** [1] - 122:8
**bluntness** [1] - 117:15
**blurry** [2] - 28:13, 28:17
**bottom** [35] - 18:19, 26:18, 27:2, 27:18, 28:19, 36:25, 66:13, 68:2, 77:4, 77:7, 78:21, 80:6, 80:10, 87:17, 89:6, 89:10, 89:12, 91:17, 97:4, 97:6, 98:7, 98:13, 103:13, 104:18, 104:21, 110:14, 110:20, 110:23, 114:24, 115:2, 116:23, 118:9, 118:12, 118:13, 118:16

---

K. J. KING

## C

cannot [1] - 5:9
car [1] - 14:15
carpeting [1] - 119:11
Case [1] - 1:6
causing [1] - 37:21
center [2] - 70:10, 79:9
Center [5] - 77:4, 81:17, 82:23, 83:2, 85:5
certain [3] - 6:9, 48:10, 93:8
Certificate [3] - 42:16, 42:19, 42:25
certification [1] - 3:8
certify [2] - 124:9, 124:14
change [7] - 37:22, 53:2, 73:16, 77:7, 84:8, 84:21, 115:22
changed [13] - 30:24, 53:10, 53:12, 57:19, 73:21, 73:22, 74:2, 85:18, 96:9, 99:7, 99:21, 101:15
changes [8] - 36:14, 72:3, 72:15, 93:8, 103:5, 103:11, 112:20, 120:13
characteristic [1] - 21:12
characteristics [1] - 20:4
check [8] - 8:18, 8:19, 8:21, 13:20, 14:22, 97:5, 97:10, 97:12
checked [1] - 9:11
checking [1] - 9:3
checkmark [5] - 71:10, 71:12, 77:5, 105:21
checkmarks [1] - 76:13
checks [1] - 76:11
circle [1] - 102:22
circling [1] - 28:11
citation [1] - 57:25
citations [1] - 58:5
City [4] - 7:24, 26:20, 80:7, 80:8
Civ [1] - 1:6
Civil [1] - 1:19
claim [1] - 83:21
clarification [1] - 64:9
clarify [2] - 36:16, 75:21
classifications [1] - 6:8
clear [1] - 91:15
clearance [1] - 80:18
clearances [1] - 79:16
client [6] - 54:22, 55:6, 55:17, 55:19, 56:24
close [3] - 86:16, 99:8, 119:18
CO [1] - 43:11
coaching [2] - 49:17, 49:18
Code [1] - 6:24
code [3] - 37:25, 69:21, 81:9
color [1] - 70:21

comments [1] - 57:21
communication [1] - 35:22
communications [4] - 40:6, 40:10, 42:10, 95:18
complaint [1] - 37:6
complete [4] - 48:17, 48:18, 59:2, 59:4
completed [1] - 54:5
completely [1] - 37:24
compliance [27] - 21:20, 22:11, 23:4, 23:11, 24:10, 29:21, 37:15, 38:8, 41:8, 42:21, 46:3, 46:10, 50:14, 55:23, 57:22, 58:21, 83:17, 83:20, 84:3, 84:7, 84:13, 85:13, 87:3, 87:8, 91:7, 95:3, 120:11
compliant [34] - 19:16, 35:17, 35:24, 36:8, 37:7, 37:12, 37:13, 53:15, 55:14, 59:6, 61:13, 76:16, 80:24, 81:24, 82:5, 83:4, 83:23, 84:16, 84:17, 84:19, 85:24, 86:9, 86:12, 86:14, 87:7, 88:24, 93:12, 103:21, 103:23, 107:8, 107:10, 107:13, 107:18, 119:8
complied [19] - 14:10, 14:13, 16:16, 17:7, 17:8, 24:4, 30:23, 53:18, 56:2, 74:14, 76:10, 76:11, 76:12, 89:25, 97:11, 98:5, 105:22, 111:18, 120:16
complies [11] - 55:2, 56:7, 56:19, 56:21, 77:5, 77:9, 79:3, 97:5, 118:7, 119:13, 120:15
comply [20] - 19:24, 21:13, 24:3, 29:16, 31:2, 31:13, 43:7, 46:23, 53:20, 56:22, 78:19, 78:25, 80:5, 80:12, 80:15, 85:21, 92:2, 104:2, 118:2, 119:15
comprehensive [1] - 55:24
concern [1] - 96:16
concerning [2] - 96:8, 102:24
concluded [1] - 121:6
conclusion [1] - 38:23
concrete [26] - 36:7, 70:22, 77:13, 78:4, 81:18, 83:19, 85:11, 87:7, 89:4, 89:6, 89:7, 89:16, 101:2, 103:11, 111:17, 112:11, 112:16, 112:17, 112:20, 113:2, 113:6, 114:4, 114:6, 115:19, 115:24, 116:2
condition [7] - 5:4, 18:20, 24:6, 38:22, 39:2, 69:10, 87:20

conditions [7] - 20:20, 36:5, 52:16, 84:7, 84:21, 85:18, 85:21
conducted [3] - 16:18, 45:22, 60:5
conducting [1] - 7:25
confirmed [3] - 14:7, 99:23, 106:22
conformance [1] - 22:4
connect [1] - 32:10
considered [2] - 34:3, 42:20
consistent [1] - 72:16
constructed [24] - 19:2, 20:24, 21:22, 22:6, 22:10, 22:18, 23:4, 23:9, 24:5, 28:22, 31:7, 36:24, 42:15, 43:4, 43:5, 43:18, 43:23, 84:7, 84:13, 84:19, 84:24, 85:3, 86:17, 86:20
constructing [2] - 21:3, 21:9
construction [19] - 19:4, 19:6, 19:10, 20:23, 23:20, 27:10, 29:21, 30:22, 31:3, 32:19, 83:11, 83:14, 83:21, 100:9, 101:25, 102:3, 103:10, 105:4, 109:4
Construction [5] - 22:13, 22:24, 23:6, 23:13, 44:5
consultants [1] - 75:12
contact [1] - 96:3
contained [8] - 16:9, 29:22, 44:5, 45:13, 58:15, 60:13, 62:19, 108:14
contractors [2] - 40:6, 40:10
conversation [8] - 12:4, 12:7, 12:23, 13:10, 16:17, 16:22, 17:2, 40:12
conversations [5] - 12:10, 12:16, 12:18, 35:14, 40:14
convey [1] - 55:23
copy [2] - 3:14, 3:17
corner [2] - 75:8, 118:11
correct [33] - 15:23, 18:8, 31:17, 31:21, 33:8, 36:22, 46:19, 49:4, 50:19, 53:12, 54:8, 54:11, 54:17, 66:9, 66:15, 71:7, 71:8, 77:23, 82:14, 85:17, 89:13, 93:17, 93:18, 95:12, 95:15, 96:7, 103:23, 106:9, 106:10, 106:11, 106:14, 109:23, 111:15
corrected [13] - 47:4, 47:7, 47:14, 47:20, 49:5, 49:7, 52:19, 52:23, 72:8, 72:10, 120:12, 120:14
correctly [3] - 84:25, 86:18, 86:20
correspond [1] - 29:7
corresponding [1] - 62:19

COs [2] - 43:10, 43:13
cost [7] - 81:11, 83:9, 83:10, 83:14, 83:15, 83:16, 86:5
counsel [3] - 3:6, 3:17, 11:19
COUNTY [1] - 124:5
couple [1] - 8:18
COURT [1] - 1:2
Court [2] - 3:13, 5:8
CR [1] - 103:6
crack [4] - 78:5, 89:16, 89:19
cracked [1] - 39:11
create [3] - 79:11, 79:18, 80:9
created [8] - 30:18, 36:25, 79:19, 84:3, 84:12, 85:12, 85:14, 85:23
creation [1] - 37:4
cross [11] - 10:21, 11:4, 17:3, 61:12, 68:2, 70:14, 70:16, 74:3, 76:10, 118:16, 119:16
cross-slope [1] - 11:4
cross-slopes [1] - 10:21
crosses [1] - 53:14
curb [35] - 8:25, 10:18, 11:7, 14:10, 16:16, 17:6, 17:13, 34:21, 34:22, 34:23, 40:19, 53:14, 53:22, 60:21, 72:4, 73:15, 73:23, 73:25, 74:8, 74:22, 74:24, 75:6, 75:8, 75:20, 76:4, 76:8, 76:9, 76:15, 100:2, 118:25, 120:2, 120:11, 120:15
cure [1] - 72:6
cut [6] - 58:11, 79:18, 80:13, 81:18, 117:23, 118:2

## D

DAA [2] - 42:3, 42:11
dash [2] - 110:11, 114:22
date [19] - 19:4, 19:6, 25:20, 31:3, 41:17, 42:20, 44:12, 45:20, 47:17, 47:18, 47:20, 57:7, 60:11, 62:7, 72:22, 87:14, 97:17, 111:6
DATE [1] - 1:12
dates [1] - 47:21
days [1] - 3:16
dealing [2] - 21:3, 36:4
deals [1] - 71:16
DEFENDANT [1] - 1:9
Defendant [1] - 2:9
defendant's [2] - 25:24, 95:23
defining [1] - 42:20
defringe [1] - 79:16
delineates [2] - 27:8, 58:20
denote [2] - 69:23, 114:7
denotes [1] - 70:22

K. J. KING

**Department** [2] - 26:14, 26:20
**depicted** [1] - 99:6
**deposition** [6] - 3:8, 3:9, 3:14, 25:24, 41:21, 94:12
**DEPOSITION** [1] - 1:16
**describe** [1] - 56:15
**described** [1] - 119:25
**describing** [1] - 13:23
**DESCRIPTION** [1] - 122:7
**design** [1] - 116:15
**Design** [37] - 19:11, 19:17, 21:14, 21:21, 22:5, 22:12, 23:6, 23:12, 23:22, 24:11, 29:23, 32:4, 32:23, 33:13, 34:9, 34:25, 35:5, 35:18, 35:25, 38:9, 41:9, 46:4, 46:24, 56:3, 57:12, 64:4, 64:11, 65:9, 76:17, 78:20, 83:13, 87:4, 91:8, 91:20, 95:4, 95:5, 119:9
**designated** [1] - 104:6
**designating** [1] - 92:22
**designed** [7] - 21:20, 21:24, 22:4, 23:4, 69:16, 87:3, 87:6
**designing** [1] - 91:6
**Detail** [1] - 29:10
**detail** [7] - 27:13, 29:2, 29:4, 29:6, 30:2, 55:12
**detailed** [1] - 51:7
**detailing** [1] - 76:4
**determine** [2] - 24:4, 105:25
**determining** [1] - 79:8
**deviations** [1] - 14:14
**DICKER** [1] - 2:9
**differ** [2] - 16:4, 16:8
**differences** [1] - 16:6
**different** [8] - 39:9, 70:21, 75:3, 75:12, 75:13, 83:18, 116:5
**DiGiovanni** [1] - 42:6
**dimension** [1] - 118:6
**dimensions** [9] - 27:8, 30:3, 31:12, 40:20, 53:8, 66:5, 66:7, 94:17, 98:10
**dip** [1] - 69:4
**dipped** [1] - 39:11
**dips** [4] - 68:19, 68:20, 68:22, 69:23
**directing** [1] - 93:15
**direction** [1] - 112:21
**directions** [1] - 69:19
**directly** [1] - 41:12
**disabilities** [1] - 117:13
**Disabilities** [1] - 19:12
**discuss** [2] - 12:15, 38:12
**discussed** [3] - 59:22, 95:22, 96:17
**discussing** [1] - 111:11

**discussion** [3] - 19:3, 95:25, 106:20
**discussions** [1] - 8:17
**DISTRICT** [2] - 1:2, 1:2
**document** [18] - 25:22, 26:2, 26:6, 27:25, 29:8, 41:19, 41:23, 42:2, 42:14, 44:15, 44:17, 58:23, 58:25, 61:15, 61:17, 61:20, 62:11, 88:8
**DOCUMENTS** [2] - 123:8, 123:9
**documents** [3] - 10:3, 25:16, 86:25
**dollars** [1] - 86:5
**Domansky** [2] - 24:21, 122:9
**Dominic** [1] - 6:24
**done** [28] - 14:20, 14:24, 15:3, 15:10, 18:25, 19:15, 25:3, 40:2, 40:24, 48:24, 52:14, 55:5, 58:13, 72:6, 73:13, 81:21, 83:3, 86:8, 100:9, 100:24, 101:15, 101:25, 102:3, 107:9, 107:22, 119:19, 119:23, 120:3
**Donuts** [11] - 59:18, 60:18, 60:22, 61:10, 71:7, 73:19, 74:8, 76:5, 76:8, 100:2, 120:12
**door** [3] - 90:23, 91:2, 91:4
**doors** [4] - 9:10, 80:18, 85:4, 85:15
**doorway** [6] - 37:23, 79:16, 81:6, 81:16, 82:24, 83:2
**dot** [1] - 102:23
**dotted** [2] - 28:11, 29:3
**double** [1] - 14:22
**double-check** [1] - 14:22
**down** [25] - 5:9, 11:22, 13:11, 14:16, 15:15, 16:5, 60:25, 63:11, 64:15, 65:21, 66:19, 75:17, 75:19, 88:21, 98:2, 107:17, 108:2, 108:4, 108:18, 108:21, 108:25, 109:17, 112:22, 116:10, 118:11
**draft** [1] - 52:13
**drafted** [1] - 51:15
**drafting** [1] - 59:23
**drafts** [1] - 52:9
**drain** [2] - 119:4, 119:15
**drop** [1] - 36:19
**drove** [1] - 119:6
**duly** [2] - 4:3, 124:11
**Dunkin** [13] - 59:18, 60:18, 60:22, 61:10, 65:25, 66:21, 71:7, 73:19, 74:8, 76:5, 76:8, 100:2, 120:11
**during** [2] - 16:25, 38:13

## E

**e-mail** [1] - 41:6
**easily** [1] - 48:23
**East** [2] - 2:10, 32:6
**EASTERN** [1] - 1:2
**easy** [1] - 49:2
**EDELMAN** [1] - 2:8
**edge** [3] - 66:13, 117:22, 117:24
**edit** [1] - 59:25
**effect** [4] - 3:12, 3:15, 36:11, 38:24
**eight** [2] - 6:15, 53:8
**eight-foot** [1] - 53:8
**either** [4] - 4:25, 15:15, 29:4, 32:2, 41:6
**elaborating** [1] - 41:3
**elevation** [2] - 78:14, 92:9
**ELSER** [1] - 2:8
**Empire** [1] - 81:14
**employed** [3] - 5:21, 5:24, 7:4
**employee** [1] - 8:6
**employee's** [2] - 14:18, 14:23
**employees** [3] - 6:2, 6:4, 6:7
**end** [11] - 90:12, 92:22, 98:20, 111:20, 112:11, 112:17, 113:6, 114:3, 114:6, 116:5, 117:15
**ends** [7] - 90:13, 98:12, 98:15, 109:13, 109:16, 109:20, 117:25
**enter** [1] - 95:8
**entire** [4] - 7:21, 55:25, 64:8, 107:20
**entitled** [2] - 27:25, 52:10
**entrance** [5] - 32:5, 32:21, 33:6, 33:13, 94:24
**equipment** [1] - 9:20
**especially** [1] - 48:22
**ESQ** [2] - 2:6, 2:11
**exact** [1] - 75:11
**exactly** [4] - 82:21, 113:25, 114:16, 118:14
**examination** [3] - 121:5, 124:10, 124:12
**EXAMINATION** [2] - 4:6, 123:4
**examined** [1] - 4:5
**example** [1] - 37:19
**except** [1] - 3:21
**exception** [1] - 25:5
**excess** [1] - 64:6
**exchange** [1] - 117:10
**excuse** [3] - 52:17, 91:9, 97:9
**execute** [2] - 121:2, 123:10
**Exhibit** [52] - 25:19, 25:22,

25:23, 41:16, 41:19, 41:21, 44:11, 44:15, 45:19, 57:6, 57:9, 58:23, 61:15, 62:6, 62:9, 62:20, 72:21, 72:24, 74:6, 75:22, 75:25, 77:19, 87:13, 87:16, 88:6, 88:22, 89:13, 92:16, 94:11, 95:20, 96:12, 96:23, 97:16, 97:19, 97:21, 99:6, 100:4, 106:24, 107:6, 108:14, 109:13, 110:10, 108:14, 109:13, 110:10, 111:5, 111:8, 111:12, 112:10, 115:17, 116:7, 116:9, 116:14, 118:20
**exhibit** [1] - 87:5
**EXHIBIT** [2] - 122:6
**EXHIBITS** [1] - 122:4
**exist** [3] - 31:16, 31:20, 36:21
**existed** [5] - 24:6, 38:22, 53:7, 53:9, 88:18
**existing** [3] - 20:20, 83:15, 85:21
**exists** [4] - 36:21, 89:20, 93:13, 94:13
**expedient** [1] - 15:11
**expensive** [1] - 83:22
**Expert** [1] - 6:25
**expert** [7] - 45:6, 45:8, 50:15, 50:16, 71:14, 71:17, 71:22
**experts** [1] - 75:13
**explain** [2] - 6:11, 19:20
**extend** [6] - 18:11, 98:23, 107:11, 111:20, 112:10, 112:15
**extended** [2] - 17:15, 79:15
**extends** [1] - 99:2
**extension** [17] - 10:20, 17:8, 17:12, 59:21, 90:3, 90:6, 103:12, 104:9, 104:10, 104:12, 104:9, 104:16, 104:20, 104:22, 105:23, 106:13, 106:15
**extensions** [18] - 18:6, 18:10, 18:16, 18:18, 18:22, 61:7, 104:25, 105:24, 106:2, 106:3, 106:11, 106:19, 106:21, 106:23, 106:25, 107:3, 117:12, 120:7
**extent** [3] - 40:4, 52:8, 79:13
**exterior** [2] - 84:20, 88:13
**extra** [1] - 82:4

## F

**facilities** [1] - 83:15
**fact** [4] - 16:8, 39:24, 68:5, 91:8
**factor** [2] - 83:11, 117:16

K. J. KING

**factors** [4] - 83:6, 83:7, 83:8, 86:2
**fair** [1] - 30:4
**fairly** [1] - 119:18
**fall** [1] - 6:9
**familiar** [1] - 41:25
**far** [5] - 5:14, 27:22, 84:23, 94:7, 94:14
**fast** [1] - 10:24
**feasible** [2] - 37:18, 81:10
**Federal** [2] - 1:19, 120:24
**feet** [8] - 82:10, 82:11, 82:20, 86:4, 94:3, 94:20, 94:22
**field** [1] - 30:25
**File** [1] - 2:12
**filing** [1] - 3:7
**findings** [3] - 16:9, 55:12, 55:13
**fine** [1] - 49:22
**Fine** [1] - 50:7
**finish** [1] - 5:11
**firm** [1] - 41:25
**first** [38] - 4:3, 8:12, 20:23, 21:22, 25:25, 39:7, 41:22, 42:13, 43:6, 43:9, 44:16, 46:18, 47:18, 47:20, 50:11, 57:8, 60:3, 61:19, 62:10, 62:24, 75:25, 76:14, 77:8, 78:23, 84:13, 85:14, 86:10, 89:4, 89:9, 89:11, 97:6, 98:3, 98:9, 99:7, 100:6, 100:15, 107:12, 119:24
**five** [4] - 6:14, 7:6, 82:9, 118:20
**fix** [1] - 106:20
**fixes** [1] - 49:2
**flag** [60] - 77:8, 77:9, 77:25, 78:4, 78:7, 78:19, 78:24, 79:2, 87:18, 89:5, 89:7, 89:9, 89:11, 89:15, 89:16, 90:12, 97:6, 97:10, 97:11, 98:3, 98:4, 98:9, 98:11, 98:15, 98:21, 98:24, 99:7, 100:6, 100:15, 107:13, 107:20, 109:22, 110:10, 110:13, 110:14, 110:17, 110:24, 112:5, 112:7, 112:12, 112:16, 112:17, 113:2, 113:7, 114:4, 114:7, 114:11, 114:13, 114:15, 114:21, 114:24, 114:25, 115:8, 115:13
**flags** [12] - 77:12, 77:16, 77:23, 79:5, 79:7, 79:11, 84:16, 89:4, 89:24, 99:5, 101:2, 111:17
**flagstones** [1] - 36:7
**flare** [1] - 76:12
**flares** [6] - 11:8, 11:10, 74:12, 74:17, 74:24, 75:3

**flat** [1] - 72:16
**flooded** [1] - 38:13
**flooding** [2] - 38:11, 38:19
**Floor** [2] - 1:21, 2:5
**floor** [1] - 91:18
**flush** [1] - 73:15
**folks** [2] - 48:25, 117:13
**follows** [1] - 4:5
**foot** [4] - 9:23, 53:8, 60:24, 110:16
**force** [1] - 3:15
**form** [43] - 3:21, 8:23, 10:16, 14:4, 15:20, 16:13, 18:15, 21:6, 21:16, 22:15, 23:15, 25:13, 28:24, 29:25, 30:21, 33:16, 36:3, 37:17, 48:7, 49:13, 49:20, 50:6, 54:20, 56:5, 56:13, 67:18, 69:8, 79:25, 82:7, 83:25, 91:13, 92:6, 104:15, 105:7, 107:15, 108:20, 111:23, 112:14, 113:5, 113:9, 116:12, 117:19, 120:5
**forth** [1] - 124:11
**Foss** [1] - 6:23
**four** [5] - 7:6, 17:22, 29:2, 63:3, 63:10
**four-zero** [1] - 63:10
**front** [13] - 9:9, 34:21, 39:14, 61:9, 64:20, 65:14, 65:19, 69:20, 71:6, 73:18, 76:5, 80:14, 102:4
**frost** [1] - 84:22
**full** [8] - 8:5, 50:21, 55:8, 88:4, 103:2, 103:19, 103:24, 103:25
**full-time** [1] - 8:5
**fully** [1] - 56:9
**FURTHER** [1] - 3:20

## G

**gap** [2] - 72:7, 73:16
**gaps** [4] - 71:24, 72:2, 72:14, 120:12
**gate** [1] - 119:4
**general** [3] - 26:15, 26:16, 26:25
**generally** [4] - 7:12, 27:9, 34:16, 54:14
**geographic** [1] - 7:20
**given** [3] - 40:22, 43:19, 124:13
**glass** [5] - 80:17, 82:23, 90:21, 90:22, 91:9
**Glen** [1] - 4:16
**GLEN** [1] - 2:6
**gonna** [5] - 48:24, 61:3, 87:8, 117:4, 117:25
**Grable** [1] - 1:22

**GRABLE** [2] - 124:7, 124:23
**grate** [1] - 119:8
**grating** [1] - 119:11
**greater** [4] - 64:12, 78:13, 79:12, 80:25
**grind** [2] - 107:17, 108:4
**grinded** [1] - 108:2
**grippable** [1] - 118:7
**ground** [9] - 36:13, 36:18, 38:11, 38:18, 38:19, 38:20, 39:21, 86:7
**guess** [1] - 86:5
**guessing** [1] - 94:19
**Guidelines** [1] - 19:13

## H

**half** [2] - 84:17
**hand** [13] - 26:18, 27:2, 27:19, 27:24, 28:20, 29:8, 62:16, 86:11, 90:16, 90:19, 104:12, 117:7, 124:20
**handicapped** [29] - 27:14, 27:20, 29:12, 30:8, 30:13, 30:17, 31:8, 31:11, 32:5, 33:24, 34:2, 34:6, 63:3, 63:20, 63:24, 64:13, 64:19, 65:7, 65:14, 66:11, 67:6, 67:11, 67:15, 67:22, 68:15, 68:25, 69:5, 70:25, 71:6
**handicapped-accessible** [27] - 27:14, 27:20, 29:12, 30:8, 30:13, 30:17, 31:8, 31:11, 32:5, 34:2, 34:6, 63:20, 63:24, 64:13, 64:19, 65:7, 65:14, 66:11, 67:6, 67:11, 67:15, 67:22, 68:15, 68:25, 69:5, 70:25, 71:6
**handle** [2] - 7:19, 7:21
**handrail** [44] - 10:19, 14:12, 17:8, 17:12, 17:15, 17:17, 18:5, 18:10, 18:16, 18:18, 18:21, 36:20, 40:21, 59:21, 61:7, 88:3, 88:12, 88:13, 88:14, 88:17, 90:2, 90:10, 90:13, 90:15, 90:19, 90:24, 91:10, 91:14, 91:16, 91:17, 92:19, 98:23, 104:11, 111:14, 111:20, 112:9, 113:15, 113:16, 115:18, 116:6, 116:9, 116:16, 117:12, 117:16
**handrail's** [1] - 41:3
**handrailing** [1] - 120:6
**handrails** [25] - 17:16, 17:23, 17:24, 18:2, 18:11, 36:11, 36:17, 87:18, 87:24, 87:25, 88:4, 88:21, 88:23, 88:24, 91:20, 92:10, 92:14, 96:20, 99:25, 105:17, 116:5,

116:18, 116:22
**handwriting** [1] - 77:2
**Hanski** [1] - 1:20
**HANSKI** [2] - 2:4
**hard** [4] - 20:17, 90:4, 112:4, 112:18
**hazard** [2] - 37:23, 116:23
**hazardous** [1] - 18:20
**HC** [2] - 33:19, 33:22
**head** [8] - 5:10, 53:16, 63:13, 63:17, 64:5, 64:8, 66:24, 67:3
**heading** [1] - 101:24
**heaving** [1] - 84:22
**height** [17] - 10:18, 24:13, 24:18, 36:17, 36:19, 40:21, 41:4, 46:12, 49:2, 53:10, 53:11, 66:11, 85:10, 105:11, 105:20, 105:21, 118:3
**heights** [1] - 48:22
**Heights** [1] - 4:13
**held** [1] - 1:19
**hereby** [1] - 124:9
**HEREBY** [1] - 3:5
**herein** [1] - 3:7
**hereinbefore** [1] - 124:11
**hereunto** [1] - 124:19
**high** [5] - 66:8, 105:14, 105:15, 105:18
**hit** [1] - 115:14
**home** [1] - 7:11

## I

**idea** [4] - 43:13, 82:3, 94:2, 112:25
**identification** [13] - 25:19, 41:16, 44:12, 45:20, 46:8, 48:13, 52:5, 57:6, 62:6, 72:21, 87:13, 97:16, 111:5
**identifications** [1] - 45:25
**identified** [10] - 46:5, 46:12, 47:3, 47:11, 48:3, 48:10, 50:16, 51:11, 51:12, 52:18
**identifies** [2] - 59:6, 74:7
**identify** [5] - 44:24, 45:3, 46:15, 54:18, 75:10
**immediately** [3] - 12:24, 53:11, 89:6
**imposed** [1] - 92:3
**impossible** [1] - 21:13
**impracticability** [1] - 20:12
**improvement** [1] - 57:15
**improvements** [1] - 57:11
**IN** [1] - 124:19
**inch** [2] - 71:24, 76:9
**inches** [26] - 17:13, 17:15, 18:12, 63:9, 63:10, 66:8, 66:12, 66:13, 71:16, 71:19,

K. J. KING

80:20, 81:9, 82:17, 91:15, 98:24, 99:3, 103:13, 103:14, 104:21, 104:23, 104:24, 105:2, 105:18, 105:19, 112:11
**include** [3] - 32:13, 46:22, 49:10
**included** [1] - 74:20
**incorrect** [2] - 54:12, 54:18
**increase** [1] - 80:11
**increased** [1] - 70:3
**indentation** [1] - 70:2
**independent** [2] - 25:4, 77:15
**indicate** [1] - 84:18
**indicated** [1] - 100:17
**indicates** [1] - 67:3
**indicating** [6] - 75:4, 75:8, 93:7, 110:24, 115:4, 117:8
**indicating)** [6] - 72:17, 90:7, 90:23, 91:5, 94:21, 115:24
**indication** [1] - 113:13
**individual** [1] - 6:13
**individuals** [5] - 6:12, 6:14, 6:16, 6:19, 93:8
**information** [3] - 43:20, 52:9, 52:11
**INFORMATION** [2] - 123:8, 123:9
**infringe** [2] - 80:16, 80:17
**injury** [1] - 117:21
**inquire** [1] - 12:6
**inspect** [2] - 25:10, 46:14
**inspection** [19] - 14:2, 16:19, 44:25, 45:23, 46:18, 47:3, 47:18, 47:19, 47:21, 50:21, 55:8, 55:12, 55:16, 57:5, 57:21, 60:4, 60:11, 119:24, 122:12
**inspections** [1] - 7:25
**installation** [7] - 8:24, 8:25, 17:7, 27:14, 30:7, 40:21, 91:10
**installed** [4] - 41:3, 53:24, 88:15, 92:19
**instead** [1] - 71:24
**instructions** [1] - 5:14
**interested** [1] - 124:17
**interim** [1] - 80:21
**introduction** [6] - 57:18, 57:20, 58:6, 58:9, 58:14, 58:17
**involve** [2] - 36:13, 37:10
**IS** [2] - 3:5, 3:20
**issue** [7] - 26:10, 49:3, 54:16, 54:25, 55:3, 69:5, 80:9
**issued** [9] - 16:2, 42:16, 43:2, 43:8, 43:13, 47:15, 51:3, 51:6, 56:15

**issues** [28] - 21:2, 24:2, 24:8, 37:22, 38:5, 38:10, 38:14, 44:24, 45:3, 45:4, 45:8, 45:11, 45:12, 46:9, 46:12, 47:3, 47:6, 47:10, 48:20, 50:16, 51:8, 54:5, 54:16, 54:17, 54:21, 56:15, 59:7
**IT** [2] - 3:5, 3:20
**item** [2] - 59:18, 62:22
**items** [8] - 8:18, 8:19, 8:20, 9:2, 48:22, 58:20, 59:7, 60:2
**itself** [6] - 16:10, 35:21, 74:18, 90:25, 107:12, 115:19

## J

**Jackson** [1] - 4:13
**jagged** [2] - 117:22, 117:24
**January** [2] - 43:6, 52:17
**Jersey** [2] - 7:14, 7:17
**job** [1] - 6:8
**jointly** [1] - 60:2
**Judge** [1] - 3:13
**judgment** [1] - 109:11
**July** [22] - 8:14, 8:16, 8:21, 9:15, 9:18, 9:22, 12:19, 13:2, 15:4, 25:6, 25:11, 39:3, 47:16, 47:21, 47:25, 48:3, 52:17, 52:19, 73:8, 99:23, 108:9
**June** [25] - 23:25, 24:6, 24:9, 25:11, 39:3, 44:25, 46:18, 52:18, 52:25, 53:3, 53:7, 53:9, 53:11, 53:13, 53:17, 53:19, 53:20, 54:6, 56:15, 76:15, 79:6, 87:21, 88:15, 88:18, 108:9

## K

**KAM)(CLP** [1] - 1:7
**kind** [4] - 28:21, 69:9, 104:22, 119:12
**kinds** [2] - 85:25, 86:2
**King** [2] - 4:10, 4:15
**KING** [2] - 1:17, 121:9
**Kleo** [1] - 4:10
**KLEO** [2] - 1:17, 121:9
**knowing** [1] - 86:6
**knowledge** [35] - 7:3, 7:23, 15:2, 15:6, 17:19, 17:25, 22:8, 24:16, 29:19, 31:23, 32:15, 36:23, 43:16, 43:17, 47:23, 53:21, 63:22, 66:10, 70:23, 77:16, 80:22, 86:11, 86:23, 86:24, 96:13, 96:14, 98:25, 99:4, 100:13, 113:19, 113:23, 116:17, 118:15, 119:7, 119:23

**known** [1] - 12:14
**knows** [1] - 115:11
**KRST** [1] - 103:9

## L

**labeled** [1] - 28:5
**laid** [1] - 73:14
**land** [1] - 37:19
**landing** [16] - 18:12, 36:25, 76:10, 77:4, 81:10, 81:20, 82:11, 82:12, 97:4, 97:5, 114:19, 114:20, 115:5, 115:14, 115:15, 118:12
**landings** [1] - 118:15
**language** [1] - 58:15
**last** [3] - 87:15, 89:20, 119:22
**late** [5] - 19:7, 42:15, 43:19, 43:24, 84:5
**law** [3] - 29:19, 29:16, 95:9
**lawsuit** [1] - 4:17
**lawyer** [1] - 49:24
**learn** [1] - 35:15
**least** [5] - 8:3, 18:11, 66:12, 94:22, 112:10
**left** [21] - 27:19, 27:24, 28:6, 28:20, 29:8, 62:16, 63:12, 63:19, 64:2, 64:21, 66:23, 90:16, 90:19, 102:21, 103:2, 103:12, 103:15, 103:22, 104:10, 104:12, 106:16
**left-hand** [8] - 27:19, 27:24, 28:20, 29:8, 62:16, 90:16, 90:19, 104:12
**length** [11] - 10:19, 79:14, 80:12, 80:15, 80:19, 81:17, 103:2, 103:19, 103:24, 103:25, 107:11
**less** [6] - 74:2, 74:4, 74:15, 75:2, 75:15, 118:17
**Letter** [1] - 122:9
**letter** [2] - 20:19, 41:15
**level** [34] - 9:23, 10:22, 18:17, 36:25, 37:3, 37:22, 60:24, 72:3, 72:15, 73:16, 75:6, 75:16, 80:21, 81:10, 81:20, 82:11, 82:12, 93:7, 99:2, 109:25, 110:4, 110:16, 112:18, 113:13, 113:17, 113:18, 113:20, 113:24, 114:18, 115:4, 115:12, 116:21, 117:4, 120:13
**leveled** [1] - 112:6, 113:21, 116:22
**leveling** [2] - 113:11, 114:7
**levels** [4] - 112:18, 114:18, 115:23, 117:7

**likely** [1] - 86:17
**line** [6] - 28:11, 63:11, 80:7, 98:12, 102:12, 115:23
**lines** [1] - 29:3
**listed** [2] - 42:2, 47:13
**LLC** [3] - 1:8, 1:20, 2:4
**LLP** [1] - 2:9
**local** [1] - 29:16
**located** [2] - 81:5, 85:16
**location** [8] - 10:10, 34:19, 81:3, 82:23, 83:3, 85:4, 85:10, 93:2
**locations** [3] - 7:20, 10:14, 85:6
**look** [9] - 21:25, 29:20, 50:15, 74:6, 77:12, 83:18, 86:2, 99:25, 116:4
**looked** [3] - 18:6, 45:10, 81:12
**looking** [8] - 18:3, 27:12, 45:13, 60:15, 84:8, 92:15, 109:17, 111:25
**looks** [7] - 28:12, 90:5, 94:19, 94:20, 94:21, 103:6, 112:6
**low** [1] - 116:24
**lower** [1] - 24:13

## M

**mail** [2] - 41:6
**maintained** [1] - 38:2
**maintaining** [1] - 38:7
**maintenance** [1] - 37:9
**majority** [2] - 7:16, 86:16
**manages** [1] - 24:24
**maneuvering** [1] - 80:18
**March** [2] - 19:23, 19:25
**Marinello** [1] - 6:24
**mark** [11] - 25:15, 41:13, 44:8, 45:16, 57:2, 62:3, 72:18, 87:10, 97:13, 111:2, 111:17
**marked** [22] - 25:18, 25:22, 25:23, 41:15, 41:19, 41:20, 44:10, 44:15, 45:18, 57:5, 58:23, 61:15, 62:5, 62:9, 72:20, 72:24, 87:12, 88:6, 97:15, 97:19, 111:4, 111:8
**marking** [2] - 28:10, 28:15
**markings** [3] - 26:19, 26:21, 76:22
**marks** [1] - 63:16
**marriage** [1] - 124:16
**matches** [1] - 76:6
**matter** [3] - 48:11, 75:15, 124:18
**maximum** [6] - 63:23, 65:5, 67:7, 70:16, 78:10, 109:2
**mean** [19] - 27:5, 33:23,

35:18, 43:22, 48:7, 55:10, 55:24, 59:5, 66:4, 69:12, 71:11, 76:11, 76:13, 80:2, 81:12, 94:18, 101:12, 103:16, 117:20
**meaning** [1] - 63:16
**means** [12] - 20:9, 30:11, 49:14, 77:2, 88:25, 97:5, 97:11, 101:14, 101:22, 103:25, 104:25, 105:12
**meant** [4] - 27:2, 43:9, 55:22, 118:22
**measure** [13] - 67:16, 67:25, 68:14, 72:16, 75:3, 75:4, 75:7, 75:13, 82:21, 86:21, 99:17, 114:13
**measured** [12] - 10:17, 10:18, 11:6, 11:8, 11:10, 17:3, 17:5, 67:22, 68:6, 89:9, 99:16, 100:16
**measurement** [13] - 12:3, 16:7, 60:20, 64:24, 65:3, 67:14, 74:23, 100:14, 108:11, 109:7, 109:10, 110:17, 113:14
**measurements** [46] - 9:5, 9:7, 10:10, 10:13, 10:20, 11:13, 11:23, 12:2, 12:22, 13:12, 13:25, 14:8, 14:12, 15:14, 15:16, 15:17, 16:4, 17:5, 17:11, 36:17, 46:21, 59:18, 59:20, 60:16, 61:5, 61:8, 67:9, 70:9, 71:5, 72:12, 74:12, 75:9, 75:11, 75:17, 77:21, 81:21, 82:9, 90:9, 94:6, 99:13, 99:24, 100:25, 109:22, 110:12, 114:11, 118:9
**measures** [3] - 67:19, 74:9, 75:15
**measuring** [7] - 9:24, 110:23, 114:14, 114:15, 115:6, 115:8
**Medic** [1] - 6:16
**meet** [2] - 9:17, 32:22
**member** [1] - 60:6
**Membership** [1] - 6:15
**memory** [1] - 108:24
**mental** [2] - 11:14, 108:22
**mention** [3] - 54:4, 74:17, 96:10
**mentioned** [4] - 10:11, 35:19, 60:17, 74:13
**mentions** [1] - 101:4
**MERMAID** [2] - 1:8, 2:10
**Mermaid** [20] - 4:18, 4:21, 8:9, 13:4, 19:9, 19:15, 20:5, 21:10, 23:19, 24:25, 25:5, 26:7, 26:10, 33:7, 38:6, 39:15, 40:7, 40:11,

68:16
**met** [1] - 15:17
**metal** [1] - 117:23
**mid** [2] - 47:25, 48:3
**mid-1990's** [1] - 22:18
**mid-July** [2] - 47:25, 48:3
**middle** [3] - 67:25, 103:20, 119:14
**might** [2] - 69:25, 106:25
**minimum** [2] - 68:4, 84:5
**minor** [1] - 48:23
**modification** [2] - 20:16, 20:18
**modifications** [6] - 40:24, 51:24, 59:16, 65:12, 65:18, 72:6
**modified** [2] - 79:11, 80:23
**modifying** [1] - 83:15
**money** [1] - 48:21
**month** [1] - 8:4
**morning** [1] - 13:6
**MOSKOWITZ** [1] - 2:8
**most** [1] - 86:17
**move** [2] - 83:2, 110:16
**moved** [1] - 85:6
**moving** [1] - 113:3
**MR** [70] - 4:7, 8:22, 10:15, 10:23, 11:19, 12:5, 12:11, 12:13, 14:3, 15:19, 16:12, 18:14, 21:5, 21:15, 22:14, 23:14, 25:12, 25:15, 28:23, 29:24, 30:20, 33:15, 36:2, 37:16, 41:13, 44:8, 45:16, 48:6, 49:12, 49:16, 49:22, 50:5, 50:7, 52:7, 52:12, 54:19, 56:4, 56:12, 57:2, 62:3, 67:17, 69:7, 72:18, 75:21, 75:23, 79:24, 82:6, 83:24, 87:10, 91:12, 92:5, 97:13, 104:14, 105:6, 107:14, 108:19, 111:2, 111:22, 111:25, 112:13, 113:4, 113:8, 116:11, 117:18, 119:17, 120:4, 120:21, 120:23, 121:3, 123:5
**must** [3] - 92:10, 104:22, 104:25

## N

**name** [3] - 4:8, 4:16, 60:8
**necessarily** [4] - 43:9, 100:23, 107:19, 114:9
**need** [15] - 5:2, 14:9, 14:11, 14:13, 14:22, 14:24, 19:16, 30:2, 49:5, 79:18, 80:20, 81:8, 107:19, 109:15, 116:22
**needed** [9] - 8:18, 14:21,

15:10, 34:15, 40:20, 53:23, 53:24, 53:25, 83:3
**needs** [5] - 34:12, 34:13, 55:5, 81:18, 86:8
**new** [9] - 19:10, 20:23, 23:20, 29:21, 32:19, 83:11, 83:14, 83:20, 108:3
**NEW** [2] - 1:2, 124:4
**New** [23] - 1:21, 1:23, 2:6, 2:11, 4:4, 4:14, 4:22, 7:13, 7:14, 7:17, 7:24, 8:10, 22:13, 22:24, 23:6, 23:13, 26:19, 44:5, 124:8
**next** [7] - 33:19, 63:11, 76:20, 85:24, 96:22, 100:3, 102:12
**no-something** [1] - 104:9
**Non** [1] - 1:16
**non** [4] - 36:8, 37:13, 86:13, 107:18
**non-compliant** [3] - 36:8, 37:13, 107:18
**Non-Party** [1] - 1:16
**none** [1] - 92:2
**normal** [1] - 13:24
**NOTARY** [1] - 121:14
**Notary** [3] - 1:23, 4:4, 124:7
**notation** [5] - 100:7, 100:19, 100:21, 100:23, 115:10
**notations** [1] - 102:14
**note** [8] - 11:14, 30:9, 30:11, 69:14, 70:4, 88:20, 101:9, 108:22
**noted** [4] - 50:5, 50:23, 100:23, 120:13
**notes** [11] - 46:5, 47:12, 62:5, 62:12, 62:13, 100:19, 100:21, 102:11, 102:16, 104:24, 118:19
**Notes** [1] - 122:13
**nothing** [3] - 52:2, 54:24, 72:15
**number** [4] - 29:2, 29:4, 98:13, 118:20
**NUMBER** [1] - 122:7
**numbers** [5] - 16:15, 62:18, 62:22, 114:22, 114:23

## O

**oath** [1] - 3:12
**objecting** [1] - 49:19
**Objection** [2] - 14:3, 105:6
**objection** [41] - 8:22, 10:15, 12:5, 15:19, 16:12, 18:14, 21:5, 21:15, 22:14, 23:14, 25:12, 28:23, 29:24, 30:20, 33:15, 36:2, 37:16, 48:6, 49:12, 50:6, 52:7, 54:19, 56:4, 56:12, 67:17, 69:7,

79:24, 82:6, 83:24, 91:12, 92:5, 104:14, 107:14, 108:19, 111:22, 112:13, 113:4, 113:8, 116:11, 117:18, 120:4
**objections** [1] - 3:21
**obligation** [1] - 37:7
**obligations** [1] - 92:3
**observation** [1] - 39:18
**observe** [1] - 68:10
**observed** [2] - 72:14, 87:21
**obviously** [2] - 39:12, 102:13
**Occupancy** [3] - 42:16, 42:19, 42:25
**occupancy** [2] - 43:6, 43:10
**occur** [2] - 58:2, 69:17
**occurred** [2] - 58:5, 85:2
**occurring** [1] - 56:10
**October** [1] - 124:20
**OF** [3] - 1:2, 124:4, 124:5
**office** [1] - 7:8
**offices** [1] - 1:20
**often** [3] - 7:23, 14:20, 36:5
**oftentimes** [1] - 69:12
**once** [4] - 47:2, 60:10, 114:18, 115:14
**One** [1] - 27:25
**one** [27] - 6:13, 12:3, 12:20, 17:24, 30:18, 32:2, 37:6, 53:16, 71:24, 84:16, 87:5, 87:15, 88:2, 89:23, 95:6, 95:11, 96:22, 98:7, 98:8, 102:2, 107:4, 108:3, 110:12, 116:14, 118:11, 119:5, 119:22
**one's** [1] - 87:8
**one-inch-plus** [1] - 71:24
**One-story** [1] - 27:25
**ones** [2] - 66:5, 66:6
**open** [5] - 5:5, 9:10, 116:15, 116:19, 117:11
**opinion** [7] - 21:18, 32:18, 33:11, 34:3, 64:3, 78:18, 91:25
**opportunity** [1] - 120:25
**opposed** [4] - 15:7, 56:19, 79:22, 108:24
**opposite** [1] - 92:22
**Order** [1] - 1:18
**order** [8] - 5:12, 82:4, 86:8, 94:23, 95:8, 107:9, 107:12, 109:19
**original** [3] - 3:9, 3:17, 37:15
**originally** [1] - 107:7
**outcome** [1] - 124:17
**outdoor** [1] - 84:20
**outline** [1] - 55:2
**outside** [1] - 36:5
**overcome** [1] - 34:23
**overcomes** [1] - 92:9

K. J. KING

overcoming [1] - 78:12
owner [3] - 40:13, 95:18, 96:2
owner's [1] - 80:9
owns [1] - 24:24

**P**

P.M [2] - 1:13, 121:4
pad [1] - 14:16
page [16] - 28:20, 57:8, 59:20, 60:3, 74:6, 75:25, 76:20, 87:16, 98:14, 100:3, 100:5, 101:5, 101:18, 102:18, 110:7, 110:9
PAGE [3] - 122:6, 123:4, 123:9
paper [2] - 108:18, 108:22
papers [2] - 10:2, 10:7
paragraph [2] - 42:14, 57:9
parallel [1] - 75:6
Parker [2] - 1:20, 4:16
PARKER [25] - 2:4, 2:6, 4:7, 10:23, 12:11, 25:15, 41:13, 44:8, 45:16, 49:16, 49:22, 50:7, 52:12, 57:2, 62:3, 72:18, 75:23, 87:10, 97:13, 111:2, 111:25, 119:17, 120:21, 121:3, 123:5
parking [18] - 24:13, 33:19, 33:20, 34:2, 34:7, 34:12, 34:13, 34:14, 34:22, 39:8, 39:17, 53:6, 53:7, 62:24, 68:25, 70:2, 72:4, 118:25
part [5] - 77:25, 79:2, 79:3, 79:21, 92:8
particular [38] - 7:8, 7:20, 8:20, 15:18, 20:4, 21:9, 21:11, 22:20, 27:15, 29:8, 34:18, 35:23, 38:5, 38:25, 41:23, 47:5, 51:3, 51:15, 51:24, 55:21, 57:14, 58:25, 59:10, 59:13, 59:16, 60:14, 60:19, 65:11, 67:5, 70:25, 77:12, 81:23, 87:2, 88:23, 90:10, 92:25, 113:15
parties [2] - 3:7, 124:15
Party [1] - 1:16
past [3] - 39:19, 98:24, 111:20
pasted [1] - 58:12
patch [4] - 70:12, 70:13, 70:19, 97:6
patched [1] - 70:22
path [2] - 34:10, 118:25
Path [1] - 74:7
pavement [1] - 36:15
pen [2] - 13:19, 14:16
Pennsylvania [2] - 7:14, 7:17
people [2] - 75:5, 116:24

percent [56] - 59:19, 63:12, 63:15, 63:25, 64:6, 64:12, 65:10, 66:23, 67:8, 69:14, 69:19, 70:4, 70:13, 70:17, 74:3, 74:4, 74:9, 74:15, 75:2, 75:10, 75:15, 75:18, 76:9, 76:19, 77:9, 78:8, 78:13, 78:14, 78:16, 79:12, 80:4, 80:13, 80:15, 81:2, 81:4, 81:13, 86:4, 97:7, 97:8, 99:9, 100:18, 107:24, 108:8, 108:13, 109:25, 110:6, 110:19, 113:21, 113:24, 114:12, 114:17, 118:17, 120:10
percentage [1] - 84:15
perfect [1] - 81:12
perform [3] - 6:21, 10:10, 90:8
performed [6] - 10:4, 40:7, 51:9, 70:24, 79:5, 99:5
performing [1] - 10:4
period [1] - 15:13
permanent [1] - 43:11
permissible [1] - 67:7
permitted [3] - 64:10, 95:4, 109:2
Perry [24] - 6:22, 7:7, 7:19, 7:24, 8:5, 15:8, 16:18, 16:22, 16:25, 24:9, 25:8, 35:15, 35:22, 40:9, 43:15, 50:11, 59:14, 60:6, 67:21, 68:6, 76:14, 95:17, 96:6, 96:15
person [2] - 93:19, 94:22
personal [1] - 86:24
personally [3] - 8:9, 68:10, 68:13
persons [1] - 93:16
pertained [1] - 43:21
photo [5] - 109:18, 110:7, 112:4, 112:5, 114:2
Photograph [4] - 122:14, 122:15, 122:16, 122:17
photograph [12] - 72:20, 73:2, 73:4, 73:7, 73:12, 87:12, 97:15, 111:4, 111:10, 111:24, 112:2, 113:23
photos [1] - 9:25
picture [11] - 73:24, 89:7, 89:8, 89:12, 90:5, 90:14, 90:16, 95:21, 107:2, 111:13
pictures [4] - 35:8, 35:12, 99:10, 116:5
piece [2] - 103:20, 117:24
pits [1] - 36:6
place [1] - 39:7
placed [1] - 92:21

placement [2] - 91:3, 116:13
places [2] - 67:20, 67:23
plaintiff [4] - 4:17, 45:6, 45:9, 62:21
PLAINTIFF [1] - 1:4
Plaintiff [2] - 1:18, 2:4
Plaintiff's [6] - 25:22, 62:9, 88:6, 96:12, 97:21, 112:10
plaintiff's [5] - 50:15, 50:16, 71:14, 71:22, 76:7
PLAINTIFFS' [1] - 122:4
Plaintiffs' [40] - 25:18, 25:23, 41:15, 41:19, 41:21, 44:11, 44:15, 45:19, 57:5, 57:9, 58:23, 61:15, 62:5, 62:20, 72:20, 72:24, 74:5, 75:24, 77:18, 87:12, 87:16, 89:12, 92:15, 94:10, 95:20, 96:23, 97:15, 97:19, 99:6, 100:4, 107:6, 108:14, 109:12, 110:9, 111:4, 111:8, 111:12, 115:17, 116:6, 116:9
Plaintiffs's [1] - 88:21
Plan [2] - 27:3, 29:10
plan [6] - 27:5, 27:7, 27:9, 27:12, 28:25, 94:9
plans [5] - 26:13, 29:20, 30:12, 31:5, 87:6
PLAZA [2] - 1:8, 2:10
Plaza [2] - 4:18, 26:7
plus [1] - 71:24
point [18] - 4:23, 19:22, 23:8, 31:4, 32:6, 33:10, 34:4, 37:6, 37:15, 67:10, 67:15, 68:14, 84:2, 93:20, 95:12, 96:3, 105:23, 112:16
pointing [1] - 26:22
pointing) [5] - 39:22, 52:20, 54:9, 107:5, 112:5
points [6] - 17:4, 31:24, 32:8, 32:12, 35:2, 53:6, 67:16, 68:7, 95:10
portion [7] - 18:17, 23:10, 64:13, 78:21, 78:22, 87:2, 91:25
portions [2] - 46:2, 77:17
portrayal [1] - 56:9
possible [1] - 80:23
possibly [1] - 25:11
posted [1] - 96:18
pour [3] - 78:6, 85:24, 86:3
poured [2] - 87:8, 108:3
practice [2] - 54:15, 67:13
practices [1] - 48:12
President [1] - 7:2
prevented [1] - 11:22, 38:7
previously [2] - 25:23, 41:20
print [1] - 27:16
problem [1] - 85:15

problems [1] - 46:9
procedure [1] - 67:25
Procedure [1] - 1:19
process [1] - 13:24
program [1] - 53:15
Program [2] - 6:14, 6:15
proper [2] - 24:17, 43:25
properly [1] - 85:3
property [101] - 4:21, 8:13, 9:18, 9:21, 10:5, 10:14, 13:2, 13:3, 15:7, 15:8, 17:20, 18:4, 18:24, 19:2, 19:9, 19:15, 19:22, 20:5, 20:21, 20:23, 21:4, 21:10, 21:19, 22:3, 22:9, 22:17, 22:21, 23:3, 23:9, 23:11, 23:18, 24:2, 24:24, 25:4, 25:9, 25:10, 26:10, 27:8, 27:10, 27:15, 27:24, 31:6, 31:9, 33:7, 35:7, 35:16, 35:21, 35:23, 36:24, 37:5, 37:9, 37:12, 37:13, 37:14, 38:3, 38:5, 38:8, 38:25, 40:25, 41:8, 43:3, 43:12, 44:21, 44:25, 45:3, 46:2, 46:23, 47:16, 48:5, 48:10, 50:12, 50:13, 50:21, 52:22, 53:21, 54:8, 55:25, 56:11, 56:19, 56:20, 56:21, 60:13, 62:2, 68:16, 76:15, 77:11, 80:7, 80:10, 83:20, 87:2, 89:21, 90:9, 91:6, 92:13, 93:22, 95:2, 95:22, 99:20, 99:22, 119:25
provide [3] - 54:11, 58:4, 106:21
provided [15] - 34:13, 34:15, 34:16, 34:20, 34:22, 45:6, 45:9, 46:16, 52:25, 53:16, 57:10, 57:15, 59:17, 61:22, 106:23
provides [1] - 57:25
Provisions [1] - 69:22
public [12] - 9:7, 32:9, 32:11, 33:2, 33:5, 33:14, 37:8, 37:13, 79:22, 93:21, 95:6, 95:8
PUBLIC [1] - 121:14
Public [3] - 1:23, 4:4, 124:8
puddling [6] - 68:20, 69:4, 69:11, 69:12, 69:16, 69:20
purpose [4] - 44:22, 45:2, 56:17, 56:23
purposes [2] - 6:17, 42:18
pursuant [2] - 1:18, 120:24
put [19] - 5:4, 13:11, 37:11, 48:13, 49:6, 52:4, 54:12, 58:16, 60:8, 75:5, 75:16, 91:14, 91:16, 108:18, 108:21, 108:23, 112:22,

K. J. KING

133

114:16, 115:12

**Q**

**questions** [2] - 4:20, 4:24
**quick** [1] - 61:12
**quotation** [1] - 63:16
**quote** [1] - 104:24

**R**

**rail** [13] - 36:19, 98:17, 98:20, 103:2, 103:3, 103:16, 103:18, 103:20, 103:22, 106:16, 116:7, 116:13, 118:3
**railing** [4] - 10:19, 102:17, 117:2, 118:5
**railings** [7] - 8:24, 53:23, 59:24, 106:4, 106:6, 106:18, 106:21
**rails** [3] - 105:16, 105:20, 105:21
**rained** [1] - 69:11
**raise** [1] - 96:15
**raised** [3] - 45:8, 66:12, 120:18
**ramp** [170] - 8:25, 10:18, 11:7, 11:9, 14:10, 16:16, 17:6, 17:13, 17:18, 17:24, 17:25, 18:4, 18:6, 18:13, 18:18, 18:19, 27:20, 28:10, 28:13, 28:16, 28:18, 28:22, 29:12, 29:15, 29:20, 30:8, 30:13, 31:8, 31:11, 31:15, 31:20, 37:2, 53:15, 53:22, 53:24, 53:25, 59:19, 59:22, 60:21, 72:4, 73:15, 73:23, 73:25, 74:8, 74:22, 74:24, 75:8, 76:4, 76:8, 76:15, 77:3, 78:2, 78:11, 78:12, 78:16, 79:12, 79:14, 79:18, 79:20, 80:3, 80:6, 80:11, 80:12, 80:23, 80:25, 81:14, 81:17, 81:23, 82:5, 82:16, 82:22, 83:4, 83:9, 84:14, 84:20, 85:20, 85:24, 86:3, 86:9, 86:17, 88:9, 88:11, 88:23, 91:11, 91:16, 91:18, 91:21, 91:22, 91:25, 92:2, 92:4, 92:8, 92:15, 92:20, 93:7, 93:12, 93:16, 94:13, 95:19, 96:11, 96:16, 96:19, 96:20, 96:25, 97:4, 97:21, 97:23, 99:3, 99:6, 100:2, 100:6, 100:11, 100:15, 101:5, 101:8, 101:17, 101:20, 101:23, 102:5, 102:6, 102:9, 102:14, 102:16, 102:19, 102:25, 103:18, 103:19, 103:21,

104:7, 104:13, 104:17, 105:9, 106:4, 106:5, 106:7, 106:8, 106:13, 106:16, 107:3, 107:7, 107:12, 110:2, 110:5, 110:21, 110:22, 111:11, 111:14, 111:19, 111:21, 113:20, 114:24, 114:14, 114:15, 114:20, 115:7, 115:12, 117:2, 117:9, 118:10, 118:13, 118:16, 120:2, 120:8, 120:11, 120:15, 120:19
**ramps** [8] - 17:20, 27:15, 30:17, 34:22, 40:19, 118:25, 120:9, 120:10
**read** [9] - 10:23, 11:2, 27:17, 29:9, 29:15, 31:13, 62:13, 94:17, 96:24
**reads** [1] - 65:24
**real** [1] - 61:12
**realign** [1] - 37:20
**realize** [1] - 117:2
**really** [2] - 69:12, 113:13
**reason** [20] - 5:16, 8:15, 21:19, 22:3, 30:15, 35:15, 46:22, 54:3, 58:8, 60:7, 74:11, 74:16, 75:11, 79:10, 84:11, 86:11, 90:18, 92:18, 116:8, 116:21
**recess** [1] - 119:20
**recognize** [10] - 26:5, 26:19, 44:17, 44:19, 58:24, 62:10, 72:25, 88:7, 97:20, 111:9
**recommendations** [3] - 40:23, 57:10, 59:8
**recommended** [1] - 100:24
**recommends** [1] - 57:15
**record** [4] - 4:9, 11:12, 120:24, 124:12
**recording** [2] - 13:12, 13:25
**redesign** [1] - 82:25
**reduced** [1] - 107:24
**refer** [1] - 102:5
**reference** [1] - 57:13
**referred** [2] - 10:25, 71:25
**referred-to** [1] - 10:25
**referring** [12] - 13:4, 18:10, 39:13, 63:18, 68:24, 70:18, 77:13, 77:18, 77:22, 89:5, 102:12, 105:23
**reflected** [2] - 61:6, 109:7
**regard** [2] - 21:2, 22:20
**regarding** [3] - 35:22, 95:19, 96:11
**regards** [1] - 35:4
**regular** [1] - 48:12
**related** [1] - 124:15
**relating** [3] - 27:13, 38:5, 46:9

**relation** [4] - 12:21, 15:3, 45:5, 115:19
**relay** [1] - 11:25
**remediations** [1] - 58:3
**remember** [14] - 11:7, 12:25, 13:7, 16:21, 16:25, 17:10, 35:11, 50:8, 51:23, 59:9, 59:15, 74:21, 74:23, 113:25
**removal** [2] - 83:16, 84:9
**remove** [1] - 46:15
**removed** [1] - 58:18
**Rent** [5] - 77:4, 81:17, 82:23, 83:2, 85:5
**Rent-A-Center** [5] - 77:4, 81:17, 82:23, 83:2, 85:5
**repair** [2] - 68:22, 69:4
**repeat** [2] - 4:25, 50:3
**rephrase** [3] - 4:25, 22:16, 50:3
**replace** [1] - 107:19
**report** [100] - 7:7, 10:6, 11:16, 13:15, 13:16, 13:21, 16:2, 16:5, 16:10, 41:2, 41:11, 44:20, 44:23, 45:2, 45:5, 45:6, 45:7, 45:9, 45:13, 45:23, 45:25, 46:8, 46:11, 46:17, 46:20, 47:4, 47:6, 47:13, 47:15, 47:17, 47:22, 48:13, 48:18, 48:19, 48:20, 48:22, 48:25, 49:6, 49:9, 50:15, 50:23, 51:2, 51:3, 51:6, 51:12, 51:13, 51:16, 51:25, 52:15, 52:16, 52:20, 52:22, 52:25, 53:18, 54:4, 54:10, 54:16, 54:23, 54:25, 55:11, 55:16, 55:19, 55:22, 55:25, 56:6, 56:8, 56:14, 56:18, 56:20, 57:14, 57:20, 57:24, 58:4, 58:7, 58:10, 58:14, 58:16, 58:18, 58:20, 59:3, 59:4, 59:10, 59:13, 59:16, 59:23, 60:4, 60:14, 61:6, 61:22, 62:20, 71:14, 71:17, 71:22, 74:17, 76:7, 100:18, 108:24, 110:8, 118:8
**Reporter** [12] - 5:8, 11:3, 25:20, 41:17, 44:13, 45:21, 57:7, 62:7, 72:22, 87:14, 97:17, 111:6
**reports** [5] - 52:9, 54:16, 54:21, 55:6, 57:20
**represent** [3] - 4:16, 52:24, 89:24
**request** [2] - 14:23, 120:25
**REQUESTED** [1] - 123:8
**requesting** [1] - 52:8
**required** [15] - 32:5, 32:9, 32:20, 33:13, 41:4, 46:16,

53:15, 69:18, 79:13, 80:15, 80:19, 81:22, 82:4, 82:11, 94:3
**requirement** [2] - 76:19, 118:3
**requirements** [6] - 31:13, 36:9, 40:19, 84:23, 103:17, 118:4
**requires** [1] - 81:9
**research** [3] - 18:25, 25:4, 25:9
**reserved** [1] - 3:22
**resistant** [1] - 69:20
**respect** [10] - 16:3, 35:2, 36:14, 40:24, 48:4, 50:10, 50:22, 52:14, 73:23, 78:23
**respective** [1] - 3:6
**responses** [1] - 5:8
**rest** [1] - 29:14
**result** [1] - 38:16
**resulted** [1] - 45:23
**retail** [6] - 27:25, 34:11, 79:21, 80:2, 93:4, 93:22
**retained** [2] - 61:21, 118:24
**return** [1] - 116:10
**returns** [2] - 116:7, 116:18
**review** [10] - 43:20, 44:10, 50:13, 51:21, 61:23, 82:2, 112:3, 121:2, 122:10, 123:10
**reviewed** [3] - 26:13, 51:17, 86:25
**reviewing** [2] - 43:24, 59:9
**RICHMOND** [1] - 124:5
**ride** [1] - 64:21
**right-hand** [2] - 26:18, 27:2
**rip** [1] - 107:19
**rise** [3] - 78:16, 82:14, 82:18
**rising** [1] - 82:16
**Rite** [7] - 61:11, 63:7, 64:20, 65:15, 65:19, 66:6, 120:16
**roles** [1] - 6:20
**room** [2] - 81:19, 82:22
**round** [1] - 117:9
**rounded** [1] - 116:18
**route** [8] - 34:13, 92:8, 92:23, 104:3, 104:5, 104:7, 119:11, 119:13
**routes** [4] - 53:13, 53:14, 79:8, 95:9
**Rules** [1] - 1:19
**rules** [1] - 120:25
**run** [14] - 59:22, 78:11, 78:12, 79:12, 80:25, 81:23, 82:5, 82:19, 103:4, 103:18, 103:19, 104:23, 117:6
**Run** [1] - 103:5
**running** [3] - 68:2, 74:3, 89:17

# S

samples [1] - 40:3
Sandy [4] - 38:13, 38:22, 38:23, 38:24
SARAH [2] - 124:7, 124:23
Sarah [1] - 1:22
saturation [1] - 38:19
saves [1] - 48:21
saw [3] - 51:8, 61:19, 117:23
saw-cut [1] - 117:23
scope [5] - 50:10, 50:20, 54:10, 55:7, 118:21
Scott [11] - 24:21, 40:12, 40:15, 40:17, 40:18, 40:23, 41:7, 41:12, 95:18, 95:25, 96:6
sealing [1] - 3:7
second [10] - 26:4, 53:22, 57:9, 57:24, 77:6, 77:8, 87:16, 89:15, 97:10, 98:3
section [8] - 37:20, 58:14, 77:7, 78:4, 88:3, 107:18, 108:4, 114:8
secured [1] - 91:4
security [1] - 90:22
see [45] - 27:13, 27:18, 28:3, 28:5, 28:7, 28:10, 28:11, 28:15, 28:19, 29:3, 29:11, 29:13, 29:14, 30:3, 30:4, 33:19, 39:8, 39:10, 50:17, 55:4, 62:15, 64:16, 65:22, 73:16, 75:25, 82:21, 89:13, 89:16, 90:4, 90:15, 92:14, 98:17, 100:8, 100:18, 102:21, 108:16, 112:4, 112:18, 112:22, 113:10, 114:3, 115:18, 115:21, 115:22, 119:5
sentence [3] - 57:24, 58:19, 77:6
separate [1] - 31:24
September [1] - 1:12
series [1] - 4:20
service [1] - 3:16
Services [3] - 6:13, 6:20, 7:2
set [2] - 124:11, 124:20
settle [5] - 38:2, 39:7, 39:18, 39:20, 86:8
settled [5] - 38:20, 39:4, 39:5, 85:18, 85:25
settlement [2] - 30:24, 38:20
settles [1] - 36:18
settling [12] - 35:19, 36:6, 36:14, 37:19, 38:11, 39:12, 39:25, 84:18, 85:2, 85:9, 85:11, 86:13
seven [1] - 8:4
shadows [2] - 98:6, 112:19
shall [1] - 29:15

shares [1] - 64:22
sharp [1] - 117:20
shift [2] - 36:7, 37:25
short [2] - 86:6, 119:20
shoulders [1] - 5:9
show [14] - 25:21, 41:18, 44:14, 58:22, 61:14, 62:8, 72:23, 87:6, 88:5, 90:2, 97:18, 99:14, 109:13, 111:7
showed [2] - 87:6, 94:9
showing [3] - 106:25, 107:3, 111:13
shown [10] - 26:5, 27:24, 73:23, 88:7, 95:20, 96:12, 97:21, 111:10, 112:9, 116:6
shows [3] - 73:13, 88:11, 100:5
shrug [1] - 5:9
side [30] - 26:18, 27:19, 27:24, 28:14, 28:20, 29:4, 29:8, 30:6, 31:16, 31:21, 32:2, 32:21, 37:2, 62:16, 79:9, 90:16, 90:20, 91:9, 93:6, 93:25, 94:4, 104:12, 109:15, 109:18, 111:14, 111:15, 111:20, 112:23, 116:19, 117:11
sides [11] - 18:22, 30:5, 30:6, 30:18, 31:8, 91:10, 91:21, 92:11, 92:12, 92:14, 92:20
sidewalk [40] - 9:4, 9:6, 9:8, 10:12, 11:5, 14:8, 32:16, 33:2, 33:6, 33:14, 36:7, 37:21, 39:13, 39:14, 39:25, 61:9, 77:17, 79:15, 79:17, 79:21, 79:23, 80:3, 80:7, 80:8, 80:14, 80:16, 90:25, 92:23, 93:3, 93:5, 93:21, 95:7, 100:9, 101:25, 102:4, 102:6, 102:7, 102:15
sidewalks [3] - 17:4, 31:24, 32:13
sign [3] - 66:14, 101:13, 120:18
signage [12] - 24:12, 24:16, 24:17, 46:16, 53:9, 53:11, 53:24, 79:7, 92:21, 93:15, 96:18, 120:18
signed [3] - 3:10, 3:12, 3:15
signs [10] - 46:13, 48:23, 49:3, 63:9, 65:25, 66:3, 66:12, 71:16, 71:18, 101:16
simple [1] - 58:19
sit [2] - 17:9, 30:16
site [15] - 21:12, 27:5, 27:7, 31:24, 31:25, 32:6, 32:8, 32:10, 32:12, 33:10, 34:3,

35:2, 93:20, 95:10, 95:12
Site [2] - 27:3, 29:10
situation [2] - 34:18, 55:22
six [7] - 8:3, 67:20, 67:23, 68:7, 76:9, 76:21, 78:13
six-inch [1] - 76:9
size [1] - 76:12
skin [1] - 117:21
slight [1] - 69:25
slip [1] - 69:20
slope [58] - 10:17, 11:4, 11:6, 14:10, 17:4, 17:13, 30:24, 36:8, 59:19, 61:12, 63:12, 63:17, 63:23, 64:6, 64:12, 65:5, 65:13, 66:23, 67:3, 67:7, 67:11, 67:14, 68:2, 68:7, 68:14, 69:13, 69:19, 70:3, 70:10, 70:14, 70:16, 74:3, 74:9, 74:22, 76:10, 76:18, 77:8, 77:10, 77:16, 78:10, 80:5, 82:9, 84:22, 86:4, 100:5, 107:8, 108:8, 108:11, 109:16, 109:23, 109:24, 112:20, 115:18, 117:5, 120:14
slope/3.2 [1] - 70:13
slopes [12] - 10:21, 11:8, 40:20, 82:3, 84:15, 84:21, 86:15, 96:17, 103:6, 115:21, 118:17, 120:8
small [8] - 15:9, 27:16, 64:5, 64:7, 88:2, 94:18, 94:19, 108:4
smooth [2] - 72:3, 117:25
soil [1] - 40:2
someone [3] - 83:19, 94:14, 95:19
sometime [1] - 21:22
sometimes [4] - 48:17, 55:3, 55:18, 68:4
sorry [2] - 36:16, 105:20
southeast [4] - 97:4, 97:23, 100:15, 118:11
southwest [4] - 77:3, 78:2, 78:15, 84:14
space [21] - 63:12, 63:15, 63:24, 64:9, 64:13, 64:19, 64:22, 65:7, 66:23, 67:2, 67:6, 67:11, 67:15, 68:7, 69:5, 69:10, 70:2, 70:20, 82:4, 116:15, 118:4
spaces [18] - 24:13, 34:2, 34:22, 63:3, 63:19, 63:20, 63:21, 64:3, 65:14, 67:22, 68:15, 68:20, 68:25, 69:15, 69:18, 70:25, 71:6, 119:3
Specialist [2] - 6:23, 6:25
specific [2] - 20:25, 38:4
specifically [14] - 4:20, 13:4, 17:10, 22:12, 23:6, 23:13,

24:15, 38:15, 38:21, 41:7, 44:4, 74:21, 74:23, 74:25
speculating [1] - 39:4
Spinal [10] - 4:12, 5:22, 5:24, 7:4, 8:2, 42:10, 54:15, 54:21, 60:5, 67:19
split [1] - 55:3
spoken [1] - 24:23
spot [1] - 34:7
spots [2] - 33:19, 33:20
SS [2] - 96:25, 124:4
stable [1] - 69:20
staff [1] - 60:6
stairs [1] - 117:3
stalls [1] - 39:10
standard [10] - 22:19, 22:22, 24:14, 35:3, 43:2, 44:3, 57:13, 57:19, 67:13, 67:24
Standard [1] - 22:23
standards [20] - 15:18, 19:10, 19:23, 23:20, 24:3, 29:22, 32:20, 42:19, 43:7, 43:21, 43:25, 44:6, 49:11, 49:14, 58:2, 83:11, 83:18, 83:21, 85:13, 109:11
Standards [44] - 19:11, 19:17, 20:2, 21:14, 21:21, 22:5, 22:11, 22:13, 23:5, 23:12, 23:21, 24:11, 29:23, 32:3, 32:22, 33:12, 34:8, 34:25, 35:4, 35:17, 35:24, 38:8, 41:9, 44:2, 44:4, 46:3, 46:24, 52:6, 56:2, 57:12, 57:25, 64:4, 64:11, 65:8, 76:16, 78:19, 83:12, 87:4, 91:7, 91:19, 95:3, 95:5, 104:2, 119:9
start [6] - 80:6, 80:10, 103:15, 110:22, 113:19, 115:2
started [4] - 39:18, 84:5, 102:13, 114:18
starts [6] - 18:16, 109:17, 109:19, 110:6, 113:11, 115:4
STATE [1] - 124:4
state [2] - 4:8, 52:21
State [5] - 1:23, 4:4, 7:13, 81:14, 124:8
statement [2] - 19:18, 54:7
states [1] - 24:14
STATES [1] - 1:2
States [2] - 7:18, 7:22
stating [3] - 15:16, 28:21, 53:18
stays [1] - 65:21
STEPHEN [1] - 2:11
Stephen [4] - 11:15, 11:17, 11:19, 12:19
steps [1] - 117:5

K. J. KING

still [4] - 69:13, 89:19, 109:22, 113:2
STIPULATED [2] - 3:5, 3:20
stones [1] - 112:22
stop [1] - 115:6
stopped [2] - 117:2, 117:3
Store [9] - 28:6, 28:7, 28:9, 28:15, 30:5, 30:6, 30:18, 30:19
storefront [1] - 80:17
stores [13] - 9:10, 34:11, 34:14, 39:14, 39:21, 79:21, 80:2, 80:14, 81:5, 93:4, 93:23, 100:11, 102:5
storm [2] - 38:14, 38:16
story [1] - 27:25
straight [1] - 75:9
street [2] - 32:11, 33:3
Street [43] - 1:21, 2:5, 2:10, 31:16, 31:20, 32:7, 32:16, 32:19, 32:21, 32:25, 33:5, 33:11, 33:14, 37:2, 94:14, 94:16, 95:11, 95:14, 96:20, 101:4, 101:8, 101:15, 101:17, 101:20, 101:23, 102:9, 102:14, 102:16, 102:19, 102:25, 104:7, 104:13, 104:17, 105:8, 106:4, 106:5, 106:7, 106:8, 106:13, 106:16, 120:7, 120:9, 120:19
structural [1] - 20:12
structurally [1] - 20:17
studies [1] - 40:3
subject [2] - 19:9, 78:16
submit [1] - 48:18
submitted [2] - 44:20, 62:21
Subscribed [1] - 121:11
substance [2] - 12:9, 12:15
substantive [1] - 52:2
Superstorm [1] - 38:13
supervise [4] - 6:2, 6:5, 6:12, 6:19
support [1] - 85:22
supposed [18] - 34:9, 49:10, 49:14, 62:25, 65:7, 69:15, 69:16, 71:11, 71:23, 91:20, 93:2, 93:21, 94:15, 97:3, 105:17, 114:23, 114:24, 116:18
surface [1] - 119:12
survey [3] - 45:18, 82:21, 122:11
SW [1] - 77:3
sworn [4] - 3:10, 4:3, 121:11, 124:11

**T**

tailor [1] - 55:5

tailored [2] - 58:7, 58:9
talks [1] - 101:17, 106:12
tape [1] - 9:24
technical [1] - 57:13
technically [1] - 37:18
temporary [1] - 43:10
ten [6] - 74:15, 75:2, 75:10, 75:15, 75:18, 82:10
tenant [2] - 85:5, 119:2
term [1] - 20:15
terms [6] - 13:24, 41:7, 42:20, 43:24, 103:17, 107:8
terrain [4] - 20:4, 20:9, 21:2, 119:8
testified [1] - 4:5
testify [1] - 12:9
testimony [3] - 5:18, 53:2, 24:13
text [1] - 102:24
texture [1] - 119:12
themselves [1] - 31:6
third [21] - 77:9, 78:7, 78:18, 87:18, 90:12, 97:11, 98:3, 98:11, 98:21, 98:24, 109:22, 110:2, 110:10, 112:11, 112:16, 112:17, 114:3, 114:21, 115:13, 118:11
three [13] - 6:12, 6:19, 29:2, 29:4, 29:6, 35:13, 77:22, 84:16, 89:24, 98:7, 98:8, 110:7, 112:5
Tim [43] - 6:22, 7:4, 7:19, 7:24, 8:5, 8:17, 15:8, 15:12, 16:14, 16:18, 16:22, 16:25, 19:3, 23:25, 24:9, 25:8, 35:14, 35:22, 38:12, 40:9, 40:22, 41:5, 43:15, 45:10, 45:22, 48:9, 50:11, 51:17, 51:19, 59:14, 59:17, 59:22, 60:6, 61:3, 61:24, 67:21, 68:6, 76:14, 95:17, 96:6, 96:15, 99:15, 99:22
Tim's [9] - 10:6, 14:7, 62:12, 62:13, 77:21, 88:20, 114:10, 118:19, 119:24
TIME [1] - 1:13
today [9] - 5:17, 6:17, 17:9, 27:23, 85:24, 86:9, 86:12, 94:11, 119:24
together [1] - 61:24
tolerance [3] - 108:23, 109:6, 109:10
tolerances [4] - 97:12, 99:8, 109:4, 120:10
Tom [1] - 6:23
took [9] - 12:2, 12:22, 15:14, 35:12, 60:19, 61:6, 73:5, 73:7, 108:2

top [37] - 17:17, 18:17, 18:21, 42:2, 59:21, 60:11, 67:25, 77:4, 78:22, 79:3, 89:8, 89:10, 97:4, 98:7, 99:3, 101:18, 102:8, 102:18, 103:13, 103:15, 104:23, 106:22, 109:25, 110:5, 110:13, 110:18, 110:21, 110:25, 111:19, 112:6, 114:11, 114:25, 116:22, 117:9, 118:13, 118:15
total [2] - 17:23, 62:24
totally [1] - 113:12
totals [1] - 53:6
towards [6] - 28:19, 62:15, 87:17, 89:8, 98:13, 113:6
trained [1] - 68:8
transcript [2] - 121:2, 123:10
transportation [1] - 32:10
Travel [2] - 6:14, 74:7
travel [8] - 34:10, 34:14, 93:2, 94:3, 94:15, 94:23, 95:7, 119:2
trial [1] - 3:22
trigger [1] - 82:10
tripping [1] - 37:23
true [2] - 53:17, 124:12
truthful [1] - 5:17
try [1] - 84:9
trying [1] - 53:5
two [37] - 9:23, 17:21, 31:24, 35:13, 46:25, 60:24, 63:7, 63:25, 64:6, 64:12, 64:23, 65:10, 65:21, 65:25, 66:21, 67:8, 68:2, 69:13, 69:19, 70:4, 70:17, 74:4, 75:3, 83:17, 84:17, 89:23, 98:7, 98:8, 109:25, 110:5, 110:16, 110:24, 113:21, 113:24, 114:21, 116:4, 118:17
two-foot [2] - 9:23, 60:24, 110:16
type [2] - 54:25, 82:24

**U**

unable [1] - 5:17
uncovered [2] - 49:11, 51:11
under [23] - 19:23, 23:21, 28:14, 29:9, 30:5, 30:18, 32:3, 32:20, 34:8, 42:22, 64:10, 65:8, 67:7, 75:10, 75:19, 77:18, 87:15, 87:17, 91:19, 95:4, 104:16, 110:19
underneath [8] - 63:5, 70:11, 85:22, 86:7, 87:18, 101:24, 105:3, 105:4
understood [1] - 109:5

undue [1] - 20:17
unevenly [1] - 36:6
unique [2] - 20:3, 21:4
United [11] - 4:12, 5:22, 5:24, 7:4, 7:18, 7:22, 8:2, 42:10, 54:15, 60:5, 67:19
united [1] - 54:21
UNITED [1] - 1:2
unless [2] - 117:14, 119:15
unsigned [1] - 3:14
up [13] - 15:12, 51:18, 51:20, 51:21, 51:25, 52:3, 55:4, 72:4, 75:8, 89:13, 113:3, 114:13, 115:3
usable [1] - 93:9
useable [1] - 93:10
users [2] - 117:14, 117:17

**V**

van [4] - 63:7, 65:21, 65:25, 66:21
varies [1] - 8:3
various [1] - 6:8
verbal [6] - 5:8, 11:15, 48:19, 48:20, 48:25, 55:16
verification [2] - 16:3, 30:25
verified [7] - 10:11, 13:14, 14:17, 16:8, 18:5, 47:12, 66:17
verify [7] - 9:4, 9:6, 14:25, 15:23, 15:25, 49:4, 72:9
verifying [2] - 14:6, 15:17
versa [1] - 110:15
via [1] - 77:5
Vice [1] - 7:2
vice [1] - 110:14
view [1] - 109:16
violation [3] - 23:20, 56:16, 64:3
violations [14] - 48:4, 48:11, 48:14, 49:10, 50:18, 50:22, 51:10, 52:5, 54:24, 56:10, 58:2, 58:5, 60:12, 60:16
vision [2] - 116:25, 117:13
visit [3] - 8:16, 15:4, 25:6
visited [2] - 8:9, 8:13

**W**

wait [1] - 5:11
waived [1] - 3:9
walk [1] - 119:16
walked [1] - 102:15
walkway [2] - 9:9, 10:21
wall [6] - 111:15, 113:12, 116:14, 116:20, 118:5, 118:6
wants [1] - 55:6
water [1] - 38:19

K. J. KING

| | **Z** |
|---|---|
| **ways** [4] - 75:4, 75:12, 75:14, 116:6 | **zero** [2] - 63:10 |
| **week** [1] - 15:5 | |
| **West** [15] - 31:16, 31:20, 32:16, 32:19, 32:21, 32:25, 33:5, 33:11, 33:14, 37:2, 94:13, 94:16, 95:11, 95:14, 105:8 | |
| **whatsoever** [1] - 86:24 | |
| **Wheelchair** [1] - 6:16 | |
| **wheelchair** [5] - 92:25, 93:19, 94:23, 117:14, 117:17 | |
| **wheelchairs** [2] - 93:9, 93:16 | |
| **WHEREOF** [1] - 124:19 | |
| **white** [1] - 115:23 | |
| **whole** [2] - 75:7, 95:22 | |
| **wide** [1] - 53:8 | |
| **width** [1] - 115:25 | |
| **WILSON** [1] - 2:8 | |
| **WITNESS** [1] - 124:19 | |
| **witness** [10] - 3:10, 3:16, 3:18, 4:3, 12:14, 49:17, 49:19, 121:5, 124:10, 124:13 | |
| **Witness** [4] - 1:17, 89:25, 98:5, 111:18 | |
| **word** [5] - 13:3, 20:8, 28:12, 28:16, 64:7 | |
| **works** [1] - 7:11 | |
| **world** [1] - 81:12 | |
| **Worth** [2] - 1:20, 2:5 | |
| **write** [9] - 14:9, 14:11, 14:13, 16:5, 60:25, 75:17, 89:23, 98:2, 109:6 | |
| **writes** [1] - 88:21 | |
| **writing** [5] - 11:22, 27:13, 41:6, 41:10, 108:24 | |
| **written** [11] - 14:7, 14:16, 47:4, 47:6, 47:24, 48:2, 48:21, 49:8, 49:9, 51:25, 55:19 | |
| **wrote** [7] - 15:15, 46:20, 51:18, 51:20, 51:21, 52:3, 59:12 | |
| **Y** | |
| **year** [3] - 84:21, 85:24 | |
| **years** [4] - 5:25, 7:6, 84:4, 84:5 | |
| **YORK** [2] - 1:2, 124:4 | |
| **York** [16] - 1:21, 1:23, 2:6, 2:11, 4:4, 4:14, 4:22, 7:13, 7:17, 7:24, 8:10, 26:20, 124:9 | |
| **yourself** [6] - 25:3, 61:23, 72:9, 73:5, 99:17, 108:10 | |

121

```
 1                    K. J. KING
 2        review and execute the transcript.
 3             MR. PARKER:  Yes.
 4             (Whereupon, at 3:46 P.M., the
 5        examination of this witness was
 6        concluded.)
 7
 8                    _____
 9                      KLEO J. KING
10
11        Subscribed and sworn to before me
12        this _____ day of _____ 20___ .
13
14        _____
15             NOTARY PUBLIC
```

ESTRELLITA BRAVO
Notary Public, State of New York
No. 01BR6069480
Qualified in Queens County
Commission Expires February 4, 20___

```
16
17
18
19
20
21
22
23
24
25
```

## ERRATA SHEET

STATE OF   NEW YORK )
                        ) SS.:
COUNTY OF  Queens   )

                                      CASE NAME: Brown v. Mermaid Plaza, et. al.
                                      13cv760

        KLEO J. KING, deposes and says:

the following are corrections made to my transcript of the Examination Before Trial held on

September 25, 2014:

| PAGE | LINE | SHOULD READ | REASON |
|------|------|-------------|--------|
| 6 | 24 | "Marinelli" | Typographical Error; Spelling |
| 7 | 6 | "Three years" | Clarification |
| 29 | 17-18 | "ANSI A-117" | Typographical Error; Spelling |
| 69 | 20 | "front" should be "firm" | Typographical Error |

                                        KLEO KING

Sworn to before me this
23 day of  October   , 2014

_____
Notary Public

ESTRELLITA BRAVO
Notary Public, State of New York
No. 01BR6069480
Qualified in Queens County
Commission Expires February 4, 20 18

6396538v.1

Exhibit F

Page 1

1

2  UNITED STATES DISTRICT COURT

   EASTERN DISTRICT OF NEW YORK

3  - - - - - - - - - - - - - - - - - - - x

4  ANGELA BROWN,

5                      Plaintiff,

6            - against -

7  MERMAID PLAZA ASSOCIATES LLC and C&J

   DONUTS, INC.,

8

                     Defendants.

9  - - - - - - - - - - - - - - - - - - - x

10

                     May 2, 2014

11                   12:12 p.m.

12                   150 East 42nd Street

                     New York, New York

13

14        DEPOSITION of ANGELA BROWN, the

15  Plaintiff in the above-entitled action,

16  held at the above time and place, taken

17  before Brittany Saline, a Notary Public of

18  the State of New York, pursuant to the

19  Federal Rules of Civil Procedure, Notice

20  and stipulations between counsel.

21

22            *       *       *       *

23

24

25

Page 2

1

2  A P P E A R A N C E S :

3

   PARKER HANSKI, LLC

4  Attorneys for Plaintiff
   40 Worth Street, 10th Floor

5  New York, New York 10013

6  BY:  GLEN H. PARKER, ESQ.
           - and -

7        ROBERT G. HANSKI, ESQ.

8

9

   WILSON ELSER MOSKOWITZ

10 EDELMAN & DICKER, LLP
   Attorneys for Defendant

11 MERMAID PLAZA ASSOCIATES
   150 East 42nd Street

12 New York, New York 10017

13 BY:  JURA C. ZIBAS, ESQ.

14

15              *       *       *       *

16

17

18

19

20

21

22

23

24

25

Page 3

1
2              S T I P U L A T I O N S
3              IT IS HEREBY STIPULATED AND
4    AGREED, by and among counsel for the
5    respective parties hereto, that the filing,
6    sealing and certification of the within
7    deposition shall be and the same are hereby
8    waived;
9              IT IS FURTHER STIPULATED AND AGREED
10   that all objections, except as to form of
11   the question, shall be reserved to the time
12   of the trial;
13             IT IS FURTHER STIPULATED AND AGREED
14   that the within deposition may be signed
15   before any Notary Public with the same
16   force and effect as if signed and sworn to
17   before the Court.
18
                   *        *        *        *
19
20
21
22
23
24
25

Page 4

1

2    A-N-G-E-L-A B-R-O-W-N, the witness herein,

3    after having first been duly sworn by a

4    Notary Public of the State of New York, was

5    examined and testified as follows:

6    EXAMINATION BY

7    MS. ZIBAS:

8        Q        Please state your name for the

9    record.

10       A        Angela Brown.

11       Q        Please state your address for

12   the record.

13       A        3162 Bayview Avenue, Apartment

14   3B, Brooklyn, New York 11224.

15               MS. ZIBAS:  Good afternoon.

16       Thank you for coming in today for

17       deposition.  I want to go through a

18       couple of what we call ground rules

19       related to the deposition.  First of

20       all, I just ask that all your answers

21       be oral, no head shaking, no

22       handshaking, nodding because the court

23       reporter can only get down words.

24               THE WITNESS:  Okay.

25               MS. ZIBAS:  Second of all, if

Page 5

Angela Brown

1
2          you ever need to take a break, just
3          let us know and as long as there is no
4          question pending, we will stop and you
5          can take a break.
6                    THE WITNESS:  Okay.
7                    MS. ZIBAS:  If your attorney
8          objects, let the objection be put on
9          the record and then unless you're
10         directed not to answer you need to go
11         ahead and answer the question.
12                   THE WITNESS:  Okay.
13              Q         Have you ever been deposed
14    before?
15              A         I have done a 50(h) hearing,
16    so basically the same thing.
17              Q         And when did you do a 50(h)
18    hearing?
19              A         It might have been -- I am not
20    sure of the date, if it was a year ago or
21    six months ago.
22              Q         And are you a party to a
23    lawsuit that required you to give a 50(h)?
24              A         Yes.
25              Q         And what's the name of that

Page 6

                    Angela Brown

1

2    lawsuit?

3          A       What's the name of it?

4          Q       Yes, the caption.

5          A       I am not sure of it, but.

6          Q       Did you file a lawsuit against

7    someone?

8          A       Yes.

9          Q       Who did you file a lawsuit

10   against?

11         A       New York City Housing

12   Authority.

13         Q       Is that the first time you

14   filed a lawsuit against the New York City

15   Housing Authority?

16         A       Yes.

17         Q       And is it pending in federal

18   or state court?

19         A       I am not sure.

20         Q       Who is your attorney on the

21   case?

22         A       Avanzino & Moreno.

23         Q       Do you have any other lawsuits

24   currently pending?

25         A       No.

Page 7

Angela Brown

1

2          Q          Have you filed any other

3     lawsuits in federal or state court ever?

4          A          No.

5          Q          Are you aware of two currently

6     pending lawsuits you have in federal court?

7          A          The ones against -- yes, okay.

8          Q          You have another lawsuit

9     pending in federal court right now?

10         A          That would be this one.

11         Q          Yes?

12         A          Yes, yes.

13         Q          We represent Mermaid Plaza

14    Associates LLC.  Do you know who the other

15    lawsuit is filed against in federal court?

16         A          I know -- I am not sure of the

17    title but it's Fine Fare Supermarkets.

18         Q          So other than these two

19    current lawsuits and the one against the

20    New York City Housing Authority, you're not

21    aware of any other lawsuit you have ever

22    filed?

23         A          No.

24         Q          Are you currently on any

25    medication?

Page 8

```
 1                    Angela Brown
 2        A        Yes.
 3        Q        What medication are you on?
 4        A        I take medication for blood
 5   pressure and multiple sclerosis.
 6        Q        Does any of the medication you
 7   have taken today cause you to be sleepy or
 8   do you believe that it can't permit you to
 9   tell the truth?
10        A        No.
11        Q        What is your date of birth?
12        A        July 2, 1971.
13        Q        Nineteen?
14        A        '71.
15        Q        And your Social Security
16   number?
17                 MR. PARKER:  I am going to
18        object.  We're not providing Social
19        Security number.  If there is a
20        particular reason why you need it then
21        we will provide it.
22                 MS. ZIBAS:  So you're going to
23        object and direct her not to answer?
24                 MR. PARKER:  For Social
25        Security number, yes.
```

Page 9

Angela Brown

MS. ZIBAS:   And outside of directing -- just objecting, do you want to put another rationale on the record or just directing her not to answer?

MR. PARKER:   At this point directing her not to answer Social Security.

Q        Do you have a middle name?

A        Lashon.

Q        How do you spell that?

A        L-A-S-H-O-N.

Q        Are you married?

A        No.

Q        Have you ever been married?

A        No.

Q        Do you have any children?

A        Yes.

Q        How many children do you have?

A        Three.

Q        And do they live with you?

A        Yes.

Q        How long have you lived at your address at 3162 Bayview Avenue?

Page 10

1                    Angela Brown
2        A          Since 2011.
3        Q          Prior to that where did you
4    live?
5        A          I lived at 730 Stanley Avenue.
6        Q          Do you currently live in an
7    apartment building?
8        A          Yes.
9        Q          What floor do you live on?
10       A          Three, third.
11       Q          Does your building have an
12   elevator?
13       A          Yes.
14       Q          Does your building have any
15   other accommodations for disabled people in
16   a wheelchair?
17       A          They have a ramp, a wooden
18   ramp.
19       Q          Is it permanent?
20       A          No.
21       Q          So are there steps in the
22   front of the building?
23       A          Yes.
24       Q          And so how do you get into the
25   building?

Angela Brown

1

2      A        They have a ramp that they

3  place there and then there is steps inside

4  the lobby that they place the ramp there,

5  too.

6      Q        You have to call someone when

7  you get to the building?

8      A        No, the ramp is not permanent,

9  like it's attached to the wall, but they

10 can remove it.

11     Q        In order to get into the

12 building, does someone have to assist you

13 to put the ramp there?

14     A        No.

15     Q        You can do it yourself?

16     A        The ramp is there but the ramp

17 can be removed.

18     Q        What about in your apartment,

19 do you have any other accommodations?  Was

20 your apartment fixed to accommodate you?

21     A        No, no.

22     Q        What about the counters?

23     A        No.

24     Q        And the doorways?

25     A        No.

Angela Brown

1

2       Q        What about the bathroom?

3       A        No.

4       Q        What is the cause of action

5   for the current lawsuit you have against

6   New York City Housing Authority?

7       A        There was no ramp in the lobby

8   and outside the building.

9       Q        Are you currently employed?

10      A        No.

11      Q        Were you ever employed?

12      A        Yes.

13      Q        When was the last time you

14  were employed?

15      A        2008.

16      Q        What did you do when you were

17  employed?

18      A        New York City correction

19  officer.

20      Q        And how long were you a New

21  York City correction officer?

22      A        Three years, three and a half.

23      Q        And since 2008 have you tried

24  to get a job?

25      A        No.

Page 13

1                    Angela Brown

2       Q        Are you on full disability?

3       A        Yes.

4       Q        And is it through Medicare or

5  through a pension fund?

6       A        Social Security Disability.

7       Q        What is the disability?

8       A        Multiple sclerosis.

9       Q        When were you diagnosed?

10      A        2008.

11      Q        What's your highest level of

12  education?

13      A        One year of college.

14      Q        And where did you complete one

15  year of college?

16      A        Brooklyn College.

17      Q        Where did you complete high

18  school?

19      A        John Dewey High School.

20      Q        How old are your children that

21  are living with you?

22      A        Twenty-three and two are 19.

23      Q        Now, in the lawsuit that has

24  been filed against Mermaid Plaza Associates

25  LLC and C&J Donuts, Incorporated, do you

Angela Brown

1
2    know what the causes of action are in that
3    lawsuit?
4         A       That it's not accessible.
5         Q       What's not accessible?
6         A       The parking lot at the Dunkin'
7    Donuts, the doors, there is several things.
8         Q       Are you able to drive?
9         A       No.
10        Q       When was the last time you
11   were able to drive?
12        A       Maybe 2009 maybe, late 2008.
13        Q       Do you currently have a car
14   that's been modified to accommodate your
15   wheelchair?
16        A       No.
17        Q       How are you able to get around
18   outside of going around the sidewalk on
19   your own, how do you get around?
20        A       Access-A-Ride or in my
21   vehicle.
22        Q       What do you mean by in your
23   vehicle?
24        A       Someone else drives.
25        Q       But do you have a car yourself

Page 15

1                    Angela Brown

2    that someone else drives or a minivan?

3         A        I have a truck that someone

4    else drives.

5         Q        Has that truck been

6    accommodated to fit your wheelchair?

7         A        No.

8         Q        When did you become

9    wheelchair-bound?

10        A        I got the chair in 2010 -- not

11   wheelchair-bound, I can get out of the

12   wheelchair.

13        Q        Oh, okay.  When you say you

14   can get out of the wheelchair, can you walk

15   at all?

16        A        No, but I can get out of it.

17        Q        Can you stand?

18        A        For short periods of time.

19        Q        Can you get out of the

20   wheelchair by yourself?

21        A        Yes.

22        Q        Do you keep any journals of

23   your daily activities?

24        A        No.

25        Q        Do you have a computer?

Page 16

Angela Brown

1

2        A        Yes.

3        Q        Now, the property that is

4   listed in the lawsuit, the address is 3015

5   Mermaid Avenue, are you familiar with that

6   property address?

7        A        Yes.

8        Q        When was the last time you

9   were at that property?

10       A        Maybe about a month -- about a

11  month ago.

12       Q        Why did you go to the

13  property?

14       A        Just to purchase something

15  from the store.

16       Q        What stores are there?

17       A        There is a Rent-A-Center,

18  Dunkin' Donuts, and a Rite Aid.

19       Q        Which store did you go to?

20       A        To the Dunkin' Donuts.

21       Q        Is 3015 Mermaid Avenue close

22  to your home address?

23       A        Yes.

24       Q        How far away is it?

25       A        No more than two blocks.

Page 17

1                    Angela Brown

2        Q        So when you went there one

3   month ago, did you go in your wheelchair?

4        A        Yes.

5        Q        Do you ever take a van there?

6        A        Sometimes.

7        Q        When would you take a van

8   there?

9        A        If I am going further like

10  somewhere else we might stop there to get

11  something or ...

12       Q        Do you remember the last time

13  you took a van or your truck there?

14       A        I can't remember.

15       Q        Would it be more than a year

16  ago, do you think?

17       A        No.

18       Q        More than six months?

19       A        It was winter so probably

20  sometime maybe once or twice in that

21  period.

22       Q        So the last time that you went

23  to the Dunkin' Donuts, did you keep

24  receipts from when you went there?

25       A        No.

Angela Brown

1

2     Q     Do you have any receipts from

3  any of the purchases at Rent-A-Center or

4  Rite Aid or Dunkin' Donuts at the 3015

5  Mermaid Avenue property?

6     A     No.

7     Q     When you went to the Dunkin'

8  Donuts, how did you access the Dunkin'

9  Donuts?

10     A     When you come down the block

11  there is a ramp that you can go up.

12     Q     What about getting inside,

13  were you able to get in the door?

14     A     Well, somebody -- the doors

15  open awkward, so you know, like one opens

16  in, one opens out, so somebody has to open

17  the doors so that I can go through.

18     Q     Was anyone with you when you

19  went there?

20     A     One of my sons.

21     Q     And other than that visit to

22  Dunkin' Donuts a month ago, when was the

23  time before that that you would have gone

24  to that 3015 Mermaid Avenue property?

25     A     I might have went to the Rite

VERITEXT REPORTING COMPANY
www.veritext.com
212-267-6868      516-608-2400

                        Angela Brown

1   Aid to purchase something.

2        Q        How often do you think you go

3   to the Rite Aid in the course of six months

4   at that property?

5        A        Not often because it's hard to

6   get around there.

7        Q        How is it hard to get around

8   there?

9        A        The ramps, you can't get up

10  the ramp, it's like awkward, I can't

11  explain it to you, but it's awkward.

12       Q        I understand it's hard to

13  explain, but do the best you can.  Is it

14  the angle of the ramp, what makes it

15  awkward?

16       A        I guess the slope of it, if I

17  am traveling in the chair then at the end

18  of the walkway it's, you know, the ramp is

19  hard to get up.  If I am driving then the

20  person has to look and see where the

21  handicap spots are, it's not like where you

22  can automatically, oh, that's the handicap

23  spot right there.

24       Q        Are there blue lines marked

Page 20

                    Angela Brown

1

2   for the handicap spot?

3        A        I believe so but there is no

4   sign, like when we go to the Pathmark you

5   can look while you're driving right in

6   front of you and see that the sign is

7   there.

8        Q        What about when you drive

9   there, are you able to get up the curb?

10       A        Am I able to get up the curb?

11       Q        Yes.

12       A        When you get out of the car

13  there is a curb there, but I believe it's

14  cracked.

15       Q        What do you mean cracked?

16       A        It's not smooth.

17       Q        Can the wheelchair get up the

18  ramp?

19       A        It goes up the ramp, but it's

20  like rigid or bumpy.

21       Q        When was the last time you

22  went up the ramp that you said was not

23  smooth or that curb?

24       A        Maybe when I went there six

25  months ago.

Page 21

Angela Brown

1

2      Q        Do you know how many spaces
3  are there that are marked with blue?
4      A        I believe it's two in front of
5  the Dunkin' Donuts and then two a little
6  bit further down.
7      Q        Did you ever take any pictures
8  of the property at 3015?
9      A        Have I taken pictures?
10      Q        Yes.
11      A        No.
12      Q        Have you ever had any problems
13  getting into any other public buildings in
14  your neighborhood outside of the two
15  lawsuits that you filed?
16      A        Some, some.  I really don't --
17  some of them are awkward.
18      Q        Which of them are awkward?
19      A        This is for the Rite Aid and
20  the Dunkin' Donuts or for the Fine Fare,
21  too?
22      Q        No, the Dunkin' Donuts.
23      A        Okay.  The Fine Fare is
24  awkward, I know there is a Key Food that's
25  awkward, I know -- I can't think of all of

Page 22

Angela Brown

1
2   them, but it's several.
3       Q       Did you ever make any
4   complaints to anyone at Rite Aid that it
5   was difficult or awkward to get into their
6   store?
7       A       I complained to them about the
8   doors.
9       Q       To the Rite Aid?
10      A       To the Dunkin' Donuts.
11      Q       Who did you complain to?
12      A       Just the cashier at the
13  register.
14      Q       When did you last complain?
15      A       I don't know, that was -- I
16  can't remember the date.
17      Q       Was it within the last year?
18      A       Probably before then.
19  Maybe -- I made several complaints to them,
20  I am not sure when.
21      Q       Always to the cashier?
22      A       Yes.
23      Q       What about the Rite Aid?
24      A       Whoever is at the register.
25      Q       So you complained at the Rite

Page 23

Angela Brown

1
2   Aid as well?

3       A       Yes.

4       Q       What did you tell people at

5   the Rite Aid about the complaints that you

6   had?

7       A       I complained about the ramps

8   to get inside up to the -- on the -- like

9   from the parking lot to go up the ramp to,

10  I guess, that's the sidewalk before you get

11  in the store.

12      Q       What did you tell them?

13      A       That it needs to be repaired,

14  that it's cracked and awkward and bumpy,

15  it's not a smooth ride up, you know, like

16  it makes the wheelchair lean to the side

17  like, you know, because I have a manual

18  one, too, that sometimes my son pushes me

19  in, so.

20      Q       When did you last complain to

21  anyone at the Rite Aid?

22      A       Maybe the last time I was in

23  there.

24      Q       That was?

25      A       Maybe six months ago.

Page 24

Angela Brown

2  Q    And in response, what did the
3  person tell you at Rite Aid?
4  A    That they would speak to the
5  manager.
6  Q    Did you ever contact the
7  manager?
8  A    I don't know who the manager
9  is.
10  Q    Did you ever write a letter to
11  anyone at Rite Aid about your complaints?
12  A    No.
13  Q    What about at Dunkin' Donuts,
14  did you ever write a letter?
15  A    No.
16  Q    What about at the Key Foods,
17  have you ever made complaints or written a
18  letter to anyone complaining about how
19  awkward --
20  A    No letters, but I made
21  complaints to people that work there and
22  they are aware of the situation.
23  Q    Now, did you live in that
24  apartment during Hurricane Sandy?
25  A    Yes.

Page 25

Angela Brown

1
2      Q       Was there any flooding in that
3  area?
4      A       Yes.
5      Q       Can you recall how much damage
6  there was in that area?
7      A       There was significant damage.
8      Q       Were you able to get out of
9  your apartment?
10     A       I didn't venture out, but from
11 what my children told me and my mother and
12 sister, they live in the area, that it
13 wouldn't have been good for me to go
14 outside.
15     Q       How long was it before you
16 went outside after the Super Storm Sandy,
17 how long before you went outside?
18     A       That was in October, so maybe
19 like month, I did go outside because I seen
20 the sand still on the streets.
21     Q       After Super Storm Sandy, how
22 long was it before you went back to the
23 3015 Mermaid Avenue property?
24     A       Maybe the springtime.
25     Q       Did you notice anything

Page 26

1                    Angela Brown
2    different in the parking lot after the
3    storm versus before the storm?
4         A        I wouldn't be able to tell
5    you.
6         Q        Did you notice if the crack
7    that you referenced was it better or worse
8    after the storm?
9         A        I would guess that most of the
10   things were worse, so I would guess that
11   that would be worse too.
12        Q        You specifically remember
13   or --
14        A        I noticed that the sidewalks
15   and everything that was in the area was
16   cracked and due to the storm.
17        Q        Did you notice any damage to
18   the actual parking lot, the blacktop at
19   3015 Mermaid Avenue after the storm?
20        A        I would say yes.
21        Q        Did you notice anywhere
22   between your apartment and 3015 Mermaid
23   Avenue, did it appear that some of the
24   ground had settled or cracked in the
25   streets?

Page 27

Angela Brown

1

2        A        The streets were damaged, the

3   sidewalks were damaged, everything.

4        Q        Are the streets and sidewalks

5   repaired now?

6        A        Not -- no.

7        Q        Do you know if they're

8   scheduled to be repaired?

9        A        No.

10        Q        Did you take any pictures

11   after the storm?

12        A        No.

13        Q        Did your kids take any

14   pictures?

15        A        No.

16        Q        Did anyone in your family, any

17   of your children, take any pictures of the

18   3015 Mermaid property?

19        A        No.

20        Q        In general, how many visits a

21   year do you usually make to 3015 Mermaid

22   Avenue, and I understand you only have

23   lived there a few years in that area?

24        A        I have lived there for maybe

25   11 or 12 years.

Page 28

Angela Brown

1

2      Q         Was your other address on
3   Stanley Avenue nearby as well?
4      A         No.  I have been at the
5   address I am at now since 2003.
6      Q         Oh, I had 2011.  I
7   misunderstood you.
8              When did you live on Stanley?
9      A         I lived there before -- I
10  lived there from '95 to maybe 2003.
11     Q         So you lived at 3162 Bayview
12  Avenue since 2003?
13     A         Yes.
14     Q         I am sorry, in my notes I had
15  2011, I thought you said.
16              Have you ever filed any
17  lawsuits prior to 2008 that were related to
18  labor law violations or claiming that you
19  weren't paid the appropriate amount at any
20  of your jobs?
21     A         No.
22     Q         Have any of your children
23  filed such lawsuits that you're aware of?
24     A         No.
25     Q         Are you currently receiving

Page 29

Angela Brown

1

2 Medicaid?

3      A      No.

4      Q      Do you know if an award of any

5 damages in a lawsuit impacts the amount you

6 would get paid under Social Security

7 Disability?

8      A      It shouldn't.

9      Q      And the only reason I am

10 asking you that is I had that situation in

11 another federal case.

12     A      No, I am getting my disability

13 from working not from SSI, so it shouldn't

14 affect that.

15     Q      Okay.  But it gets paid

16 through Medicare even though it's from New

17 York City.

18     A      Through Medicare?

19     Q      Yes, who do your checks come

20 from, your Social Security checks?

21     A      They come from Social Security

22 Disability.

23     Q      Okay.  They don't come from

24 the city, correct?

25     A      No, it's based on my work

Page 30

Angela Brown

2  experience.

3      Q      So since the time that you

4  have been going to the 3015 Mermaid Avenue

5  property, have you noticed any changes made

6  since the time you filed the lawsuit?

7      A      No.

8      Q      Have you looked for any

9  changes?

10      A      Yes.

11      Q      What changes have you looked

12  for?

13      A      I looked to see if they put

14  the handrails in or if they put the sign

15  up, if they repaired the cracks in the

16  pavement.

17      Q      But you haven't been there in

18  the last month, correct?

19      A      No.

20      Q      Why were you looking for

21  handrails?

22      A      Well, the handrails -- before

23  the wheelchair, I used to walk with the

24  cane, and I used to have to hold on to the

25  building in order to walk up the ramp.

Page 31

Angela Brown

1

2      Q          And which cracks were you

3   looking for to be repaired?

4      A          Where the ramp is.

5      Q          When you're talking about the

6   ramp, are you talking about the one in

7   front of the doughnut store, Dunkin'

8   Donuts?

9      A          Yes.

10     Q          Now, when you have gone to the

11  3015 Mermaid property in a van or your

12  truck, did you have any problem getting

13  around the parking lot, was there enough

14  room?

15     A          There is enough room, but

16  there is potholes in the parking lot.

17     Q          When did you first notice the

18  potholes?

19     A          I am not sure when it was, but

20  I know that they are there.

21     Q          Was it before this past winter

22  or after?

23     A          Maybe they were there before

24  the winter, they may still be there, I

25  haven't went in the car, so I am not

Page 32

1                   Angela Brown

2    looking, like, I am just concentrating on

3    where I am going.

4          Q        So when you come down the

5    street to get to the property -- I am just

6    trying to envision -- do you come from

7    behind the building or in front of the

8    building?

9          A        Behind the building.

10         Q        If you're trying to go to

11   Dunkin' Donuts, like you did about a month

12   ago, how do you actually get in; do you go

13   through the parking lot or up the side

14   ramp?

15         A        Up the side ramp.

16         Q        Have you ever asked to talk to

17   a manager at the doughnut store or Dunkin'

18   Donuts about the doors?

19         A        No.

20         Q        Do you remember the name of

21   any of the cashiers that you complained to?

22         A        No.

23         Q        Have you ever looked up

24   anything on the internet about this

25   property, have you ever done any internet

Page 33

Angela Brown

1
2   research?
3       A        No.
4       Q        Have you ever done any
5   research on the Americans With Disabilities
6   Act?
7       A        Yes.
8       Q        What did you research?
9       A        I just researched as far as
10  the accessibility for buildings and
11  properties.
12      Q        When did you first do the
13  research on the Americans with Disabilities
14  Act?
15      A        Maybe that was 2012, 2011.
16      Q        Why did you do the research?
17      A        Because my apartment building
18  where I live didn't have an accessible
19  ramp.
20      Q        You're talking about the
21  Bayview Avenue?
22      A        Bayview Avenue.
23      Q        Okay.  When did you first
24  notice any complaints about accessibility
25  at 1350 Mermaid Avenue?

Page 34

1                    Angela Brown
2        A        When I started, I say 2011,
3   2010, when I started using the wheelchair.
4        Q        What was the first thing you
5   remembered that you noticed about the
6   property as far as accessibility?
7        A        The first thing was the slope
8   of the ramps and the cracks in the
9   pavement.  It might have been -- I am not
10  sure.
11       Q        Do you think this was in 2010
12  or 2011 when you noticed this?
13       A        I am not sure of the date when
14  I started using the wheelchair.
15       Q        Did you complain to anybody
16  your first time that you had noticed the
17  slope of the ramp or the cracks in the
18  pavement?
19       A        Maybe, probably did.
20       Q        And who did you complain to
21  when you first noticed it?
22       A        The employees of either the
23  Dunkin' Donuts or the Rite Aid.
24       Q        Have you ever been to the
25  Rent-A-Center?

Page 35

Angela Brown

1

2      A        No.

3      Q        What are your children's

4   names?

5      A        Bryan.

6      Q        Is that with a Y or an I?

7      A        Y.

8      Q        Last name Brown?

9      A        Howard.

10      Q        How do you spell that?

11      A        H-O-W-A-R-D.

12      Q        And your other children?

13      A        Aaron, two A's, Brown and

14   Corey Brown.

15      Q        C-O-R-E-Y?

16      A        Yes.

17      Q        And your lawsuit currently

18   pending against the New York City Housing

19   Authority, you said the cause of action has

20   to do with ramp, is that accessing the

21   building with the ramp; is that correct?

22      A        No, I actually fell down the

23   steps because there was no ramp.

24      Q        Have you asked for any

25   modifications in your apartment, inside the

Page 36

Angela Brown

1
2  building?

3       A       Yes.

4       Q       What modifications did you ask

5  for?

6       A       I asked for a wheelchair

7  accessible apartment.

8       Q       When did you make that

9  request?

10      A       I have been making that

11  request for years.

12      Q       How many years?

13      A       This is 2014 -- say five or

14  six years, five maybe, five years, yes.

15      Q       What year did you start using

16  the wheelchair again; 2008 or 2009?

17      A       The wheelchair was probably

18  2010.

19      Q       2010, okay.

20      A       What it is every year when you

21  do your lease agreement they ask you is

22  anybody in the apartment handicap and do

23  you need an accessible apartment, so since

24  2008 I have let them know that I need an

25  accessible apartment.

Page 37

1                    Angela Brown

2        Q        Have you talked to anyone at

3   the Dunkin' Donuts about this lawsuit?

4        A        No.

5        Q        Have you ever seen the

6   complaint that was filed on your behalf on

7   this lawsuit?

8        A        Yes, I did seen it.

9        Q        Did you ever read it?

10       A        I skimmed through it.

11       Q        What do you understood about

12  this lawsuit?  Just tell me in layman's

13  terms, I know there is a lot of legalese in

14  here.

15       A        To get accessibility to the

16  property.

17       Q        Are you aware of the New York

18  State causes of action that are in the

19  complaint?

20       A        I am not sure what you're

21  asking.

22       Q        That there is a violation of

23  New York State Civil Rights laws, are you

24  aware that that was filed on your behalf?

25       A        Yes.

Page 38

Angela Brown

2  Q      Do you know what the damages
3  requested are in the lawsuit on your
4  behalf?
5  A      No.
6  Q      So at this point the property
7  at 3015 Mermaid Avenue you said that the
8  crack in the ramp in front of the Dunkin'
9  Donuts remains an issue, right?
10  A      Yes.
11  Q      I am not quite sure how the
12  ramp is awkward.  Are you saying that the
13  bottom of the ramp --
14  A      When you ride up the ramp
15  there is like no like things on the side to
16  make sure that you stay inside the ramp
17  like -- you can easily go to the left or --
18  I can't explain it to you.
19  Q      But what about the bottom of
20  the ramp?
21  A      It's just like, you know, it's
22  not a smooth ride up the ramp, it's bumpy
23  and it makes the chair --
24  Q      Is it concrete?
25  A      Yes.

Page 39

Angela Brown

1

2     Q        What about at the bottom of

3  the ramp, is there any issue with getting

4  on the ramp?

5     A        You mean the ledge part?

6     Q        Yes.

7     A        It's a little not like -- I

8  wouldn't say like -- if this was the edge

9  of the table, it's not flush to the

10  pavement so then, you know, the wheels can

11  bump over it, but it's not a smooth

12  transition.

13     Q        Was there ever a time when it

14  wasn't bumpy at the bottom, when it was

15  smooth?

16     A        No.

17     Q        Is there a reason that you

18  didn't ask to speak to a manager at the

19  doughnut shop about the doors?

20     A        I just make whichever

21  employees that I see aware of the problem

22  and they say I will speak to somebody about

23  it and see if it can be fixed.

24     Q        But you have said you told

25  them more than once, did you ask them why

Page 40

1                    Angela Brown
2    nothing has been done?
3          A         It's like you tell people,
4    they really don't care, so you tell them
5    and tell them, that's why when I --
6    somebody referred me to speak to the
7    lawyers about having them done.
8          Q         And who referred you?
9          A         It's like an advocate for
10   disability place, I forgot the name of it.
11         Q         How did you find this group?
12         A         Somebody referred me to them
13   to get the ramp put in the building and
14   then they referred me to the attorneys.
15         Q         But who was the person who
16   referred you to the advocate for
17   disabilities group?
18         A         Just like someone that I know,
19   a friend or --
20         Q         What's the friend's name?
21         A         I am not sure, it was just
22   somebody who was like you can get in touch
23   with them and they will help you get the
24   things that you need to get.
25         Q         And do you remember, was this

Page 41

```
 1                    Angela Brown
 2   advocate for disabilities group, when did
 3   you first contact them?
 4        A         2012, I believe.
 5        Q         Do you remember the name of
 6   this group?
 7        A         I know the initials, I think,
 8   is BDIC or ...
 9        Q         And where are they located?
10        A         In Brooklyn.
11        Q         And did you go see them?
12        A         No.
13        Q         Did you call them on the
14   phone?
15        A         Yes.
16        Q         Did you find their website?
17        A         Did I look at their website --
18   um, I don't think so, I spoke to them on
19   the phone.
20        Q         How many calls did you make to
21   them?
22        A         Several, several.
23        Q         Do you remember who you talked
24   to?
25        A         The person there is -- her
```

Page 42

Angela Brown

1
2     name the Gabriella, I am not sure of her
3     last name.
4          Q       Did you keep any notes when
5     you called these people?
6          A       I don't think so.
7          Q       Do you have any business
8     cards?
9          A       I have -- um -- what did she
10    send me, like you have to register with
11    their group, they want your name and just
12    so that they can help you with any problems
13    that you're having so you have to register.
14         Q       You register over the phone?
15         A       I believe she might have sent
16    me paperwork and I sent it back to her.
17         Q       Do you have a copy of the
18    paperwork you sent her?
19         A       I am not sure.
20         Q       Do you have any brochures or
21    anything with their name and address on it?
22         A       I might.
23         Q       Do they confirm your
24    disability before they take any action on
25    your behalf?

Page 43

1                    Angela Brown

2        A        She asked me questions but I

3   don't think I had to sign any paperwork.

4        Q        When was the last time you

5   talked to somebody at this BDIC group?

6        A        I am not sure.  I know I have

7   a letter from them now that I have to fill

8   out and send back.

9        Q        What's the letter about?

10       A        Just like updating

11  information.

12       Q        What's it related to?

13       A        I just glanced at it, I know I

14  have to fill it out and send it back to

15  them.

16       Q        Does it have to do with the

17  lawsuits?

18       A        No.

19       Q        When is the next time you plan

20  on going back to 3015 Mermaid Avenue?

21       A        I can't say.

22       Q        Do you plan on going back to

23  the property?

24       A        I have to do it, you know, I

25  go to the Rite Aid to get pharmaceutical

Page 44

Angela Brown

2 products or whatever and Dunkin' Donuts I

3 go get breakfast or coffee.

4      Q      Do you get all your

5 prescriptions filled at that Rite Aid?

6      A      No, I don't -- maybe not

7 pharmaceutical, maybe just products, I

8 don't use their pharmacy.

9      Q      Do you know approximately how

10 many total parking spaces there are in the

11 3015 Mermaid Avenue parking lot?

12     A      No.

13     Q      Are there two rows for

14 parking --

15     A      Yes.

16     Q      -- or one?

17            Did anybody that you talked to

18 when you were complaining to Rite Aid or

19 Dunkin' Donuts ever refused to pass on your

20 complaint or tell you that no one would try

21 to make changes to the property?

22     A      No.

23     Q      Was there a reason that you

24 didn't try to contact anybody who owned the

25 building?

Page 45

Angela Brown

2     A        I figured if I talked to the

3  employees that they would pass the

4  information on.

5     Q        Why did you think they would

6  pass the information on?

7     A        They work for the company.

8     Q        You mean working for Dunkin'

9  Donuts?

10     A        Or either one, if I am telling

11  you something is wrong with the way I get

12  into your business, then I figured they

13  would try to make the situation better or

14  pass the information on so that it could be

15  made better.

16     Q        Did you tell this BDIC group

17  the problems you were having at 3015

18  Mermaid Avenue?

19     A        I told them about it, yes.

20     Q        Did they do anything on your

21  behalf?

22     A        They referred me to talk to

23  Parker Hanski.

24     Q        They never tried to contact

25  the Dunkin' Donuts for you?

Page 46

1              Angela Brown

2      A       No.

3      Q       So other than the things that

4  you mentioned today about 3015 Mermaid

5  Avenue, do you have any other issues that

6  you have with accessibility there, any

7  other things that you can think of?

8      A       No.

9              MS. ZIBAS:  All right.  I

10     don't have any further questions.

11             MR. PARKER:  Thank you.

12             (Time noted: 1:02 p.m.)

13

14

           - - - - - - - - - - - - - - - - - - - - - - - - - - - -

15             ANGELA BROWN

16

17  Subscribed and sworn to

18  before me on this _____day

19  of _____, 2014.

20

21

22  _____

           NOTARY PUBLIC

23

24

25

1

2                              INDEX

3                     INDEX TO TESTIMONY

4                                  Page          Line

5    Examination by Ms. Zibas        4             6

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 48

1

2                     C E R T I F I C A T I O N

3

4           I, BRITTANY SALINE, a Professional

5    Reporter and a Notary Public, do hereby

6    certify that the foregoing witness, ANGELA

7    BROWN, was duly sworn on the date

8    indicated, and that the foregoing is a true

9    and accurate transcription of my

10   stenographic notes.

11          I further certify that I am not

12   employed by nor related to any party to

13   this action.

14          IN WITNESS HEREOF, I hereunto set my

15   hand this 2nd day of May, 2014.

16                        _Brittany Saline_ _ _ _ _ _ _

17                        BRITTANY SALINE

18

19

20

21

22

23

24

25

Page 49

1
2                        ERRATA SHEET
3      PAGE    LINE NUMBER   CORRECTION    REASON
4      ---------------------------------------------------------
5      ---------------------------------------------------------
6      ---------------------------------------------------------
7      ---------------------------------------------------------
8      ---------------------------------------------------------
9      ---------------------------------------------------------
10     ---------------------------------------------------------
11     ---------------------------------------------------------
12     ---------------------------------------------------------
13     ---------------------------------------------------------
14     ---------------------------------------------------------
15     ---------------------------------------------------------
16     ---------------------------------------------------------
17     ---------------------------------------------------------
18     ---------------------------------------------------------
19     ---------------------------------------------------------
20     ---------------------------------------------------------
21     ---------------------------------------------------------
22     ---------------------------------------------------------
23     ---------------------------------------------------------
24     ---------------------------------------------------------
25     ---------------------------------------------------------
                   (Signature of Witness)

[& - better]

| & |
|---|
| **&**  2:10 6:22 |

| **1** |
|---|
| **10013**  2:5 |
| **10017**  2:12 |
| **10th**  2:4 |
| **11**  27:25 |
| **11224**  4:14 |
| **12**  27:25 |
| **12:12**  1:11 |
| **1350**  33:25 |
| **150**  1:12 2:11 |
| **19**  13:22 |
| **1971**  8:12 |
| **1:02**  46:12 |

| **2** |
|---|
| **2**  1:10 8:12 |
| **2003**  28:5,10,12 |
| **2008**  12:15,23 13:10  14:12 28:17 36:16  36:24 |
| **2009**  14:12 36:16 |
| **2010**  15:10 34:3,11  36:18,19 |
| **2011**  10:2 28:6,15  33:15 34:2,12 |
| **2012**  13:15 41:4 |
| **2014**  1:10 36:13  46:19 48:15 |
| **2nd**  48:15 |

| **3** |
|---|
| **3015**  16:4,21 18:4  18:24 21:8 25:23  26:19,22 27:18,21  30:4 31:11 38:7  43:20 44:11 45:17  46:4 |
| **3162**  4:13 9:25  28:11 |
| **3b**  4:14 |

| **4** |
|---|
| **4**  47:5 |
| **40**  2:4 |
| **42nd**  1:12 2:11 |

| **5** |
|---|
| **50**  5:15,17,23 |

| **6** |
|---|
| **6**  47:5 |

| **7** |
|---|
| **71**  8:14 |
| **730**  10:5 |

| **9** |
|---|
| **95**  28:10 |

| **a** |
|---|
| **aaron**  35:13 |
| **able**  14:8,11,17  18:13 20:9,10 25:8  26:4 |
| **access**  14:20 18:8 |
| **accessibility**  33:10  33:24 34:6 37:15  46:6 |
| **accessible**  14:4,5  33:18 36:7,23,25 |
| **accessing**  35:20 |
| **accommodate**  11:20  14:14 |
| **accommodated**  15:6 |
| **accommodations**  10:15 11:19 |
| **accurate**  48:9 |
| **act**  33:6,14 |
| **action**  1:15 12:4  14:2 35:19 37:18  42:24 48:13 |
| **activities**  15:23 |
| **actual**  26:18 |
| **address**  4:11 9:25  16:4,6,22 28:2,5  42:21 |
| **advocate**  40:9,16  41:2 |

| **affect**  29:14 |
|---|
| **afternoon**  4:15 |
| **ago**  5:20,21 16:11  17:3,16 18:22 20:25  23:25 32:12 |
| **agreed**  3:4,9,13 |
| **agreement**  36:21 |
| **ahead**  5:11 |
| **aid**  16:18 18:4 19:2  19:4 21:19 22:4,9  22:23 23:2,5,21  24:3,11 34:23 43:25  44:5,18 |
| **americans**  33:5,13 |
| **amount**  28:19 29:5 |
| **angela**  1:4,14 4:10  5:1 6:1 7:1 8:1 9:1  10:1 11:1 12:1 13:1  14:1 15:1 16:1 17:1  18:1 19:1 20:1 21:1  22:1 23:1 24:1 25:1  26:1 27:1 28:1 29:1  30:1 31:1 32:1 33:1  34:1 35:1 36:1 37:1  38:1 39:1 40:1 41:1  42:1 43:1 44:1 45:1  46:1,15 48:6 |
| **angle**  19:15 |
| **answer**  5:10,11 8:23  9:6,8 |
| **answers**  4:20 |
| **anybody**  34:15  36:22 44:17,24 |
| **apartment**  4:13  10:7 11:18,20 24:24  25:9 26:22 33:17  35:25 36:7,22,23,25 |
| **appear**  26:23 |
| **appropriate**  28:19 |
| **approximately**  44:9 |
| **area**  25:3,6,12 26:15  27:23 |
| **asked**  32:16 35:24  36:6 43:2 |

| **asking**  29:10 37:21 |
|---|
| **assist**  11:12 |
| **associates**  1:7 2:11 |
| **attached**  11:9 |
| **attorney**  5:7 6:20 |
| **attorneys**  2:4,10  40:14 |
| **authority**  6:12,15  7:20 12:6 35:19 |
| **automatically**  19:23 |
| **avanzino**  6:22 |
| **avenue**  4:13 9:25  10:5 16:5,21 18:5  18:24 25:23 26:19  26:23 27:22 28:3,12  30:4 33:21,22,25  38:7 43:20 44:11  45:18 46:5 |
| **award**  29:4 |
| **aware**  7:5,21 24:22  28:23 37:17,24  39:21 |
| **awkward**  18:15  19:11,12,16 21:17  21:18,24,25 22:5  23:14 24:19 38:12 |

| **b** |
|---|
| **b**  4:2 |
| **back**  25:22 42:16  43:8,14,20,22 |
| **based**  29:25 |
| **basically**  5:16 |
| **bathroom**  12:2 |
| **bayview**  4:13 9:25  28:11 33:21,22 |
| **bdic**  41:8 43:5 45:16 |
| **behalf**  37:6,24 38:4  42:25 45:21 |
| **believe**  8:8 20:3,13  21:4 41:4 42:15 |
| **best**  19:14 |
| **better**  26:7 45:13,15 |

[birth - dunkin]

**birth** 8:11
**bit** 21:6
**blacktop** 26:18
**block** 18:10
**blocks** 16:25
**blood** 8:4
**blue** 19:25 21:3
**bottom** 38:13,19 39:2,14
**bound** 15:9,11
**break** 5:2,5
**breakfast** 44:3
**brittany** 1:17 48:4 48:17
**brochures** 42:20
**brooklyn** 4:14 13:16 41:10
**brown** 1:4,14 4:10 5:1 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1,8,13,14 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1,15 48:7
**bryan** 35:5
**building** 10:7,11,14 10:22,25 11:7,12 12:8 30:25 32:7,8,9 33:17 35:21 36:2 40:13 44:25
**buildings** 21:13 33:10
**bump** 39:11
**bumpy** 20:20 23:14 38:22 39:14
**business** 42:7 45:12

**c**

**c** 2:2,13 35:15 48:2,2
**c&j** 1:7 13:25
**call** 4:18 11:6 41:13
**called** 42:5
**calls** 41:20
**cane** 30:24
**caption** 6:4
**car** 14:13,25 20:12 31:25
**cards** 42:8
**care** 40:4
**case** 6:21 29:11
**cashier** 22:12,21
**cashiers** 32:21
**cause** 8:7 12:4 35:19
**causes** 14:2 37:18
**center** 16:17 18:3 34:25
**certification** 3:6
**certify** 48:6,11
**chair** 15:10 19:18 38:23
**changes** 30:5,9,11 44:21
**checks** 29:19,20
**children** 9:18,20 13:20 25:11 27:17 28:22 35:12
**children's** 35:3
**city** 6:11,14 7:20 12:6,18,21 29:17,24 35:18
**civil** 1:19 37:23
**claiming** 28:18
**close** 16:21
**coffee** 44:3
**college** 13:13,15,16
**come** 18:10 29:19,21 29:23 32:4,6
**coming** 4:16
**company** 45:7
**complain** 22:11,14 23:20 34:15,20

**complained** 22:7,25 23:7 32:21
**complaining** 24:18 44:18
**complaint** 37:6,19 44:20
**complaints** 22:4,19 23:5 24:11,17,21 33:24
**complete** 13:14,17
**computer** 15:25
**concentrating** 32:2
**concrete** 38:24
**confirm** 42:23
**contact** 24:6 41:3 44:24 45:24
**copy** 42:17
**corey** 35:14
**correct** 29:24 30:18 35:21
**correction** 12:18,21 49:3
**counsel** 1:20 3:4
**counters** 11:22
**couple** 4:18
**course** 19:4
**court** 1:2 3:17 4:22 6:18 7:3,6,9,15
**crack** 26:6 38:8
**cracked** 20:14,15 23:14 26:16,24
**cracks** 30:15 31:2 34:8,17
**curb** 20:9,10,13,23
**current** 7:19 12:5
**currently** 6:24 7:5 7:24 10:6 12:9 14:13 28:25 35:17

**d**

**d** 35:11
**daily** 15:23
**damage** 25:5,7 26:17

**damaged** 27:2,3
**damages** 29:5 38:2
**date** 5:20 8:11 22:16 34:13 48:7
**day** 46:18 48:15
**defendant** 2:10
**defendants** 1:8
**deposed** 5:13
**deposition** 1:14 3:7 3:14 4:17,19
**dewey** 13:19
**diagnosed** 13:9
**dicker** 2:10
**different** 26:2
**difficult** 22:5
**direct** 8:23
**directed** 5:10
**directing** 9:3,5,8
**disabilities** 33:5,13 40:17 41:2
**disability** 13:2,6,7 29:7,12,22 40:10 42:24
**disabled** 10:15
**district** 1:2,2
**donuts** 1:7 13:25 14:7 16:18,20 17:23 18:4,8,9,22 21:5,20 21:22 22:10 24:13 31:8 32:11,18 34:23 37:3 38:9 44:2,19 45:9,25
**door** 18:13
**doors** 14:7 18:14,17 22:8 32:18 39:19
**doorways** 11:24
**doughnut** 31:7 32:17 39:19
**drive** 14:8,11 20:8
**drives** 14:24 15:2,4
**driving** 19:20 20:5
**due** 26:16
**duly** 4:3 48:7
**dunkin** 14:6 16:18 16:20 17:23 18:4,7

18:8,22 21:5,20,22
22:10 24:13 31:7
32:11,17 34:23 37:3
38:8 44:2,19 45:8
45:25

**e**

e  2:2,2 4:2 35:15
  48:2
easily  38:17
east  1:12 2:11
eastern  1:2
edelman  2:10
edge  39:8
education  13:12
effect  3:16
either  34:22 45:10
elevator  10:12
elser  2:9
employed  12:9,11
  12:14,17 48:12
employees  34:22
  39:21 45:3
entitled  1:15
envision  32:6
errata  49:2
esq  2:6,7,13
examination  4:6
  47:5
examined  4:5
experience  30:2
explain  19:12,14
  38:18

**f**

f  48:2
familiar  16:5
family  27:16
far  16:24 33:9 34:6
fare  7:17 21:20,23
federal  1:19 6:17
  7:3,6,9,15 29:11
fell  35:22
figured  45:2,12
file  6:6,9

filed  6:14 7:2,15,22
  13:24 21:15 28:16
  28:23 30:6 37:6,24
filing  3:5
fill  43:7,14
filled  44:5
find  40:11 41:16
fine  7:17 21:20,23
first  4:3,19 6:13
  31:17 33:12,23 34:4
  34:7,16,21 41:3
fit  15:6
five  36:13,14,14
fixed  11:20 39:23
flooding  25:2
floor  2:4 10:9
flush  39:9
follows  4:5
food  21:24
foods  24:16
force  3:16
foregoing  48:6,8
forgot  40:10
form  3:10
friend  40:19
friend's  40:20
front  10:22 20:6
  21:4 31:7 32:7 38:8
full  13:2
fund  13:5
further  3:9,13 17:9
  21:6 46:10 48:11

**g**

g  2:7 4:2
gabriella  42:2
general  27:20
getting  18:12 21:13
  29:12 31:12 39:3
give  5:23
glanced  43:13
glen  2:6
go  4:17 5:10 16:12
  16:19 17:3 18:11,17
  19:3 20:4 23:9

25:13,19 32:10,12
  38:17 41:11 43:25
  44:3
goes  20:19
going  8:17,22 14:18
  17:9 30:4 32:3
  43:20,22
good  4:15 25:13
ground  4:18 26:24
group  40:11,17 41:2
  41:6 42:11 43:5
  45:16
guess  19:17 23:10
  26:9,10

**h**

h  2:6 5:15,17,23
  9:13 35:11
half  12:22
hand  48:15
handicap  19:22,23
  20:2 36:22
handrails  30:14,21
  30:22
handshaking  4:22
hanski  2:3,7 45:23
hard  19:6,8,13,20
head  4:21
hearing  5:15,18
held  1:16
help  40:23 42:12
hereof  48:14
hereto  3:5
hereunto  48:14
high  13:17,19
highest  13:11
hold  30:24
home  16:22
housing  6:11,15
  7:20 12:6 35:18
howard  35:9
hurricane  24:24

**i**

impacts  29:5
incorporated  13:25
index  47:2,3
indicated  48:8
information  43:11
  45:4,6,14
initials  41:7
inside  11:3 18:12
  23:8 35:25 38:16
internet  32:24,25
issue  38:9 39:3
issues  46:5

**j**

job  12:24
jobs  28:20
john  13:19
journals  15:22
july  8:12
jura  2:13

**k**

keep  15:22 17:23
  42:4
key  21:24 24:16
kids  27:13
know  5:3 7:14,16
  14:2 18:15 19:19
  21:2,24,25 22:15
  23:15,17 24:8 27:7
  29:4 31:20 36:24
  37:13 38:2,21 39:10
  40:18 41:7 43:6,13
  43:24 44:9

**l**

l  3:2 4:2 9:13
labor  28:18
lashon  9:11
late  14:12
law  28:18
laws  37:23
lawsuit  5:23 6:2,6,9
  6:14 7:8,15,21 12:5
  13:23 14:3 16:4

29:5 30:6 35:17
37:3,7,12 38:3
**lawsuits** 6:23 7:3,6
7:19 21:15 28:17,23
43:17
**lawyers** 40:7
**layman's** 37:12
**lean** 23:16
**lease** 36:21
**ledge** 39:5
**left** 38:17
**legalese** 37:13
**letter** 24:10,14,18
43:7,9
**letters** 24:20
**level** 13:11
**line** 47:4 49:3
**lines** 19:25
**listed** 16:4
**little** 21:5 39:7
**live** 9:22 10:4,6,9
24:23 25:12 28:8
33:18
**lived** 9:24 10:5
27:23,24 28:9,10,11
**living** 13:21
**llc** 1:7 2:3 7:14
13:25
**llp** 2:10
**lobby** 11:4 12:7
**located** 41:9
**long** 5:3 9:24 12:20
25:15,17,22
**look** 19:21 20:5
41:17
**looked** 30:8,11,13
32:23
**looking** 30:20 31:3
32:2
**lot** 14:6 23:9 26:2,18
31:13,16 32:13
37:13 44:11

**m**

**making** 36:10
**manager** 24:5,7,8
32:17 39:18
**manual** 23:17
**marked** 19:25 21:3
**married** 9:14,16
**mean** 14:22 20:15
39:5 45:8
**medicaid** 29:2
**medicare** 13:4 29:16
29:18
**medication** 7:25 8:3
8:4,6
**mentioned** 46:4
**mermaid** 1:7 2:11
7:13 13:24 16:5,21
18:5,24 25:23 26:19
26:22 27:18,21 30:4
31:11 33:25 38:7
43:20 44:11 45:18
46:4
**middle** 9:10
**minivan** 15:2
**misunderstood** 28:7
**modifications** 35:25
36:4
**modified** 14:14
**month** 16:10,11
17:3 18:22 25:19
30:18 32:11
**months** 5:21 17:18
19:4 20:25 23:25
**moreno** 6:22
**moskowitz** 2:9
**mother** 25:11
**multiple** 8:5 13:8

**n**

**n** 2:2 3:2 4:2,2 9:13
48:2
**name** 4:8 5:25 6:3
9:10 32:20 35:8
40:10,20 41:5 42:2
42:3,11,21

**names** 35:4
**nearby** 28:3
**need** 5:2,10 8:20
36:23,24 40:24
**needs** 23:13
**neighborhood** 21:14
**never** 45:24
**new** 1:2,12,12,18
2:5,5,12,12 4:4,14
6:11,14 7:20 12:6
12:18,20 29:16
35:18 37:17,23
**nineteen** 8:13
**nodding** 4:22
**notary** 1:17 3:15 4:4
46:22 48:5
**noted** 46:12
**notes** 28:14 42:4
48:10
**notice** 1:19 25:25
26:6,17,21 31:17
33:24
**noticed** 26:14 30:5
34:5,12,16,21
**number** 8:16,19,25
49:3

**o**

**o** 3:2 4:2 9:13 35:11
35:15 48:2
**object** 8:18,23
**objecting** 9:3
**objection** 5:8
**objections** 3:10
**objects** 5:8
**october** 25:18
**officer** 12:19,21
**oh** 15:13 19:23 28:6
**okay** 4:24 5:6,12 7:7
15:13 21:23 29:15
29:23 33:23 36:19
**old** 13:20
**once** 17:20 39:25
**ones** 7:7

**open** 18:15,16
**opens** 18:15,16
**oral** 4:21
**order** 11:11 30:25
**outside** 9:2 12:8
14:18 21:14 25:14
25:16,17,19
**owned** 44:24

**p**

**p** 2:2,2 3:2
**p.m.** 1:11 46:12
**page** 47:4 49:3
**paid** 28:19 29:6,15
**paperwork** 42:16,18
43:3
**parker** 2:3,6 8:17,24
9:7 45:23 46:11
**parking** 14:6 23:9
26:2,18 31:13,16
32:13 44:10,11,14
**part** 39:5
**particular** 8:20
**parties** 3:5
**party** 5:22 48:12
**pass** 44:19 45:3,6,14
**pathmark** 20:4
**pavement** 30:16
34:9,18 39:10
**pending** 5:4 6:17,24
7:6,9 35:18
**pension** 13:5
**people** 10:15 23:4
24:21 40:3 42:5
**period** 17:21
**periods** 15:18
**permanent** 10:19
11:8
**permit** 8:8
**person** 19:21 24:3
40:15 41:25
**pharmaceutical**
43:25 44:7
**pharmacy** 44:8

[phone - spaces]

phone  41:14,19
    42:14
pictures  21:7,9
    27:10,14,17
place  1:16 11:3,4
    40:10
plaintiff  1:5,15 2:4
plan  43:19,22
plaza  1:7 2:11 7:13
    13:24
please  4:8,11
point  9:7 38:6
potholes  31:16,18
prescriptions  44:5
pressure  8:5
prior  10:3 28:17
probably  17:19
    22:18 34:19 36:17
problem  31:12
    39:21
problems  21:12
    42:12 45:17
procedure  1:19
products  44:2,7
professional  48:4
properties  33:11
property  16:3,6,9
    16:13 18:5,24 19:5
    21:8 25:23 27:18
    30:5 31:11 32:5,25
    34:6 37:16 38:6
    43:23 44:21
provide  8:21
providing  8:18
public  1:17 3:15 4:4
    21:13 46:22 48:5
purchase  16:14 19:2
purchases  18:3
pursuant  1:18
pushes  23:18
put  5:8 9:4 11:13
    30:13,14 40:13

**q**

question  3:11 5:4,11
questions  43:2
    46:10
quite  38:11

**r**

r  2:2 4:2 35:11,15
    48:2
ramp  10:17,18 11:2
    11:4,8,13,16,16
    12:7 18:11 19:11,15
    19:19 20:18,19,22
    23:9 30:25 31:4,6
    32:14,15 33:19
    34:17 35:20,21,23
    38:8,12,13,14,16,20
    38:22 39:3,4 40:13
ramps  19:10 23:7
    34:8
rationale  9:4
read  37:9
really  21:16 40:4
reason  8:20 29:9
    39:17 44:23 49:3
recall  25:5
receipts  17:24 18:2
receiving  28:25
record  4:9,12 5:9
    9:5
referenced  26:7
referred  40:6,8,12
    40:14,16 45:22
refused  44:19
register  22:13,24
    42:10,13,14
related  4:19 28:17
    43:12 48:12
remains  38:9
remember  17:12,14
    22:16 26:12 32:20
    40:25 41:5,23
remembered  34:5
remove  11:10

removed  11:17
rent  16:17 18:3
    34:25
repaired  23:13 27:5
    27:8 30:15 31:3
reporter  4:23 48:5
represent  7:13
request  36:9,11
requested  38:3
required  5:23
research  33:2,5,8,13
    33:16
researched  33:9
reserved  3:11
respective  3:5
response  24:2
ride  14:20 23:15
    38:14,22
right  7:9 19:24 20:5
    38:9 46:9
rights  37:23
rigid  20:20
rite  16:18 18:4,25
    19:4 21:19 22:4,9
    22:23,25 23:5,21
    24:3,11 34:23 43:25
    44:5,18
robert  2:7
room  31:14,15
rows  44:13
rules  1:19 4:18

**s**

s  2:2 3:2,2 9:13
saline  1:17 48:4,17
sand  25:20
sandy  24:24 25:16
    25:21
saying  38:12
scheduled  27:8
school  13:18,19
sclerosis  8:5 13:8
sealing  3:6
second  4:25

security  8:15,19,25
    9:9 13:6 29:6,20,21
see  19:21 20:6 30:13
    39:21,23 41:11
seen  25:19 37:5,8
send  42:10 43:8,14
sent  42:15,16,18
set  48:14
settled  26:24
shaking  4:21
sheet  49:2
shop  39:19
short  15:18
side  23:16 32:13,15
    38:15
sidewalk  14:18
    23:10
sidewalks  26:14
    27:3,4
sign  20:4,6 30:14
    43:3
signature  49:25
signed  3:14,16
significant  25:7
sister  25:12
situation  24:22
    29:10 45:13
six  5:21 17:18 19:4
    20:24 23:25 36:14
skimmed  37:10
sleepy  8:7
slope  19:17 34:7,17
smooth  20:16,23
    23:15 38:22 39:11
    39:15
social  8:15,18,24 9:8
    13:6 29:6,20,21
somebody  18:14,16
    39:22 40:6,12,22
    43:5
son  23:18
sons  18:20
sorry  28:14
spaces  21:2 44:10

| | | | |
|---|---|---|---|
| **speak** 24:4 39:18,22 40:6 | **t** | **traveling** 19:18 | **went** 17:2,22,24 |
| **specifically** 26:12 | **t** 3:2,2 48:2,2 | **trial** 3:12 | 18:7,19,25 20:22,24 |
| **spell** 9:12 35:10 | **table** 39:9 | **tried** 12:23 45:24 | 25:16,17,22 31:25 |
| **spoke** 41:18 | **take** 5:2,5 8:4 17:5,7 | **truck** 15:3,5 17:13 | **wheelchair** 10:16 |
| **spot** 19:24 20:2 | 21:7 27:10,13,17 | 31:12 | 14:15 15:6,9,11,12 |
| **spots** 19:22 | 42:24 | **true** 48:8 | 15:14,20 17:3 20:17 |
| **springtime** 25:24 | **taken** 1:16 8:7 21:9 | **truth** 8:9 | 23:16 30:23 34:3,14 |
| **ssi** 29:13 | **talk** 32:16 45:22 | **try** 44:20,24 45:13 | 36:6,16,17 |
| **stand** 15:17 | **talked** 37:2 41:23 | **trying** 32:6,10 | **wheels** 39:10 |
| **stanley** 10:5 28:3,8 | 43:5 44:17 45:2 | **twenty** 13:22 | **whichever** 39:20 |
| **start** 36:15 | **talking** 31:5,6 33:20 | **twice** 17:20 | **wilson** 2:9 |
| **started** 34:2,3,14 | **tell** 8:9 23:4,12 24:3 | **two** 7:5,18 13:22 | **winter** 17:19 31:21 |
| **state** 1:18 4:4,8,11 | 26:4 37:12 40:3,4,5 | 16:25 21:4,5,14 | 31:24 |
| 6:18 7:3 37:18,23 | 44:20 45:16 | 35:13 44:13 | **witness** 4:2,24 5:6 |
| **states** 1:2 | **telling** 45:10 | | 5:12 48:6,14 49:25 |
| **stay** 38:16 | **terms** 37:13 | **u** | **wooden** 10:17 |
| **stenographic** 48:10 | **testified** 4:5 | **u** 3:2 | **words** 4:23 |
| **steps** 10:21 11:3 | **testimony** 47:3 | **um** 41:18 42:9 | **work** 24:21 29:25 |
| 35:23 | **thank** 4:16 46:11 | **understand** 19:13 | 45:7 |
| **stipulated** 3:3,9,13 | **thing** 5:16 34:4,7 | 27:22 | **working** 29:13 45:8 |
| **stipulations** 1:20 | **things** 14:7 26:10 | **understood** 37:11 | **worse** 26:7,10,11 |
| **stop** 5:4 17:10 | 38:15 40:24 46:3,7 | **united** 1:2 | **worth** 2:4 |
| **store** 16:15,19 22:6 | **think** 17:16 19:3 | **updating** 43:10 | **write** 24:10,14 |
| 23:11 31:7 32:17 | 21:25 34:11 41:7,18 | **use** 44:8 | **written** 24:17 |
| **stores** 16:16 | 42:6 43:3 45:5 46:7 | **usually** 27:21 | **wrong** 45:11 |
| **storm** 25:16,21 26:3 | **third** 10:10 | | |
| 26:3,8,16,19 27:11 | **thought** 28:15 | **v** | **x** |
| **street** 1:12 2:4,11 | **three** 9:21 10:10 | **van** 17:5,7,13 31:11 | **x** 1:3,9 |
| 32:5 | 12:22,22 13:22 | **vehicle** 14:21,23 | |
| **streets** 25:20 26:25 | **time** 1:16 3:11 6:13 | **venture** 25:10 | **y** |
| 27:2,4 | 12:13 14:10 15:18 | **versus** 26:3 | **y** 35:6,7,15 |
| **subscribed** 46:17 | 16:8 17:12,22 18:23 | **violation** 37:22 | **year** 5:20 13:13,15 |
| **super** 25:16,21 | 20:21 23:22 30:3,6 | **violations** 28:18 | 17:15 22:17 27:21 |
| **supermarkets** 7:17 | 34:16 39:13 43:4,19 | **visit** 18:21 | 36:15,20 |
| **sure** 5:20 6:5,19 | 46:12 | **visits** 27:20 | **years** 12:22 27:23 |
| 7:16 22:20 31:19 | **title** 7:17 | | 27:25 36:11,12,14 |
| 34:10,13 37:20 | **today** 4:16 8:7 46:4 | **w** | 36:14 |
| 38:11,16 40:21 42:2 | **told** 25:11 39:24 | **w** 4:2 35:11 | **york** 1:2,12,12,18 |
| 42:19 43:6 | 45:19 | **waived** 3:8 | 2:5,5,12,12 4:4,14 |
| **sworn** 3:16 4:3 | **total** 44:10 | **walk** 15:14 30:23,25 | 6:11,14 7:20 12:6 |
| 46:17 48:7 | **touch** 40:22 | **walkway** 19:19 | 12:18,21 29:17 |
| | **transcription** 48:9 | **wall** 11:9 | 35:18 37:17,23 |
| | **transition** 39:12 | **want** 4:17 9:4 42:11 | |
| | | **way** 45:11 | **z** |
| | | **website** 41:16,17 | **zibas** 2:13 4:7,15,25 |
| | | | 5:7 8:22 9:2 46:9 |

Exhibit G

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------- X

ANGELA BROWN

Plaintiff,

--against--

MERMAID PLAZA ASSOCIATES LLC AND
C & J DONUTS, INC.

Defendants.

-------------------------------------------------------------X

**Docket No. 1:13-CV-00760 (KAM) (CLP)**

**CONFIDENTIAL SETTLEMENT AGREEMENT**

**NOT TO BE FILED**

## CONFIDENTIAL SETTLEMENT AGREEMENT

**WHEREAS,** plaintiff Angela Brown commenced the above-entitled action alleging claims of discrimination in violation of Title III of the Americans with Disabilities Act, 42 U.S.C. § 1985, the New York State Executive Law, New York State Civil Rights Law, and the Administrative Code of the City of New York as well as for common law negligence;

**WHEREAS,** it is the intent of the plaintiff and Mermaid Plaza Associates LLC (collectively hereinafter also referred to as "Parties") to improve access for persons with disabilities at their public accommodation located in Kings County, New York (hereinafter referred to as the "Subject Premises");

**WHEREAS,** Mermaid Plaza Associates LLC denied and continues to deny any and all liability or wrongdoing in regard to Angela Brown's allegations; and

**WHEREAS,** the Parties now desire to resolve the issues raised in the above-entitled action without further proceedings and without admitting any fault or liability pursuant to the terms and conditions of this confidential settlement agreement ("Settlement Agreement").

1

**NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED**, by and between the undersigned, as follows:

**Recitals**: The Parties acknowledge that all of the "WHEREAS" clauses preceding paragraphs are incorporated as material parts of this Settlement Agreement.

1.      **RELEASE**.    Plaintiff Angela Brown (hereinafter also referred to as "plaintiff") agrees to dismiss with prejudice the above-entitled action against Mermaid Plaza Associates LLC (hereinafter also referred to as "defendant") and to release and discharge Mermaid Plaza Associates LLC, their employees, officers, directors, and attorneys (hereinafter the "Released Parties") from any and all liability, claims, or causes of action relating to the Subject Premises, which includes, but is not limited to, all of plaintiff's claims for injunctive relief, compensatory damages, punitive damages, and attorneys' fees, as well as claims for violations of Title III of the Americans with Disabilities Act, 42 U.S.C. § 1985, the New York State Executive Law, New York State Civil Rights Law, and the Administrative Code of the City of New York as well as for common law negligence, from the beginning of the world to the date of that plaintiff signs this Settlement Agreement.  This release of claims does not encompass claims that plaintiff may have against the Released Parties with respect to their ownership, operation, leasehold interest, management or control of any place of public accommodation aside from the Subject Premises. Defendant Mermaid Plaza Associates LLChereby releases plaintiff and plaintiff's attorneys and agents from any and all potential or actual causes of action arising from or that could have been raised in response to or in defense of the above-entitled action.

2

2.    **CONSIDERATION.**    In consideration for the release by plaintiff, defendant shall perform the modifications and/or alterations identified herein.  Defendant shall also pay to plaintiff's counsel the sum of **$60,000 (SIXTY THOUSAND DOLLARS)** in full settlement of plaintiff and plaintiff's attorney's claims (collectively hereinafter also referred to as the "Monetary Payment").  In consideration for the modifications and/or alterations identified herein and the other terms and conditions of this Settlement Agreement, plaintiff provides the Release herein.

3.    **STIPULATION OF DISMISSAL AND MONETARY PAYMENT.**

Plaintiff's counsel will sign and return to counsel for defendant a Stipulation and Order of Dismissal with Prejudice, which counsel for defendant will hold in escrow and then file with the Court five (5) business days after the Monetary Payment is delivered to plaintiff's counsel by the methods described in this paragraph.  The Monetary Payment will be made in one payment of **$60,000 (SIXTY THOUSAND DOLLARS)** made payable to "Parker Hanski LLC".  Defendant will deliver the Monetary Payment to plaintiff's counsel within fifteen (15) days after plaintiff's counsel provides to counsel for defendant the Settlement Agreement signed by plaintiff.  The Parties can provide the signed Settlement Agreement to counsel either by email or by mail.  Counsel for defendant will deliver the Monetary Payment to plaintiff's counsel either by Overnight Mail or By Hand Delivery.  If defendant fails to deliver the Monetary Payment to plaintiff's counsel within the fifteen (15) day period described above, then defendant shall pay interest on the Monetary Payment at the rate of 21.9 percent per annum compounded monthly and shall pay for plaintiff's attorney fees and expenses for seeking and/or obtaining a Court Order directing defendant to pay the Monetary Payment.  Defendant shall have no role, responsibility, liability or interest

regarding how the Monetary Payment is to be divided among plaintiff, plaintiff's attorneys, plaintiff's experts, consultants, and/or any other persons with claims to said Monetary Payment. Except as set forth herein, each party to this action shall bear their own fees, expenses and costs related to this action.

4.    **ADA ACCESSIBILITY AND BARRIER REMOVAL:** To the extent not already provided or completed, defendant agrees to perform the following:

1. Defendant will install International Symbol of Accessibility signs above the designated accessible parking spaces designating the spaces as accessible parking spaces and mounted at a height above the ground surface of 60 inches;

2. Defendant will mark the access aisles for the accessible parking space with a sign reading "NO PARKING ANYTIME"; and

3. Defendant will install accessible handrails on the two ramps leading from the public sidewalk onto the sidewalk adjoining the stores.  The accessible handrails will comply with the followings:
   i.    there must be at least 36 inches of clear width between handrails;
   ii.   there must be handrails on both sides of the ramp;
   iii.  the top of the gripping surface of the handrail must be between 34 inches minimum and 38 inches maximum above the walking surface;
   iv.   the handrails must extend horizontally above the level landing by at least 12 inches beyond the top and bottom of the ramp runs; and
   v.    the handrail extensions cannot end bluntly but must return in a circular or square fashion to the walking surface or back to the railing.  See Figure 505.10.1 in the 2010 standards for accessible design.

With respect to the common areas of the Subject Premises, public use areas adjoining the Subject Premises, and the Subject Premises, defendant shall alter and modify its operating procedures so that the Subject Premises is, and remains, complaint with Title III of the Americans with Disabilities Act ("ADA") by putting into effect, and enforcing, written operational policies, procedures and rules to ensure compliance by defendant's tenants with the ADA, including a policy of strictly adhering to, and

enforcing, the compliance with laws provisions, which includes but not limited to the ADA. Pursuant to the notice provisions of the leases with its tenants, defendant shall notice each of its tenants that their leased premises will be inspected by defendant to ensure compliance with the ADA, and that defendant will require any tenant that is not in compliance to perform alterations, modifications, and operational changes within 60-days of the inspection date, to bring the particular leased premises into compliance with the ADA. Defendant shall provide plaintiff with written certification that the notices have been distributed and shall specify the date and manner in which they were distributed within fifteen (15) days after such distribution. Such certification shall include the names and addresses of the entities, and such entities' contact person to whom the notices were distributed (collectively, "non-monetary relief"). Plaintiff represents that the non-monetary relief listed in this Paragraph is acceptable. Plaintiff makes no representations regarding the legal issue of whether these modifications, alterations, changes in policies, procedures or training, or maintenance obligations, comply with any laws or regulations. Defendant represents that they are not relying on any legal or factual representations by the plaintiff regarding defendant's compliance with any laws or regulations and/or whether defendant's modifications, alterations, changes in policies, procedures or training, or maintenance obligations, comply with any laws or regulations.

5.      **COMPLETION DATE:**     Defendant shall complete modifications, alterations, changes in policies, procedures or training, or maintenance obligations, contained in Paragraph 4 within nine (9) months of the date that this Settlement Agreement is fully executed. However, if any of the items contained in Paragraph 4 are not timely completed due to acts beyond the

control of defendant, then defendant shall be allowed additional time in which to complete and defendant shall not be deemed to be in violation of the compliance dates contained herein as long as defendant makes a good faith effort to effect implementation as soon as reasonably possible thereafter.

6.     **TECHNICAL ISSUES**:  If in the course of carrying out the modifications, alterations, changes in policies, procedures or training, or maintenance obligations for any of the items contained in Paragraph 4, it is determined that it would be technically infeasible (as defined in §4.1.6 of the ADA Accessibility Guidelines) to carry out any such modification, alteration, change in policies, procedures or training, or maintenance obligations, then defendant must promptly notify plaintiff's counsel and propose alternate barrier removal steps to remove the applicable barrier(s) to the maximum extent feasible  as provided for in 28 C.F.R. § 36.305. Plaintiff shall not unreasonably withhold or delay approval.

7.     **COUNTERPARTS:**  This Settlement Agreement can be executed in any number of counterparts, each of which shall be taken to be one and the same instrument, for the same effect as if all Parties had signed the same signature page.  The Parties agree and acknowledge that a photocopy, facsimile copy, Adobe PDF or scanned copy of an executed signature may be used in place of an original executed signature for any purpose and shall be deemed as legally binding as the original signatures.

8.     **NO ADMISSIONS.**   Nothing contained herein shall be deemed to be an admission by the Parties that they have in any manner or way violated the other's rights, or the

rights of any other person or entity, as defined in the constitutions, statutes, ordinances, rules or regulations of the United States, the State of New York or the City of New York. The Parties have entered into this Settlement Agreement solely for the purpose of avoiding the burdens and expense of protracted litigation.

9. **NO WAIVER.** Failure to insist on compliance with any term, covenant or condition contained in this Settlement Agreement shall not be deemed a waiver of that term, covenant or condition. Nor shall any waiver or relinquishment of any right or power contained in this Settlement Agreement at any one time or more times be deemed a waiver or relinquishment of any right or power at any other time or times.

10. **CONFIDENTIALITY:** This Settlement Agreement shall not be filed or presented to the Court. The Parties agree that they and their agents will maintain absolute confidentiality concerning the Monetary Payment and the terms and conditions of this Settlement Agreement (hereinafter collectively referred to as the "Confidential Information"). The Parties may only disclose the Confidential Information to their attorneys, accountants, architects, managing agents and insurers, to the extent necessary to implement the terms of this Settlement Agreement; provided, however, that the Parties inform each of the entities or persons that they disclose the Confidential Information to of this Settlement Agreement's confidentiality provision, and receive assurances from each such party to whom such Confidential Information is being disclosed, that such party will adhere to this Settlement Agreement's confidentiality provision and agrees not to disclose the Confidential Information. The Parties may also disclose the Confidential Information to enforce the terms of this Settlement Agreement. In response to

7

any inquiry concerning Confidential Information, the Parties may only state that they have resolved their differences with the other.

11.   **SEVERABILITY**.        The illegality, unenforceability or overbreadth of any provision of this Settlement Agreement shall have no effect upon, and shall not impair the enforceability of, any other provision of this Settlement Agreement.  Upon a finding by a Court that this Settlement Agreement, or any of its provisions, is illegal, void or unenforceable, the Parties agree to execute a Settlement Agreement that is legal and enforceable, and which has the effect of accomplishing the intent of the provisions described herein.

12.   **NON-DISPARAGEMENT**:   The Parties agree not to make any disparaging, denigrating, demeaning or untrue statements about the other relating to the Subject Premises. This provision will not limit either party's ability to testify in connection with any legal proceeding when compelled to do so by lawful process, or from enforcing compliance with the terms of this Settlement Agreement.

13.   **JOINTLY DRAFTED AGREEMENT**.   This Settlement Agreement shall be deemed to have been jointly drafted and no provision herein shall be interpreted or construed for or against any party because such party drafted or requested such provision, or this Settlement Agreement as a whole.

14.   **ENTIRE AGREEMENT**.   This Settlement Agreement sets forth the entire agreement between the Parties.  This Settlement Agreement supersedes any and all prior oral or

written understandings and agreements among the Parties.  This Settlement Agreement may not be modified, except by and in a writing signed and notarized by the Parties.

15.    **SUCCESSORS**.    The Parties are bound by this Settlement Agreement. Anyone who succeeds to the rights and responsibilities of either party is also bound.  This Settlement Agreement is made for the benefit of the Parties and to all who succeed to their rights and responsibilities, including without limitation their successors or assigns.

16.    **NON-RELIANCE**.    The Parties acknowledge that they have been represented by counsel throughout the negotiation and execution of this Settlement Agreement.  The Parties represent, that in entering into this Settlement Agreement, they are not relying on and have not relied upon any representation or statement not set forth expressly in this Settlement Agreement.

17.    **WARRANTY.**    The Parties expressly represent and warrant that they have full legal capacity to enter into this Settlement Agreement, that they have been advised of their right to discuss all aspects of this Settlement Agreement with an attorney, that they have carefully read and fully understand the Settlement Agreement, that they have reviewed the Settlement Agreement with their attorneys, that they have had the opportunity to have their attorneys answer any questions they might have had, that they have had a reasonable period of time to consider whether or not to enter into this Settlement Agreement, and that they have executed the Settlement Agreement voluntarily, knowingly, and without duress, coercion or undue influence.

18.    **NO THIRD PARTY BENEFICIARIES.**  With the exception of the Release provision and the Non-Disparagement provision herein, nothing in this Settlement Agreement, express or implied, is intended to or shall confer upon any person or entity not a party to this Settlement Agreement any right, benefit or remedy of any nature whatsoever under or by reason of this Settlement Agreement.

19.    **GOVERNING LAW.**    This Settlement Agreement is to be construed in accordance with the laws of the State of New York without regard to any State's conflict of laws provisions; and the Parties agree that the United States District Court shall retain jurisdiction over this Settlement Agreement and that any future legal proceeding arising out of this Settlement Agreement can be instituted in either the United States District Court in New York or New York State Supreme Court.  Should a Court find that a party has failed to perform any obligation arising under this Settlement Agreement, then that party which failed to perform shall pay all the attorneys' fees, expenses and costs incurred by the other party for enforcing the terms and conditions of this Settlement Agreement.

21.    **NOTICES.**  All notices related to this Settlement Agreement shall be in writing addressed to the counsel for each party by mail or email.  Notices delivered shall be deemed received on the day of delivery.

22.    **HEADINGS.**  The headings contained herein are for convenience of reference only and are not intended to define, limit, expand or describe the scope or intent of any provision of this Settlement Agreement.

10

**[REMAINDER OF THE PAGE BLANK; SIGNATURES ON THE FOLLOWING PAGE]**

**WHEREFORE**, the Parties hereto have agreed and accepted this Settlement Agreement as of the date indicated below.

**AGREED AND ACCEPTED:**

_____                    _____
**ANGELA BROWN**                                Date

**MERMAID PLAZA ASSOCIATES LLC**

   BY:_____         _____
   Print Name:                                    Date
   Title:

Exhibit H

**Barrett, Stephen J.**

| | |
|---|---|
| **From:** | Glen Parker [ghp@parkerhanski.com] |
| **Sent:** | Monday, September 30, 2013 3:52 PM |
| **To:** | Zibas, Jura C. |
| **Subject:** | Re: 1:13-cv-00760-KAM-CLP Brown v. Mermaid Plaza Associates LLC et al |

There is no site inspection report or any other third-party report.
Plaintiff will not be amending it's Rule 26 Disclosures at this point in time.

With regard to the documents previously produced by defendant, all the defendant needs to state in response to a request seeking a previously produced document is see documents previously provided.

Plaintiff does not have a record of receiving a Rule 26 disclosure from the defendant.
Did the defendant make such a disclosure?  If yes, please provide a courtesy copy. And if no, please provide  a disclosure as soon as possible.

**From:** <Zibas>, Jura Zibas <Jura.Zibas@wilsonelser.com>
**Date:** Monday, September 30, 2013 3:37 PM
**To:** Glen Parker <ghp@parkerhanski.com>
**Subject:** RE: 1:13-cv-00760-KAM-CLP Brown v. Mermaid Plaza Associates LLC et al

Dear Glen,

Pursuant to the attached Rule 26 disclosures, plaintiff indicates there are no documents upon which she intends to rely to support her claim.   If a site inspection was prepared on behalf of plaintiff by a third party, this should be disclosed in the Rule 26.  Per your email below, you indicate an inspection was done prior to filing the lawsuit.  Pursuant to the federal rules regarding Initial Disclosures, I will assume you will amend the Rule 26 initial disclosure and send all documents upon which plaintiff intends to rely to me immediately.

Defendant provided the plan and images previously.  We will not re-produce the same plans, images, and documents in response to your discovery demands.

Thank you

Regards,
Jura

Jura C. Zibas
Attorney at Law
Wilson Elser Moskowitz Edelman & Dicker LLP
150 E 42nd Street
New York, NY 10017
212.915.5756 (Direct)

1

Exhibit I

Steven Winter Associates, Inc.
Improving the Built Environment Since 1972

61 Washington Street
Norwalk, CT  06854

203.857.0200 (main)
203.852.0741 (fax)
www.swinter.com

# Accessibility Review: 3015 Mermaid Avenue, Brooklyn, NY

| 1991 ADAAG | 2010 ADA Standard | Photos | Recommendation: 2010 ADA Standard | Est. Cost (min.) | Est. Cost (max.) |
|---|---|---|---|---|---|
| **Accessible parking spaces** | | | | | |
| **Requirement:** Section 4.1.2(5)(a) states that if parking spaces are provided for self-parking by employees or visitors, or both, then accessible spaces complying with 4.6 shall be provided in each such parking area in conformance with the table below. | **Requirement:** Section 208.2 states that parking spaces complying with 502 shall be provided in accordance with Table 208.2. | | | | |
| **Accessible parking spaces in front of Dunkin Donuts** | | | | | |
| Accessible parking spaces – Signage/Identification | | | | | |
| **Requirement:** Section 4.6.4 states that accessible parking spaces shall be designated as reserved by a sign showing the symbol of accessibility. Such signs shall be located so they cannot be obscured by a vehicle parked in the space.

**Finding:** The accessible parking spaces are not designated as reserved by a sign showing the symbol of accessibility. | **Requirement:** Section 216.5 states that parking spaces complying with 502 shall be identified by signs complying 502.6. Section 502.6 states that parking space identification signs shall include the International Symbol of Accessibility. Signs shall be 60 inches minimum above the finish floor or ground surface measured to the bottom of the sign.

**Finding:** The accessible parking spaces are not identified by signs complying with 502.6. |  | Install identification sign which includes the International Symbol of Accessibility at the head of each of the accessible parking spaces. Mount the signs at 60 inches minimum above the  parking lot surface, measured to the bottom of the sign. | $  530.00 | $  570.00 |

Steven Winter Associates, Inc.
Improving the Built Environment Since 1972

61 Washington Street
Norwalk, CT 06854

203.857.0200 (main)
203.852.0741 (fax)
www.swinter.com

# Accessibility Review: 3015 Mermaid Avenue, Brooklyn, NY

| 1991 ADAAG | 2010 ADA Standard | Photos | Recommendation: 2010 ADA Standard | Est. Cost (min.) | Est. Cost (max.) |
|---|---|---|---|---|---|
| **Accessible parking spaces – Signage/Identification** | | | | | |
| **Requirement:** Section 4.1.2(5)(b) states that one in every eight accessible spaces, but not less than one, shall be served by an access aisle 96 inches wide minimum and shall be designated "Van-Accessible" as required by 4.6.4. Section 4.6.4 states that spaces complying with 4.1.2(5)(b) shall have an additional sign "van accessible" mounted below the symbol of accessibility. | **Requirement:** Section 208.2.4 states that for every six or fraction of six parking spaces required by 208.2 to comply with 502, at least one shall be a van parking space complying with 502. Section 216.5 states that parking spaces complying with 502 shall be identified by signs complying 502.6. Section 502.6 states that signs identifying van parking spaces shall contain the designation "van accessible." |  | At one of the two accessible parking spaces, install a sign which identifies the van-accessible parking space. | $ 90.00 | $ 100.00 |
| **Finding:** The two accessible parking spaces are served by an access aisle which is 96-inches wide; the spaces are not designated by signage as "Van-Accessible". | **Finding:** The two accessible parking spaces are van parking spaces; the spaces are not identified by signs containing the designation "Van-Accessible". | | | | |

Steven Winter Associates, Inc.
Improving the Built Environment Since 1972

61 Washington Street
Norwalk, CT  06854

203.857.0200 (main)
203.852.0741 (fax)
www.swinter.com

# Accessibility Review: 3015 Mermaid Avenue, Brooklyn, NY

| 1991 ADAAG | 2010 ADA Standard | Photos | Recommendation: 2010 ADA Standard | Est. Cost (min.) | Est. Cost (max.) |
|---|---|---|---|---|---|
| Accessible parking spaces - Surface slopes | | | | | |
| **Requirement:** Section 4.6.3 states that parking spaces and access aisles shall be level with surface slopes not exceeding 1:50 (2%) in all directions. | **Requirement:** Section 502.4 states that parking spaces and access aisles serving them shall comply with 302; except that slopes not steeper than 1:48 (2.08%) shall be permitted. |  | Resurface and restripe the accessible parking spaces and access aisle. | $ 1,900.00 | $ 2,020.00 |
| **Finding:** The surface slopes of the parking spaces and access aisle exceeds 1:50 (2%) at 4.3% (left parking space), 9.9% (access aisle), and 4.6% (right parking space). | **Finding:** The surface slopes of the parking spaces and access aisle exceeds 1:48 (2.08%) at 4.3% (left parking space), 9.9% (access aisle), and 4.6% (right parking space). | | | | |

Steven Winter Associates, Inc.
Improving the Built Environment Since 1972

61 Washington Street
Norwalk, CT 06854

203.857.0200 (main)
203.852.0741 (fax)
www.swinter.com

## Accessibility Review: 3015 Mermaid Avenue, Brooklyn, NY

### Accessible parking spaces to the right of the Rite Aid entrance

Accessible parking spaces – Location

| 1991 ADAAG | 2010 ADA Standard | Photos | Recommendation: 2010 ADA Standard | Est. Cost (min.) | Est. Cost (max.) |
|---|---|---|---|---|---|
| **Requirement:** Section 4.6.2 states that accessible parking spaces serving a particular building shall be located on the shortest accessible route of travel from adjacent parking to an accessible entrance. In buildings with multiple accessible entrances with adjacent parking, accessible parking spaces shall be dispersed and located closest to the accessible entrances. | **Requirement:** Section 208.3.1 states that parking spaces complying with 502 that serve a particular building or facility shall be located on the shortest accessible route from parking to an entrance complying with 206.4. Where parking serves more than one accessible entrance, parking spaces complying with 502 shall be dispersed and located on the shortest accessible route to the accessible entrances. |  | Relocate the two accessible parking spaces and access aisle so that they are located closest to the accessible entrances. | $ 1,900.00 | $ 2,020.00 |
| **Finding:** The building has multiple accessible entrances with adjacent parking; the accessible parking spaces are not dispersed and located closest to the accessible entrances. | **Finding:** Parking serves more than one accessible entrance; the accessible parking spaces are not dispersed and located on the shortest accessible route to the accessible entrances. | | | | |

4

11/14/2013

Steven Winter Associates, Inc.
Improving the Built Environment Since 1972

61 Washington Street
Norwalk, CT 06854

203.857.0200 (main)
203.852.0741 (fax)
www.swinter.com

# Accessibility Review: 3015 Mermaid Avenue, Brooklyn, NY

| 1991 ADAAG | 2010 ADA Standard | Photos | Recommendation: 2010 ADA Standard | Est. Cost (min.) | Est. Cost (max.) |
|---|---|---|---|---|---|
| **Accessible parking spaces - Surface slopes** | | | | | |
| **Requirement:** Section 4.6.3 states that parking spaces and access aisles shall be level with surface slopes not exceeding 1:50 (2%) in all directions. | **Requirement:** Section 502.4 states that parking spaces and access aisles serving them shall comply with 302; except that slopes not steeper than 1:48 (2.08%) shall be permitted. |  | Relocate the two accessible parking spaces and access aisle so that they are located closest to the accessible entrances. | See above | See above |
| **Finding:** The surface slopes of the parking spaces and access aisle exceed 1:50 (2%) at 3.3% (left parking space), 7.3% (access aisle), and 5.8% (right parking space). | **Finding:** The surface slopes of the parking spaces and access aisle exceed 1:48 (2.08%) at 3.3% (left parking space), 7.3% (access aisle), and 5.8% (right parking space). | | | | |

11/14/2013

Steven Winter Associates, Inc.
Improving the Built Environment Since 1972

61 Washington Street
Norwalk, CT 06854

203.857.0200 (main)
203.852.0741 (fax)
www.swinter.com

## Accessibility Review: 3015 Mermaid Avenue, Brooklyn, NY

| 1991 ADAAG | 2010 ADA Standard | Photos | Recommendation: 2010 ADA Standard | Est. Cost (min.) | Est. Cost (max.) |
|---|---|---|---|---|---|
| **Accessible parking spaces - Signage/Identification** | | | | | |
| **Requirement:** Section 4.6.4 states that accessible parking spaces shall be designated as reserved by a sign showing the symbol of accessibility. Such signs shall be located so they cannot be obscured by a vehicle parked in the space. | **Requirement:** Section 216.5 states that parking spaces complying with 502 shall be identified by signs complying 502.6. Section 502.6 states that parking space identification signs shall included the International Symbol of Accessibility. Signs shall be 60 inches minimum above the finish floor of ground surface measured to the bottom of the sign. |  | Install identification sign at the relocated accessible parking spaces which includes the International Symbol of Accessibility at the head of each of the accessible parking spaces. Mount the signs at 60 inches minimum above the parking lot surface, measured to the bottom of the sign. | $   270.00 | $   290.00 |
| **Finding:** The accessible parking spaces are not designated as reserved by a sign showing the symbol of accessibility. | **Finding:** The accessible parking spaces are not identified by signs complying with 502.6. | | | | |

6

11/14/2013

Steven Winter Associates, Inc.
Improving the Built Environment Since 1972

61 Washington Street
Norwalk, CT 06854

203.857.0200 (main)
203.852.0741 (fax)
www.swinter.com

# Accessibility Review: 3015 Mermaid Avenue, Brooklyn, NY

| 1991 ADAAG | 2010 ADA Standard | Photos | Recommendation: 2010 ADA Standard | Est. Cost (min.) | Est. Cost (max.) |
|---|---|---|---|---|---|
| **Accessible routes** | | | | | |
| **Requirement:** Section 4.1.2(1) states that at least one accessible route complying with 4.3 shall be provided within the boundry of the site from public transportation stops, accessible parking spaces, passenger loading zones if provided, and public streets or sidewalks, to an accessible building entrance. | **Requirement:** Section 206.1 states that accessible routes shall be provided in accordance with 206 and shall comply with Chapter 4. Section 206.2.1 states that at least one accessible route shall be provided within the site from accessible parking spaces and accessible passenger loading zones; public streets and sidewalks; and public transportation stops to the accessible building or facility entrance they serve. | | | | |
| **Ramp at the southwest corner of the building** | | | | | |
| **Ramp - Slope** | | | | | |
| **Requirement:** Section 4.3.7 states that an accessible route with a running slope greater than 1:20 is a ramp and shall comply with 4.8. Section 4.8.2 states that the maximum slope of a ramp in new construction shall be 1:12 (8.33%). Ramps to be constructed on existing sites or in existing buildings or facilities may have slopes as allowed in 4.1.6(3)(a) if space limitations prohibit the use of a 1:12 (8.33%) slope or less. **Finding:** The running slope of the ramp run is greater than 1:12 (8.33%) at 9.6% and 10.0%. Space limitations do not prohibit a 1:12 (8.33%) slope or less. | **Requirement:** Section 405.2 states that ramp runs shall have a running slope not steeper than 1:12 (8.33%). In existing sites, buildings, and facilities, ramps shall be permitted to have running slopes steeper than 1:12 (8.33%) where such slopes are necessary due to space limitations. **Finding:** The running slope of the ramp run is greater than 1:12 (8.33%) at 9.6% and 10.0%. Space limitations do not prohibit a 1:12 (8.33%) slope or less. | | Remove and replace with a ramp which has compliant slopes, landings, and handrails on both sides of the ramp run. | $ 16,370.00 | $ 17,450.00 |

Steven Winter Associates, Inc.
Improving the Built Environment Since 1972

61 Washington Street
Norwalk, CT  06854

203.857.0200 (main)
203.852.0741 (fax)
www.swinter.com

# Accessibility Review: 3015 Mermaid Avenue, Brooklyn, NY

| 1991 ADAAG | 2010 ADA Standard | Photos | Recommendation: 2010 ADA Standard | Est. Cost (min.) | Est. Cost (max.) |
|---|---|---|---|---|---|
| **Ramp - Landings** | | | | | |
| **Requirement:** Section 4.8.4 states that ramps shall have level landings at the bottom and top of each ramp and each ramp run. | **Requirement:** Section 405.7 states that ramps shall have landings at the top and bottom of each ramp run. Landings shall comply with 405.7. The exception under section 405.7.1 states that slopes not steeper than 1:48 shall be permitted. |  | Remove and replace with a ramp which has compliant slopes, landings, and handrails on both sides of the ramp run. | See above | See above |
| **Finding:** The landing at the bottom of the ramp run is not level. The slope of the landing is 2.9%. | **Finding:** The slope of the bottom landing exceeds 1:48 (2.08%) at 2.9%. | | | | |

3015 Mermaid Avenue, Brooklyn, NY

8

11/14/2013

Steven Winter Associates, Inc.
Improving the Built Environment Since 1972

61 Washington Street
Norwalk, CT 06854

203.857.0200 (main)
203.852.0741 (fax)
www.swinter.com

## Accessibility Review: 3015 Mermaid Avenue, Brooklyn, NY

| 1991 ADAAG | 2010 ADA Standard | Photos | Recommendation: 2010 ADA Standard | Est. Cost (min.) | Est. Cost (max.) |
|---|---|---|---|---|---|
| **Ramp - Handrails** | | | | | |
| **Requirement:** Section 4.8.5(5) states that if a ramp run has a rise greater than 6 inches or a horizontal projection greater than 72 inches, then it shall have handrails on both sides. | **Requirement:** Section 405.8 states that ramp runs with a rise greater than 6 inches shall have handrails complying with 505. Section 505.2 states that handrails shall be provided on both sides of ramps. |  | Remove and replace with a ramp which has compliant slopes, landings, and handrails on both sides of the ramp run. | See above | See above |
| **Finding:** The rise of the ramp run is greater than 6 inches at approximately 17 inches. Handrails are not provided. | **Finding:** The rise of the ramp run is greater than 6 inches at approximately 17 inches. Handrails are not provided. |  | | | |

11/14/2013

Steven Winter Associates, Inc.
Improving the Built Environment Since 1972

61 Washington Street
Norwalk, CT 06854

203.857.0200 (main)
203.852.0741 (fax)
www.swinter.com

# Accessibility Review: 3015 Mermaid Avenue, Brooklyn, NY

## Ramp at the southeast corner of the building

### Ramp - Slope

| 1991 ADAAG | 2010 ADA Standard | Photos | Recommendation: 2010 ADA Standard | Est. Cost (min.) | Est. Cost (max.) |
|---|---|---|---|---|---|
| **Requirement:** Section 4.8.2 states that the maximum slope of a ramp in new construction shall be 1:12 (8.33%). Ramps to be constructed on existing sites or in existing buildings or facilities may have slopes as allowed in 4.1.6(3)(a) if space limitations prohibit the use of a 1:12 (8.33%) slope or less. | **Requirement:** Section 405.2 states that ramp runs shall have a running slope not steeper than 1:12 (8.33%). In existing sites, buildings, and facilities, ramps shall be permitted to have running slopes steeper than 1:12 (8.33%) where such slopes are necessary due to space limitations. |  | Remove and replace with a ramp which has compliant slopes, landings, and handrails on both sides of the ramp run. | $ 16,370.00 | $ 17,450.00 |
| **Finding:** The running slope of the ramp run is greater than 1:12 (8.33%) at 10.4% and 14.3%. Space limitations do not prohibit a 1:12 (8.33%) slope or less. | **Finding:** The running slope of the ramp run is greater than 1:12 (8.33%) at 10.4% and 14.3%. Space limitations do not prohibit a 1:12 (8.33%) slope or less. | | | | |

Steven Winter Associates, Inc.
Improving the Built Environment Since 1972

61 Washington Street
Norwalk, CT  06854

203.857.0200 (main)
203.852.0741 (fax)
www.swinter.com

## Accessibility Review: 3015 Mermaid Avenue, Brooklyn, NY

### Ramp - Landings

| 1991 ADAAG | 2010 ADA Standard | Photos | Recommendation: 2010 ADA Standard | Est. Cost (min.) | Est. Cost (max.) |
|---|---|---|---|---|---|
| **Requirement:** Section 4.8.4 states that ramps shall have level landings at the bottom and top of each ramp and each ramp run. | **Requirement:** Section 405.7 states that ramps shall have landings at the top and bottom of each ramp run. Landings shall comply with 405.7. The exception under section 405.7.1 states that slopes not steeper than 1:48 shall be permitted. |  | Remove and replace with a ramp which has compliant slopes, landings, and handrails on both sides of the ramp run. | See above | See above |
| **Finding:** The landing at the bottom and top of the ramp run are not level. The slope of the bottom landing is 3.5%. The slope of the top landing is 2.5%. | **Finding:** The landing at the bottom and top of the ramp run are not level. The slope of the bottom landing is 3.5%. The slope of the top landing is 2.5%. | | | | |

Steven Winter Associates, Inc.
Improving the Built Environment Since 1972

61 Washington Street
Norwalk, CT 06854

203.857.0200 (main)
203.852.0741 (fax)
www.swinter.com

# Accessibility Review: 3015 Mermaid Avenue, Brooklyn, NY

| 1991 ADAAG | 2010 ADA Standard | Photos | Recommendation: 2010 ADA Standard | Est. Cost (min.) | Est. Cost (max.) |
|---|---|---|---|---|---|
| **Ramp - Handrails** | | | | | |
| **Requirement:** Section 4.8.5(5) states that if a ramp run has a rise greater than 6 inches or a horizontal projection greater than 72 inches, then it shall have handrails on both sides. | **Requirement:** Section 405.8 states that ramp runs with a rise greater than 6 inches shall have handrails complying with 505. Section 505.2 states that handrails shall be provided on both sides of ramps. |  | Remove and replace with a ramp which has compliant slopes, landings, and handrails on both sides of the ramp run. | See above | See above |
| **Finding:** The rise of the ramp run is greater than 6 inches at approximately 15 inches. Handrails are not provided. | **Finding:** The rise of the ramp run is greater than 6 inches at approximately 15 inches. Handrails are not provided. |  | | | |

3015 Mermaid Avenue, Brooklyn, NY

12

11/14/2013

Steven Winter Associates, Inc.
Improving the Built Environment Since 1972

61 Washington Street
Norwalk, CT  06854

203.857.0200 (main)
203.852.0741 (fax)
www.swinter.com

# Accessibility Review: 3015 Mermaid Avenue, Brooklyn, NY

| 1991 ADAAG | 2010 ADA Standard | Photos | Recommendation: 2010 ADA Standard | Est. Cost (min.) | Est. Cost (max.) |
|---|---|---|---|---|---|
| **Sidewalk along the front of the building** | | | | | |
| **Sidewalk - Slope** | | | | | |
| **Requirement:** Section 4.3.7 states that nowhere shall the cross slope of an accessible route exceed 1:50 (2%). | **Requirement:** Section 403.3 that the cross slope of walking surfaces shall not be steeper than 1:48 (2.08%). | | Remove and replace the sidewalk with a sidewalk which has a compliant cross slope. | $ 6,110.00 | $ 7,020.00 |
| **Finding:** The cross slope of the sidewalk exceeds 1:50(2%) at 2.9%, 3.1%, 2.8%, and 2.7%. The cross slope exceeding 1:50(2%) begins near the Rent-A-Center entrance and continues along the sidewalk to just past the Rite-Aid entrance. | **Finding:** The cross slope of the sidewalk exceeds 1:48(2.08%) at 2.9%, 3.1%, 2.8%, and 2.7%. The cross slope exceeding 1:48(2.08%) begins near the Rent-A-Center entrance and continues along the sidewalk to just past the Rite-Aid entrance. | | | | |

13

11/14/2013

Steven Winter Associates, Inc.
Improving the Built Environment Since 1972

61 Washington Street
Norwalk, CT 06854

203.857.0200 (main)
203.852.0741 (fax)
www.swinter.com

# Accessibility Review: 3015 Mermaid Avenue, Brooklyn, NY

## Curb ramps

| 1991 ADAAG | 2010 ADA Standard | Photos | Recommendation: 2010 ADA Standard | Est. Cost (min.) | Est. Cost (max.) |
|---|---|---|---|---|---|
| **Requirement:** Section 4.7.1 states that curb ramps complying with 4.7 shall be provided wherever an accessible route crosses a curb. | **Requirement:** Section 406.1 states that curb ramps on accessible routes shall comply with 406, 405.2 through 405.5, and 405.10. | | | | |

## Curb ramp at the accessible parking spaces in front of Dunkin Donuts

### Curb ramp – Slope

| 1991 ADAAG | 2010 ADA Standard | Photos | Recommendation: 2010 ADA Standard | Est. Cost (min.) | Est. Cost (max.) |
|---|---|---|---|---|---|
| **Requirement:** Section 4.7.2 states that the slopes of curb ramps shall comply with 4.8.2. Section 4.8.2 states that the maximum slope of a ramp in new construction shall be 1:12 (8.33%). Ramps to be constructed on existing sites or in existing buildings or facilities may have slopes as allowed in 4.1.6(3)(a) if space limitations prohibit the use of a 1:12 (8.33%) slope or less.<br><br>**Finding:** The running slope of the ramp run is greater than 1:12 (8.33%) at 11.7%. Space limitations do not prohibit a 1:12 (8.33%) slope or less. | **Requirement:** Section 405.2 states that ramp runs shall have a running slope not steeper than 1:12 (8.33%). In existing sites, buildings, and facilities, ramps shall be permitted to have running slopes steeper than 1:12 (8.33%) where such slopes are necessary due to space limitations.<br><br>**Finding:** The running slope of the ramp run is greater than 1:12 (8.33%) at 11.7%. Space limitations do not prohibit a 1:12 (8.33%) slope or less. | | Remove and replace with a curb ramp which has compliant slope, width, side flares, and transitions. | $ 1,980.00 | $ 2,280.00 |

3015 Mermaid Avenue, Brooklyn, NY

14

11/14/2013

Steven Winter Associates, Inc.
Improving the Built Environment Since 1972

61 Washington Street
Norwalk, CT  06854

203.857.0200 (main)
203.852.0741 (fax)
www.swinter.com

# Accessibility Review: 3015 Mermaid Avenue, Brooklyn, NY

| 1991 ADAAG | 2010 ADA Standard | Photos | Recommendation: 2010 ADA Standard | Est. Cost (min.) | Est. Cost (max.) |
|---|---|---|---|---|---|
| Curb ramp - Flare slope | | | | | |
| **Requirement:** Section 4.7.5 states that if a curb ramp is located where pedestrians must walk across the ramp, or where it is not protected by handrails or guardrails, it shall have flared sides; the maximum slope of the flare shall be 1:10 (10.0%); see Fig. 12(a). | **Requirement:** Section 406.3 states that where provided, curb ramp flares shall not be steeper than 1:10. | | Remove and replace with a curb ramp which has compliant slope, width, side flares, and transitions. | See above | See above |
| **Finding:** The slope of the left curb ramp flare is greater than 1:10 (10.0%) at 21.0%. The slope of the right curb ramp flare is greater than 1:10 (10.0%) at 14.9%. | **Finding:** The slope of the left curb ramp flare is greater than 1:10 (10.0%) at 21.0%. The slope of the right curb ramp flare is greater than 1:10 (10.0%) at 14.9%. | | | | |

15

11/14/2013

Steven Winter Associates, Inc.
Improving the Built Environment Since 1972

61 Washington Street
Norwalk, CT  06854

203.857.0200 (main)
203.852.0741 (fax)
www.swinter.com

# Accessibility Review: 3015 Mermaid Avenue, Brooklyn, NY

| 1991 ADAAG | 2010 ADA Standard | Photos | Recommendation: 2010 ADA Standard | Est. Cost (min.) | Est. Cost (max.) |
|---|---|---|---|---|---|
| **Curb ramp – Transition** | | | | | |
| **Requirement:** Section 4.7.2 states that transitions from ramps to walks, gutters, or streets shall be flush and free of abrupt changes. | **Requirement:** Section 406.2 states that the adjacent surfaces at the transition at curb ramps to walks, gutters, and street shall be at the same level. |  | Remove and replace with a curb ramp which has compliant slope, width, side flares, and transitions. | See above | See above |
| **Finding:** The transition between the curb ramp and the parking lot is not flush and free of abrupt changes. There is a ½ inch vertical level change between the curb ramp and the parking lot. | **Finding:** The transition between the surfaces of the curb ramp and the parking lot are not at the same level. There is a ½ inch vertical level change between the surfaces of the curb ramp and the parking lot. | | | | |

Steven Winter Associates, Inc.
Improving the Built Environment Since 1972

61 Washington Street
Norwalk, CT 06854

203.857.0200 (main)
203.852.0741 (fax)
www.swinter.com

# Accessibility Review: 3015 Mermaid Avenue, Brooklyn, NY

Curb ramp – Width

| 1991 ADAAG | 2010 ADA Standard | Photos | Recommendation: 2010 ADA Standard | Est. Cost (min.) | Est. Cost (max.) |
|---|---|---|---|---|---|
| **Requirement:** Section 4.7.3 states that the minimum width of a curb ramp shall be 36 inches, exclusive of flared sides. | **Requirement:** Section 405.5 states that the clear width of a ramp run shall be 36 inches minimum. |  | Remove and replace with a curb ramp which has compliant slope, width, side flares, and transitions. | See above | See above |
| **Finding:** The width of the curb ramp is less than 36 inches at 23 inches. | **Finding:** The width of the curb ramp is less than 36 inches at 23 inches. | | | | |

3015 Mermaid Avenue, Brooklyn, NY

17

11/14/2013

Steven Winter Associates, Inc.
Improving the Built Environment Since 1972

61 Washington Street
Norwalk, CT  06854

203.857.0200 (main)
203.852.0741 (fax)
www.swinter.com

# Accessibility Review: 3015 Mermaid Avenue, Brooklyn, NY

## Curb ramp at the accessible parking spaces to the right of the Rite Aid entrance

Curb ramp - Slope

| 1991 ADAAG | 2010 ADA Standard | Photos | Recommendation: 2010 ADA Standard | Est. Cost (min.) | Est. Cost (max.) |
|---|---|---|---|---|---|
| **Requirement:** Section 4.7.2 states that the slopes of curb ramps shall comply with 4.8.2. Section 4.8.2 states that the maximum slope of a ramp in new construction shall be 1:12 (8.33%). Ramps to be constructed on existing sites or in existing buildings or facilities may have slopes as allowed in 4.1.6(3)(a) if space limitations prohibit the use of a 1:12 (8.33%) slope or less. | **Requirement:** Section 405.2 states that ramp runs shall have a running slope not steeper than 1:12 (8.33%). In existing sites, buildings, and facilities, ramps shall be permitted to have running slopes steeper than 1:12 (8.33%) where such slopes are necessary due to space limitations. |  | Remove and replace with a curb ramp which has compliant slope, width, side flares, and transitions. | $  1,980.00 | $  2,280.00 |
| **Finding:** The running slope of the ramp run is greater than 1:12 (8.33%) at 11.5%. Space limitations do not prohibit a 1:12 (8.33%) slope or less. | **Finding:** The running slope of the ramp run is greater than 1:12 (8.33%) at 11.5%. Space limitations do not prohibit a 1:12 (8.33%) slope or less. | | | | |

3015 Mermaid Avenue, Brooklyn, NY

18

11/14/2013

Steven Winter Associates, Inc.
Improving the Built Environment Since 1972

61 Washington Street
Norwalk, CT 06854

203.857.0200 (main)
203.852.0741 (fax)
www.swinter.com

# Accessibility Review: 3015 Mermaid Avenue, Brooklyn, NY

## Curb ramps - flare slope

| 1991 ADAAG | 2010 ADA Standard | Photos | Recommendation: 2010 ADA Standard | Est. Cost (min.) | Est. Cost (max.) |
|---|---|---|---|---|---|
| **Requirement:** Section 4.7.5 states that if a curb ramp is located where pedestrians must walk across the ramp, or where it is not protected by handrails or guardrails, it shall have flared sides; the maximum slope of the flare shall be 1:10 (10.0%); see Fig. 12(a). | **Requirement:** Section 406.3 states that where provided, curb ramp flares shall not be steeper than 1:10. | | Remove and replace with a curb ramp which has compliant slope, width, side flares, and transitions. | See above | See above |
| *If X is less than 48 in., then the slope of the flared side shall not exceed 1:12* Fig. 12 Sides of Curb Ramps | Figure 406.3 Sides of Curb Ramps | | | | |
| **Finding:** The slope of the left curb ramp flare is greater than 1:10 (10.0%) at 16.6%. The slope of the right curb ramp flare is greater than 1:10 (10.0%) at 13.4%. | **Finding:** The slope of the left curb ramp flare is greater than 1:10 (10.0%) at 16.6%. The slope of the right curb ramp flare is greater than 1:10 (10.0%) at 13.4%. | | | | |

Steven Winter Associates, Inc.
Improving the Built Environment Since 1972

61 Washington Street
Norwalk, CT 06854

203.857.0200 (main)
203.852.0741 (fax)
www.swinter.com

## Accessibility Review: 3015 Mermaid Avenue, Brooklyn, NY

| 1991 ADAAG | 2010 ADA Standard | Photos | Recommendation: 2010 ADA Standard | Est. Cost (min.) | Est. Cost (max.) |
|---|---|---|---|---|---|
| **Curb ramps – width** | | | | | |
| **Requirement:** Section 4.7.3 states that the minimum width of a curb ramp shall be 36 inches, exclusive of flared sides. | **Requirement:** Section 405.5 states that the clear width of a ramp run shall be 36 inches minimum. | | Remove and replace with a curb ramp which has compliant slope, width, side flares, and transitions. | See above | See above |
| **Finding:** The width of the curb ramp is less than 36 inches at 18 inches. | **Finding:** The width of the curb ramp is less than 36 inches at 18 inches. | | | | |

11/14/2013

20

3015 Mermaid Avenue, Brooklyn, NY

Steven Winter Associates, Inc.
Improving the Built Environment Since 1972

61 Washington Street
Norwalk, CT 06854

203.857.0200 (main)
203.852.0741 (fax)
www.swinter.com

# Accessibility Review: 3015 Mermaid Avenue, Brooklyn, NY

| 1991 ADAAG | 2010 ADA Standard | Photos | Recommendation: 2010 ADA Standard | Est. Cost (min.) | Est. Cost (max.) |
|---|---|---|---|---|---|
| **Entrances** | | | | | |
| **Requirement:** Section 4.1.3(7)(a) states that at each accessible entrance to a building or facility, at least one door shall comply with 4.13. | **Requirement:** Section 206.5.1 states that each entrance to a building or facility required to comply with 206.4 shall have at least one door, doorway, or gate complying with 404. | | | | |
| **Entrance to Rent-A-Center** | | | | | |
| Entrance to Rent-A-Center - Maneuvering clearance slope | | | | | |
| **Requirement:** Section 4.13.6 states that the minimum maneuvering clearances at doors that are not automatic or power-assisted shall be as shown in Fig. 25. The floor or ground area within the required clearances shall be level and clear. | **Requirement:** Section 404.2.4 states that minimum maneuvering clearances at doors and gates shall comply with 404.2.4. Section 404.2.4.4 states that floor or ground surface within the required maneuvering clearances shall comply with 302; with the exception that slopes not steeper than 1:48 (2.08%) shall be permitted. |  | Remove and replace concrete to provide landing with compliant slope. | $  380.00 | $  440.00 |
| **Finding:** The ground area within the required maneuvering clearance is not level. The slope of the maneuvering clearance is 2.6%. | **Finding:** The slope of the maneuvering clearance is greater than 1:48 (2.08%) at 2.6%. | | | | |

21

3015 Mermaid Avenue, Brooklyn, NY

11/14/2013

Steven Winter Associates, Inc.
Improving the Built Environment Since 1972

61 Washington Street
Norwalk, CT  06854

203.857.0200 (main)
203.852.0741 (fax)
www.swinter.com

# Accessibility Review: 3015 Mermaid Avenue, Brooklyn, NY

## Entrance to Rent-A-Center - Threshold

| 1991 ADAAG | 2010 ADA Standard | Photos | Recommendation: 2010 ADA Standard | Est. Cost (min.) | Est. Cost (max.) |
|---|---|---|---|---|---|
| **Requirement:** Section 4.13.6 states that thresholds at doorways shall not exceed ¾ inch in height for exterior sliding doors or ½ inch for other types of doors. Raised threshold and floor level changes at accessible doorways shall be beveled with a slope no greater than 1:2.<br><br>**Finding:** The threshold exceeds ½ inch in height at 1 inch. | **Requirement:** Section 404.2.5 states that thresholds, if provided at doorways, shall be ½ inch high maximum. Raised thresholds and changes in level at doorways shall comply with 302 and 303.<br><br>**Finding:** The threshold exceeds ½ inch in height at 1 inch. |  | Remove and replace concrete landing to provide compliant threshold transition. | See above | See above |

11/14/2013

22

3015 Mermaid Avenue, Brooklyn, NY

Steven Winter Associates, Inc.
Improving the Built Environment Since 1972

61 Washington Street
Norwalk, CT 06854

203.857.0200 (main)
203.852.0741 (fax)
www.swinter.com

# Accessibility Review: 3015 Mermaid Avenue, Brooklyn, NY

## Entrance to Duncan Donuts

### Entrance to Duncan Donuts – Maneuvering clearance slope

| 1991 ADAAG | 2010 ADA Standard | Photos | Recommendation: 2010 ADA Standard | Est. Cost (min.) | Est. Cost (max.) |
|---|---|---|---|---|---|
| **Requirement:** Section 4.13.6 states that the minimum maneuvering clearances at doors that are not automatic or power-assisted shall be as shown in Fig. 25. The floor or ground area within the required clearances shall be level and clear.<br><br>**Finding:** The ground area within the required maneuvering clearance is not level. The slope of the maneuvering clearance is 2.7%. | **Requirement:** Section 404.2.4 states that minimum maneuvering clearances at doors and gates shall comply with 404.2.4. Section 404.2.4.4 states that floor or ground surface within required maneuvering clearances shall comply with 302; with the exception that slopes not steeper than 1:48(2.08%) shall be permitted.<br><br>**Finding:** The slope of the maneuvering clearance is greater than 1:48(2.08%) at 2.7%. | | Remove and replace concrete to provide landing with compliant slope.. | $  380.00 | $  440.00 |

11/14/2013

Steven Winter Associates, Inc.
Improving the Built Environment Since 1972

61 Washington Street
Norwalk, CT 06854

203.857.0200 (main)
203.852.0741 (fax)
www.swinter.com

# Accessibility Review: 3015 Mermaid Avenue, Brooklyn, NY

## Entrance to Duncan Donuts – Threshold

| 1991 ADAAG | 2010 ADA Standard | Photos | Recommendation: 2010 ADA Standard | Est. Cost (min.) | Est. Cost (max.) |
|---|---|---|---|---|---|
| **Requirement:** Section 4.13.6 states that thresholds at doorways shall not exceed ¾ inch in height for exterior sliding doors or ½ inch for other types of doors. Raised threshold and floor level changes at accessible doorways shall be beveled with a slope no greater than 1:2. | **Requirement:** Section 404.2.5 states that thresholds, if provided at doorways, shall be ½ inch high maximum. Raised thresholds and changes in level at doorways shall comply with 302 and 303. |  | Remove and replace concrete landing to provide compliant threshold transition. | See above | See above |
| **Finding:** The threshold exceeds ½ inch in height at 1 inch. | **Finding:** The threshold exceeds ½ inch in height at 1 inch. | | | | |

11/14/2013

Steven Winter Associates, Inc.
Improving the Built Environment Since 1972

61 Washington Street
Norwalk, CT 06854

203.857.0200 (main)
203.852.0741 (fax)
www.swinter.com

## Accessibility Review: 3015 Mermaid Avenue, Brooklyn, NY

| 1991 ADAAG | 2010 ADA Standard | Photos | Recommendation: 2010 ADA Standard | Est. Cost (min.) | Est. Cost (max.) |
|---|---|---|---|---|---|
| **Entrance to Rite-Aid** | | | | | |
| **Entrance to Rite-Aid – Maneuvering clearance slope** | | | | | |
| **Requirement:** Section 4.13.6 states that the minimum maneuvering clearances at doors that are not automatic or power-assisted shall be as shown in Fig. 25. The floor or ground area within the required clearances shall be level and clear.<br><br>**Finding:** The ground area within the required maneuvering clearance is not level. The slope of the maneuvering clearance is 2.5%. | **Requirement:** Section 404.2.4 states that minimum maneuvering clearances at doors and gates shall comply with 404.2.4. Section 404.2.4.4 states that floor or ground surface within required maneuvering clearances shall comply with 302, with the exception that slopes not steeper than 1:48(2.08%) shall be permitted.<br><br>**Finding:** The slope of the maneuvering clearance is greater than 1:48(2.08%) at 2.5%. | | Remove and replace concrete to provide landing with compliant slope. | $380 | $440 |

3015 Mermaid Avenue, Brooklyn, NY

25

11/14/2013

Exhibit J



# INVOICE

31-07 Starr Avenue Suite 1
Long Island City, NY 11101
Phone (718) 383-1220   Fax (718) 383-1233

**DATE:** April 30, 2014
**INVOICE #** 201

**BILL TO:**
PRD Realty
19 West 34th Street  9th floor
New York, NY 11101

**Ref:** **3001 Mermaid Avenue Concrete ramp and asphalt repairs**

**Att:  Scott Domansky**

| DESCRIPTION | Price | Total |
|---|---|---|
| Concrete ramp and asphalt repairs | | $        12,301.00 |
| | **TOTAL** | $        **12,301.00** |

Make all checks payable to C.C.C. RENOVATION INC

### THANK YOU FOR YOUR BUSINESS!

MER000110

Exhibit K

# 3015 Mermaid Avenue

# Brooklyn, NY

## Accessibility Survey and Comments

### Inspection Date – May 13, 2014

Prepared by -

Joel D. Ziev, Ed.D.

Partners for Access LLC

Port Washington NY, 11050

# Accessibility Review – 3015 Mermaid Avenue –

Prepared by Partners for Access LLC
Port Washington, NY 11050

## Introduction

Partners for Access LLC (PFA) has been retained by Parker Hanski LLC to review the accessibility of the shopping center located at 3015 Mermaid Avenue, Brooklyn, NY, by people with Disabilities.

The following report outlines the findings of a site inspection conducted on May 13, 2014. The report includes an overview of the store fronts and off street parking area with a primary focus on elements that do not conform to the requirements of the American with Disabilities Act Accessibility Guidelines (ADAAG) and the ADA Title III as well as relevant local and State regulations.

Title III of the Americans with Disabilities Act of 1990 (ADA), require that the services, programs and activities of covered entities be accessible to people with disabilities in the most integrated setting possible. The ADA established minimum guidelines that are called the Americans with Disabilities Act Accessibility Guidelines ("ADAAG"). These guidelines were u<ins>dated in 2010 and re-uire that any alterations or new construction undertaken after March 15, 2012 com-ly with the 2010 Standards.</ins>

The New York City LL 58 of 1987 although similar to ADAAG, is not identical, and where the New York City Building Code is more stringent, those standards apply. All references included in this review refer to applicable sections in the 1991 and 2010 ADA Standards unless the New York City Building Code provides a stricter standard.  In situations where the NYC Code provides for a stricter standard they are noted with the symbol √NY and the reference is to the ICC-ANSI standard.  The ADA Standards are available at the United States Access Board's website www.access-board.gov.

Joel D. Ziev, Ed.D.
Partners for Access LLC
PartnersForAccess.com
May 27, 2014

**ADA Review – Mermaid Plaza- May 13, 2014**

Prepared by Partners for Access LLC

| Citation 1991/2010 Standards | Observations and Measurements | Recommendations | Pictures |
|---|---|---|---|
| 1. Off Street Parking | | | |
| 1.1   4.1.2(5) 502.2, 208.2 | The parking lot has 45 parking spaces including four that are marked as accessible spaces. All of the accessible spaces are also marked as Van Accessible. This exceeds the requirements for the number of accessible parking spaces for both cars and Vans. | |  |
| 1.2   4.6.2 | The accessible parking spaces are located on an accessible route and are adjacent to the sidewalk that runs along the storefronts. | |  |
| 1.3   4.6/502 | All of the accessible parking spaces are at least 96" wide and an adjoining access aisles of at least 60" wide. Also compliant for the Van accessible spaces. | | |
| 1.4   4.6.4, 4.1.2(5)(b) /502.6 | Each accessible parking space must have a sign with the international symbol of access (ISA) These signs are to be at 60 inches above the ground surface as measured to the bottom of the sign. | Raise the signs to the required minimum height of 60 inches above the ground surface as measured to the bottom of the sign. |  |

1

ADA Review – Mermaid Plaza– May 13, 2014

Prepared by Partners for Access LLC

| | | | | |
|---|---|---|---|---|
| | | The signs for each of the four accessible spaces are at 54 inches above the ground surface as measured to the bottom of the sign. | | |
| **2 Accessible path of travel** | | | | |
| 2.1 | 4.1.3(1),4.3.7 4.5, 4.7.4/ 302.1, 406.2, 502.4 | Curb Ramp in front of Dunkin Donuts | Repair/replace the surface of this access aisle. | |
| | | The surface of curb ramps must be stable, firm, without cracks, and slip resistant. | | |
| | | The access aisle at the bottom of the curb ramp has an asphalt patch that is not level and has 1" plus gaps. | | |
| | | Asphalt migration at edges of patch. | | |
| 2.2 | 4.7.5/406.3 | A curb ramp can have a maximum running slope of 1:12 (8.33%) with flared sides that are no steeper than 1:10 (10%). | Repair/replace this curb ramp. | |
| | | This ramp's center running slope is 13.3% and the flared side slopes are 14.2%. | | |
| 2.3 | | Curb Ramp in front of Rite Aid | Compliant | |

2

ADA Review – Mermaid Plaza- May 13, 2014

Prepared by Partners for Access LLC

| | | | | |
|---|---|---|---|---|
| 2.4 | 4.3.7/ 403.3 | Sidewalk along front of shopping center's storefronts. The cross slope of walking surfaces shall not be steeper than 2%. A minimum 36" accessible route of travel is required. This sidewalk is wider than 36 inches.<br><br>There is a 36 inch accessible route along the buildings but there are sections of the sidewalk closer to the curb that have a cross slope greater than 2%.<br><br>• At entrance to RENT-A-CENTER - Measurement taken 5' from entrance door had cross slope of 2.8%<br>• At entrance to DUNKIN DONUTS - Measurement taken 5' from entrance door had cross slope of 2.8%<br>• At entrance to RITE AID - Measurement taken 5' from entrance door had cross slope of 2.3% | Replace the non-compliant portions of the sidewalk. |  |
| 3 | Ramp at South West corner of shopping center. | | | |
| 3.1 | 4.1.3(1), 4.3.7, 4.8.2, 4.8.5/405.2 | A walkway with a running slope greater than 5% (1:20) is considered a ramp. A ramp can have a maximum running slope of 8.33% (1:12). | There is sufficient length in the existing ramp to achieve compliance. |  |
| | | The running slope of the bottom concrete flag closest to the city sidewalk is 9.6%. The running slopes of the other concrete flags are at 7.4% and 7.3%. | Resurface this ramp to have no more than an 8.3% slope. | |

ADA Review – Mermaid Plaza- May 13, 2014

| | | | |
|---|---|---|---|
| 3.2 | 4.5.1, 4.8.2, 4.8.5/ 405.2, 405.8, 505 | A Ramp with a running slope of greater than 5% and/or more than a 6" rise must have a handrail on both sides of the ramp. **This ramp has no handrails** | Install handrails on both side of this ramp. |
| 3.3 | 4.3.7, 4.8.4/ 403.3, 405.7 | At the top and bottom of a ramp, there must be a level landing that is 60 inches in length and of equal width to the ramp. The cross slope of walking surfaces shall not be steeper than 2%. The landing located at the bottom of this ramp has a cross slope of 2.2%. | Rebuild this landing. |
| 4 | Ramp at South East corner of shopping center. | | |
| 4.1 | 4.1.3(1), 4.3.7, 4.8.2, 4.8.5/405.2 | A walkway with a running slope greater than 5% (1:20) is considered a ramp. A ramp can have a maximum running slope of 8.33% (1:20). The running slope of the bottom concrete flag closest to the city sidewalk is at 8.6%. The running slopes of ramp to the other concrete flags are at 7.4% and 7.3%. | There is sufficient length in the existing ramp to achieve compliance. Resurface this ramp to have no more than an 8.33% slope |
| 4.2 | 4.5.1, 4.8.2, 4.8.5/ 405.2, 405.8, 505 | A Ramp with a running slope of greater than 5% and/or more than a 6" rise must have a handrail on both sides of the ramp. **This ramp has no handrails** | Install handrails. |

Prepared by Partners for Access LLC

4

ADA Review – Mermaid Plaza– May 13, 2014

| | | | | |
|---|---|---|---|---|
| 4.3 | 4.3.7, 4.8.4/ 403.3, 405.7 | At the top and bottom of a ramp, there must be a level landing that is 60 inches in length and of equal width to the ramp. The cross slope of walking surfaces shall not be steeper than 2%. The landings at the bottom and top of this ramp are not level. The slope at the bottom is 3.5% and 2.5% at the top. | Rebuild these landings. | |
| 4.4 | 4.3.7, 4.8.4/ 403.3, 405.7 | The Sidewalk at the base of this ramp currently has a utilities trench with an asphalt patch. The asphalt patch is smooth, but has non-compliant cross slopes. The cross slope of walking surfaces shall not be steeper than 2%. | Resurface this patch |  |
| 5 | Dunkin Donuts – Doorway entrance | | | |
| 4.13.7/404.2.4 | | The entrance way to this store includes two doors. The outer door opens into an 8" 4" by 5'4" vestibule. The inner door opens out to this vestibule. The doors are 42 inches wide. The pull side of a manual door must have at least 60 inches of space perpendicular to the doorway and at least 18 inches beyond the latch side parallel to doorway. The latch side of the outer door is less than 4 inches from the wall and does not provide sufficient maneuvering space. The outer door is not compliant | Rebuild the outer doorway. Use a 32 inch door. Reverse the door to have latch on the opposite side. This will provide more than the minimum 18 inch maneuvering space. Install door hinge that will permit door to open either in or out. |  |

ADA Review – Mermaid Plaza– May 13, 2014

Prepared by Partners for Access LLC

| | | | |
|---|---|---|---|
| | The inner door opens into the required maneuvering space for a wheel chair user.<br><br>(Note: NYC Fire Code requires that door must open in path of egress. Sec. 1008.1.2.2.) | | |
| 6. Driveway drain grate<br>4.1.3(1),4.3.7 4.5, 4.7.4/ 302.1, 406.2, 502.4 | Drain grate along Sidewalk– The drain grate at the east side of the driveway entrance is broken. The surface of walkways must be stable, firm, without cracks, and slip resistant. | Replace/ repair this grate. |  |

6

Exhibit L

# C.C.C Renovation Inc.

**31-07 Starr Ave**
**Long Island City , NY 11101**
Phone 718-383-1220
Fax 718-383-1233

DATE:       July 30, 2014
INVOICE #:  164
JOB #:

BILL TO:
TO OWNER:

PRD REALTY
19 WEST 34TH STREET--9TH FLOOR
NEW YORK, NY  10001

PROJECT:     3001 Mermaid Avenue
REFERENCE: **Installation of Handicap
ramps and signs**

**Attention: Scott Domansky**

| DESCRIPTION | COST | AMOUNT |
|---|---|---|
| **3001 Mermaid Avenue** | | $   17,000.00 |
| Handicap Ramp | | |
| Railing Installation | | |
| Asphalt Repair | | |
| Handicap Signs | | |
| | Tax $ | 1,508.75 |
| | TOTAL $ | 18,508.75 |

*NOTE: The applicable tax is not included in this price and will be applied at the end of the project.*
*Please provide a Capital Improvement Certificate should this project require one.*

AS ALWAYS, THANK YOU
AND WE APPRECIATE YOUR BUSINESS!

MER000109

Exhibit M



United Spinal
Association



ACCESSIBILITY
SERVICES

Accessibility Inspection
3015 Mermaid Ave
Brooklyn, NY 11224

Inspected 6/6, 7/23, 7/31/14

## Introduction

Title III of the Americans with Disabilities Act (ADA) requires public accommodations to design and construct facilities for first occupancy after January 26, 1993 that are readily accessible to and usable by individuals with disabilities in compliance with the Americans with Disabilities Act 1991 Accessibility Guidelines (1991 ADA Standards).   Thus, our review took into account compliance with the 1991 ADA Standards as the basic accessibility reference standard.  Any alterations that are undertaken after March 15, 2012 must comply with the 2010 ADA/ABA Standards for Accessible Design to the maximum extent feasible.

We have provided recommendations for improvements using the 2010 ADA/ABA Standards for Accessible Design as the technical reference standard.  The report provides citations to the 1991 ADA Standards where violations to these standards occur and the remediation is the same as provided in the 2010 ADA Standards.  If the remediation is different in the 2010 ADA Standards from the original 1991 ADA Standards, we have provided the citation to the 2010 ADA Standards. Both Standards are available at http://www.ada_gov/2010ADAstandards_index.htm.

The inspection was conducted by United Spinal's Accessibility Services staff member Tim Perry.  Below are Accessibility Services findings.

1

Accessibility Inspection
3015 Mermaid Ave
Brooklyn, NY 11224

 United Spinal Association

 ACCESSIBILITY SERVICES

Inspected 6/6, 7/23, 7/31/14

| Citation 1991/2010 Standards | Issue | ACS Findings |
|---|---|---|
| **Off Street Parking** | | |
| 4.1.2(5) 502.2, 208.2 | The parking lot has 45 parking spaces including four that are marked as accessible spaces. All of the accessible spaces are also marked as Van Accessible. | 49 total spaces provided. A total of 4 Van accessible spaces have been provided. |
| 4.6.2 | The accessible parking spaces are located on an accessible route and are adjacent to the sidewalk that runs along the storefronts. | The accessible parking spaces are located on an accessible route and are adjacent to the sidewalk that runs along the storefronts. |
| 4.5/502 | All of the accessible parking spaces are at least 96" wide and an adjoining access aisle of at least 60" wide. | Parking spaces comply dimensionally (measured at 9 and 10 foot wide respectively with a shared 12 foot wide access aisle). |
| 4.6.4, 4.1.2(5)(b)/502.6 | Each accessible parking space must have a sign with the international symbol of access (ISA) and mounted at 60 inches above the ground surface measured to the bottom of the sign. | The signage mounted at the head of all four parking spaces has been provided at 60 inches minimum above grade as required. |
| **Accessible Path of Travel** | | |
| 4.1.3(1),4.3.7 4.5, 4.7.4/ 302.1, 406.2, 502.4 | Curb Ramp in front of Dunkin Donuts | This transition to the curb ramp is firm, stable and slip resistant as required. |
| 4.7.5/406.3 | | Curb ramp proximate to Dunkin Donuts has a measured slope between 7.6 – 7.9%. Compliant |

2

Accessibility Inspection
3015 Mermaid Ave
Brooklyn, NY 11224



United Spinal Association

ACCESSIBILITY SERVICES

Inspected 6/6, 7/23, 7/31/14

| Citation 1991/2010 Standards | Issue | ACS Findings |
|---|---|---|
| 4.1.3(1),4.3.7 4.5, 4.7.4/ 302.1, 406.2, 502.4 | Curb Ramp in front of Rite Aid | Compliant |
| **Ramp at South west corner of shopping center** | | |
| 4.1.3(1), 4.3.7, 4.8.2, 4.8.5/405.2 | 31ˢᵗ Street ramp | Signage has been provided at the 31 St. ramp indicating the accessible ramp on the 30ᵗʰ St. side serving as the accessible route connecting public streets and sidewalks to building entry. |
| **Ramp at South East corner of shopping center** | | |
| 4.1.3(1), 4.3.7, 4.8.2, 4.8.5/405.2 | 30ᵗʰ Street ramp | The 8.6% running slope of the first flag of concrete along this ramp run is considered within tolerances. |
| 4.5.1, 4.8.2, 4.8.5/ 405.2, 405.8, 505 | | The 30ᵗʰ St ramp serving as the accessible route has been provided with handrails along both sides measured at compliant mounting heights. Handrail extensions have been provided at the top of the ramp run. Handrail extensions at the bottom of the run are not required as they are hazardous. |
| 4.3.7, 4.8.4/ 403.3, 405.7 | Landings at the bottom and top of this ramp | ACS has measured both landings at this ramp run and found them to be not in excess of 2%. The top landing begins past the provided edge protection and measured at less than 2% slope/cross slope. The bottom landing has been measured at less than 2% slope/cross slope. The two landings provided are compliant. |
| 4.3.7, 4.8.4/ 403.3, 405.7 | The Sidewalk at the base of this ramp | The public city sidewalk is outside the scope of the property in question. Also the asphalt patch appears to be a temporary patch done by utility workers currently working in this area. Concrete will be added and patched correctly when work is completed. |
| **Driveway Drain Grate** | | |
| 4.1.3(1),4.3.7 4.5, 4.7.4/ 302.1, 406.2. | Drain grate along Sidewalk | This drain grate is located within the parking lot and not along the provided accessible route. |

Accessibility Inspection
3015 Mermaid Ave
Brooklyn, NY 11224

United Spinal Association

ACCESSIBILITY SERVICES

Inspected 6/6, 7/23, 7/31/14

| Citation 1991/2010 Standards | Issue | ACS Findings |
|---|---|---|
| 502.4 | | |
| End of Report | | |

Exhibit N

3015 Mermaid Avenue - Report

# 3015 Mermaid Avenue
Brooklyn, NY 11224

Inspection date: November 18, 2014

## Report

| ITEM | ISSUE | CITATION | | NOTE | RECOMMENDATION | IMAGE |
|------|-------|----------|--|------|----------------|-------|
| **Ramp at West 30th Street** | | | | | | |
| 001 | Slopes of 14.3% were measured at the bottom flag of concrete at the ramp immediately adjacent to the public sidewalk. | 2010<br>1991<br>2008 | -405.2<br>-4.8.2<br>-405.2 | | Repave the ramp so that all portions have slopes not more than 8.33%. | A |
| 002 | Slopes of 5.4% were measured at the landing located at the top of the ramp where the edge protection ends | 2010<br>1991<br>2008 | -2405.7<br>-4.8.4<br>-405.7 | | Repave the top landing so that it is level with slopes not steeper than 2%. | B |
| 003 | Handrails do not extend beyond the bottom of the ramp run. | 2010<br>1991<br>2008 | -3505.10.1<br>-4.8.5<br>-505.10.1 | | Extend the handrails beyond the bottom of the ramp run. The Handrail against the building should extend around the building edge by making a 90° turn to the left and return to the wall.  The handrail against the parking lot should extend to the adjacent curb by making a 90° turn to the right and return to the guard or landing surface. | C1 / C2 |

Ramp handrails shall extend horizontally above the landing for 12 inches minimum beyond the top and bottom of ramp runs. Extensions shall return to a wall, guard, or the landing surface, or shall be continuous to the handrail of an adjacent ramp run.

Ramps shall have landings at the top and the bottom of each ramp run. Slopes not steeper than 1:48 (2%) shall be permitted.

Ramp runs shall have a running slope not steeper than 1:12 (8.33%).

3015 Mermaid Avenue - Report

| ITEM | ISSUE | CITATION | | NOTE | RECOMMENDATION | IMAGE |
|------|-------|----------|---|------|----------------|-------|
| **Ramp at West 31st Street** | | | | | | |
| 004 | Slopes of 10% were measured at the bottom flag of concrete at the ramp immediately adjacent to the public sidewalk | 2010 | -405.2 | | Repave the ramp so that all portions have slopes not more than 8.33%. | D |
| | | 1991 | -4.8.2 | | | |
| | | 2008 | -405.2 | | | |
| 005 | Only one side of the ramp has a handrail extending the full length of the ramp, which measures 174 inches in length. The handrail away from the building extends the full length of the ramp. The handrail against the building does not extend the full length of the ramp because it is only 37 1/2 inches in length. | 2010 | -505.2 | | Extend the handrail against the building so that it extends the full length of the ramp. | E |
| | | 1991 | -4.8.5 | | | |
| | | 2008 | -505.2 | | | |
| 006 | Handrails do not extend beyond the bottom of the ramp run. | 2010 | -3505.10.1 | | Extend the handrails beyond the bottom of the ramp run. The Handrail against the building should extend around the building edge by making a 90° turn to the right and return to the wall. The handrail against the parking lot should extend to the adjacent curb by making a 90° turn to the left and return to the guard or landing surface. | F1 / F2 |
| | | 1991 | -4.8.5 | | | |
| | | 2008 | -505.10.1 | | | |

3015 Mermaid Avenue - Report

| ITEM | ISSUE | | CITATION | NOTE | RECOMMENDATION | IMAGE |
|---|---|---|---|---|---|---|
| **2 spaces labeled as accessible at Rite Aid** | | | | | | |
| 007 | Running slope of 6.6% were measured at the access aisles at the location where the access aisle meets the curb ramp. Cross slopes of 6.2% were measured at the access aisle at the location where the access aisle meets the left flair of the curb ramp. Cross slopes of 3.6% were measured at the location where the access aisle meets the right flair of the curb ramp. | 2010 -502.4 1991 -4.1.3(9) 2008 -502.5 | Parking spaces and access aisles shall have surface slopes not steeper than 1:48 (2%). | | Repave the parking spaces and access aisle so that surface slopes are not steeper than 2%. | G |
| **2 spaces labeled as accessible at Dunkin Donuts/Baskin Robbins** | | | | | | |
| 008 | Running slope of 5.3% were measured at the access aisles at the location where the access aisle meets the curb ramp. Cross slopes of 4.0% were measured at the access aisle at the location where the access aisle meets the left flair of the curb ramp. Cross slopes of 6.7% were measured at the location where the access aisle meets the right flair of the curb ramp. | 2010 -502.4 1991 -4.1.3(9) 2008 -502.5 | Parking spaces and access aisles shall have surface slopes not steeper than 1:48 (2%). | | Repave the parking spaces and access aisle so that surface slopes are not steeper than 2%. | H |

**End Report**

This report was prepared by:

Jimmy Zuehl
Architectural Accessibilty Consultant

ARCHbility
architectural accessibility consultants

646/450-3774
jzuehl@archbility.com

Jimmy Zuehl

December 1, 2014
Date

Report - Page 3 / 3

3015 Mermaid Avenue - Images

**3015 Mermaid Avenue**
Brooklyn, NY 11224

Inspection date: November 18, 2014

## Report Images

| IMAGE | IMAGE |
| --- | --- |



A



B

Images - Page 1 of 4





Images - Page 3 of 4



3015 Mermaid Avenue - Images

Images - Page 4 of 4

Exhibit O

![United Spinal Association logo] **United Spinal Association**

United Spinal Association Response to Plaintiff's November 18th Inspection Report
April 14, 2015

United Spinal Association Response to Plaintiff's November 18th Inspection Report
3015 Mermaid Avenue
Brooklyn, NY 11224
April 14, 2015

Report

| ITEM | ISSUE | CITATION | NOTE | RECOMMENDATION | UNITED SPINAL RE-INSPECTION 4-14-15 |
|---|---|---|---|---|---|
| **Ramp at West 30th Street** | | | | | |
| 001 | Slopes of 14.3% were measured at the bottom flag of concrete at the ramp immediately adjacent to the public sidewalk. | 2010 -405.2 1991 -4.8.2 2008 -405.2 | | Repave the ramp so that all portions have slopes not more than 8.33%. | Bottom Flag at West 30th Street indicated is 8% |
| | Ramp runs shall have a running slope not steeper than 1:12 (8.33%). | | | | |
| 002 | Slopes of 5.4% were measured at the landing located at the top of the | 2010 -2405.7 | | Repave the top landing so that it is level with slopes not steeper than 2%. | Handrails were extended to 1 |
| | Ramps shall have landings at the top and the bottom of | | | | |

United Spinal Association

United Spinal Association Response to Plaintiff's November 18th Inspection Report
April 14, 2015

| | | | | | | |
|---|---|---|---|---|---|---|
| | ramp where the edge protection ends | 1991 -4.8.4 2008 -405.7 | | each ramp run. Slopes not steeper than 1:48 (2%) shall be permitted. | | incorporate the portion of the ramp that exceeded 5% at the top of the ramp |
| 003 | Handrails do not extend beyond the bottom of the ramp run. | 2010 -3505.10.1 1991 -4.8.5 2008 -505.10.1 |  | Ramp handrails shall extend horizontally above the landing for 12 inches minimum beyond the top and bottom of ramp runs. Extensions shall return to a wall, guard, or the landing surface, or shall be continuous to the handrail of an adjacent ramp run. | Extend the handrails beyond the bottom of the ramp run. The Handrail against the building should extend around the building edge by making a 90° turn to the left and return to the wall. The handrail against the parking lot should extend to the adjacent curb by making a 90° turn to the right and return to the guard or landing surface. | Handrail is not required to extend into the public sidewalk  505.10 Handrail Extensions. Handrail gripping surfaces shall extend beyond and in the same direction of stair flights and ramp runs in accordance with |

2

United Spinal Association

United Spinal Association Response to Plaintiff's November 18th Inspection Report
April 14, 2015

| | | | | | | |
|---|---|---|---|---|---|---|
| **Ramp at West 31st Street** | | | | | | |
| 004 | Slopes of 10% were measured at the bottom flag of concrete at the ramp immediately adjacent to the public sidewalk | 2010 -405.2 1991 -4.8.2 2008 -405.2 | Ramp runs shall have a running slope not steeper than 1:12 (8.33%). | | Repave the ramp so that all portions have slopes not more than 8.33%. | 505.10. 3. In *alterations*, full extensions of handrails shall not be required where such extensions would be hazardous due to plan configuration.

The 1991 ADA Standards that were applicable at the time of construction only required a single accessible route. 4.1.2 Accessible Sites and Exterior Facilities: New Construction. An accessible site shall meet the following minimum requirements: (1) At least one accessible route complying with 4.3 shall be provided within the boundary of the site from public transportation stops, accessible parking spaces, |

United Spinal Association

United Spinal Association Response to Plaintiff's November 18th Inspection Report
April 14, 2015

4

| | | | | | | |
|---|---|---|---|---|---|---|
| 005 | Only one side of the ramp has a handrail extending the full length of the ramp, which measures 174 inches in length. The handrail away from the building extends the full length of the ramp. The handrail against the building does not extend the full length of the ramp because it is only 37 1/2 inches in length. | 2010-505.21991-4.8.52008-505.2 | Handrails shall be provided on both sides of stairs and ramps. | Extend the handrail against the building so that it extends the full length of the ramp. | passenger loading zones if provided, and public streets or sidewalks, to an accessible building entrance. | Signage provided to identify the only accessible route required on 30th Street |
| 006 |  | Handrails do not extend beyond the | 2010-3505.10.11991- | Ramp handrails shall extend | Extend the handrails beyond the bottom | Signage provided to |

United Spinal Association

United Spinal Association Response to Plaintiff's November 18th Inspection Report
April 14, 2015

| | | | | | |
|---|---|---|---|---|---|
| | bottom of the ramp run. | 4.8.52008-505.10.1 | horizontally above the landing for 12 inches minimum beyond the top and bottom of ramp runs. Extensions shall return to a wall, guard, or the landing surface, or shall be continuous to the handrail of an adjacent ramp run. | of the ramp run. The Handrail against the building should extend around the building edge by making a 90° turn to the right and return to the wall. The handrail against the parking lot should extend to the adjacent curb by making a 90° turn to the left and return to the guard or landing surface. | identify the only accessible route required on 30th Street |
| **2 spaces labeled as accessible at Rite Aid** | | | | | |
| 007 | Running slope of 6.6% were measured at the access aisles at the location where the access aisle meets the curb ramp. Cross slopes of 6.2% were measured at the access aisle at the location where the access aisle meets the left flair of the curb ramp. Cross slopes of 3.6% were measured at the location where the access aisle meets the right flair of the curb ramp. | 2010-502.41991-4.1.3(9)2008-502.5 | Parking spaces and access aisles shall have surface slopes not steeper than 1:48 (2%). | Repave the parking spaces and access aisle so that surface slopes are not steeper than 2%. | After Hurricane Sandy, the concrete sidewalk heaved above the asphalt parking and it became necessary to gently slope the top of the access aisle to meet the compliant curb ramp. The cross slope of the access aisle at the left of the curb ramp is 4% The cross slope off the access aisle at the right of the curb ramp is 1.5%. Slightly grading the pavement between access aisle and concrete is permitted by § 202.3, Exception 1 of the 2010 ADA Standards that |

5

**United Spinal Association**

United Spinal Association Response to Plaintiff's November 18th Inspection Report
April 14, 2015

6

| | | | | | provides an exception where compliance with applicable requirements is *technically infeasible*, the *alteration* shall comply with the requirements to the maximum extent feasible. Technically Infeasible is defined as an *alteration* that has little likelihood of being accomplished because existing *site constraints* prohibit modification or *addition* of elements, spaces, or features that are in full and strict compliance with the minimum requirements. |
|---|---|---|---|---|---|

![United Spinal Association]

United Spinal Association Response to Plaintiff's November 18th Inspection Report
April 14, 2015



**2 spaces labeled as accessible at Dunkin Donuts/Baskin Robbins**

| 008 | 2010-502.4 1991-4.1.3(9) 2008-502.5 | Running slope of 5.3% were measured at the access aisles at the location where the access aisle meets the curb ramp. Cross slopes of 4.0% were measured at the access aisle at the location where the access aisle meets the left flair of the curb ramp. Cross slopes of 6.7% were measured at the location where the access aisle meets the right flair of the curb ramp. | Parking spaces and access aisles shall have surface slopes not steeper than 1:48 (2%). | Repave the parking spaces and access aisle so that surface slopes are not steeper than 2%. | After Hurricane Sandy, the concrete sidewalk heaved above the asphalt parking and it became necessary to gently slope the top of the access aisle to meet the compliant curb ramp. The cross slope of the access aisle at the left of the curb ramp is 1.3% The cross slope of |
|---|---|---|---|---|---|

7



United Spinal Association

United Spinal Association Response to Plaintiff's November 18th Inspection Report
April 14, 2015

8

the access aisle at the right of the access aisle is 3.5%

Slightly grading the pavement between access aisle and concrete is permitted by § 202.3, Exception 1 of the 2010 ADA Standards that provides an exception where compliance with applicable requirements is *technically infeasible*, the *alteration shall comply with the requirements to the maximum extent feasible.* Technically Infeasible is defined *as an alteration that has little likelihood of being accomplished because existing site constraints prohibit modification or addition of elements, spaces, or features that are in full and strict compliance with the*

United Spinal Association Response to Plaintiff's November 18th Inspection Report
April 14, 2015

minimum requirements.